THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT
HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A
SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE
OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT
HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE
STATEMENT MAY BE REVISED PRIOR TO THE COURT'S APPROVAL OF THE
DISCLOSURE STATEMENT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Ziff Davis Media Inc., et al.,[1] | ) | |
| | ) | Case No. 08-10768 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

**THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
DATED AS OF MAY 6, 2008**

David Neier (DN 5391)
Carey D. Schreiber (CS 3896)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York  10166
Telephone:  (212) 294-6700
Facsimile: (212) 294-4700

Mark K. Thomas (admitted *pro hac vice*)
Daniel J. McGuire (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700

Dated:  May 6, 2008

---

[1]     The Debtors in these cases include:  Ziff Davis Media Inc.; Ziff Davis Development Inc.; Ziff Davis
Holdings Inc.; Ziff Davis Intermediate Holdings Inc.; Ziff Davis Internet Inc.; Ziff Davis Publishing Inc.;
and Ziff Davis Publishing Holdings Inc.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED MAY 6, 2008 FILED BY ZIFF DAVIS MEDIA INC., ZIFF DAVIS DEVELOPMENT INC., ZIFF DAVIS HOLDINGS INC., ZIFF DAVIS INTERMEDIATE HOLDINGS INC., ZIFF DAVIS INTERNET INC., ZIFF DAVIS PUBLISHING INC., AND ZIFF DAVIS PUBLISHING HOLDINGS INC., DEBTORS AND DEBTORS-IN-POSSESSION, (AS SUBSEQUENTLY AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN").  THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, AND THE PLAN SUPPLEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF ANY OF THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER

LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

[Balance of Page Intentionally Left Blank]

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................1

II.  OVERVIEW OF THE PLAN ......................................................................................3

    A.    General Structure of the Plan.................................................................................4
    B.    Summary of Treatment of Claims and Interests under the Plan ............................5

III.  PLAN VOTING INSTRUCTIONS AND PROCEDURES ...........................................13

    A.    Notice to Holders of Claims and Interests ...........................................................13
    B.    Voting Rights........................................................................................................13
    C.    Solicitation Materials...........................................................................................14
    D.    Voting Procedures, Ballots and Voting Deadline .................................................15
    E.    Confirmation Hearing and Deadline for Objections to Confirmation ...................16

IV.  GENERAL INFORMATION CONCERNING THE DEBTORS....................................17

    A.    Overview of Business Operations.........................................................................17
    B.    Description of the Debtors' Business Operations..................................................17
    C.    Sale of the Debtors' Enterprise Group..................................................................18
    D.    Organizational Structure .......................................................................................19
    E.    Pre-Confirmation Management and Employees.....................................................19
        1.    Existing Board of Directors ....................................................................19
        2.    Existing Executive Officers ....................................................................20
        3.    Employees / Labor Relations ..................................................................20
        4.    Existing Compensation and Benefits ......................................................21
    F.    Pre-Confirmation Capital Structure of the Company ...........................................23
        1.    Prepetition Equity ..................................................................................23
        2.    Prepetition Secured Notes.......................................................................25
        3.    Prepetition Unsecured Notes...................................................................26
    G.    Summary of Assets ...............................................................................................27
    H.    Historical Financial Information...........................................................................27
    I.    Events Leading to Commencement of the Chapter 11 Cases ................................27
    J.    Decreasing Demand for Technology and Videogame Print Publications .............28
    K.    The Debtors' Significant Leverage and Termination of the Forbearance
        Agreement.............................................................................................................28
    L.    Plan Negotiations; Consensual Plan Efforts .........................................................30

V.  THE CHAPTER 11 CASES .........................................................................................32

    A.    Continuation of Business; Stay of Litigation........................................................32
    B.    First Day Motions .................................................................................................32
    C.    Retention of Professionals ....................................................................................33
    D.    Creditors' Committee............................................................................................33
    E.    Authorization to Use Cash Collateral of Existing Lenders....................................33
    F.    Postpetition and Post Confirmation Funding.........................................................35

VI.  SUMMARY OF THE PLAN OF REORGANIZATION ...............................................35

| | A. | Overall Structure of the Plan | 35 |
|---|---|---|---|
| | B. | Substantive Consolidation | 36 |
| | C. | Reorganized Capital Structure Created by Plan | 36 |
| | D. | Classification and Treatment of Claims and Interests | 37 |
| | | 1. Treatment of Unclassified Claims under the Plan | 38 |
| | | 2. Treatment of Classified Claims and Interests under the Plan | 40 |
| | E. | Reservation of Rights Regarding Claims | 42 |
| | F. | Allowed Claims, Distribution Rights and Objections to Claims | 42 |
| | | 1. Allowance Requirement | 42 |
| | | 2. Date of Distribution | 43 |
| | | 3. Making of Distributions | 43 |
| | | 4. Objection Procedures | 44 |
| | G. | Disposition of Executory Contracts and Unexpired Leases | 44 |
| | | 1. Contracts and Leases Deemed Assumed | 44 |
| | | 2. Cure with Respect to Assumed Contracts and Leases | 45 |
| | | 3. Rejection Damages | 46 |
| | | 4. Compensation and Benefit Programs | 46 |
| | H. | Revesting of Assets; Release of Liens | 46 |
| | I. | Post-Consummation Corporate Structure, Management and Operation | 46 |
| | | 1. Continued Corporate Existence | 46 |
| | | 2. Post-Consummation Governance Documents | 47 |
| | | 3. Cancellation of Old Securities and Agreements | 47 |
| | | 4. Officers and Directors of Reorganized Debtors | 48 |
| | | 5. New Management Incentive Plan | 48 |
| | | 6. Funding of Reorganized Debtors | 48 |
| | | 7. Exemption from Certain Transfer Taxes | 48 |
| | | 8. Corporate Action | 49 |
| | J. | Confirmation and/or Consummation | 49 |
| | | 1. Requirements for Confirmation of the Plan | 49 |
| | | 2. Conditions to Confirmation Date and Effective Date | 51 |
| | K. | Releases, Discharge, Injunctions, Exculpation and Indemnification | 52 |
| | | 1. Releases by Debtors in Favor of Third Parties | 52 |
| | | 2. Releases by Creditors of Claims Against Third Parties | 52 |
| | | 3. Discharge and Discharge Injunction | 53 |
| | | 4. Exculpation Relating to Chapter 11 Cases | 54 |
| | | 5. Post-Effective Date Indemnifications | 54 |
| | L. | Preservation of Rights of Action | 54 |
| | M. | Retention of Jurisdiction | 55 |
| | N. | Amendment, Alteration and Revocation of Plan | 58 |
| | O. | Plan Implementation Documents | 58 |
| VII. | | CERTAIN RISK FACTORS TO BE CONSIDERED | 59 |
| | A. | General Considerations | 59 |
| | B. | Certain Bankruptcy Considerations | 59 |
| | C. | Claims Estimations | 60 |
| | D. | Conditions Precedent to Consummation | 60 |
| | E. | Inherent Uncertainty of Financial Projections | 60 |

| | | | |
|---|---|---|---|
| | F. | Certain Risk Factors Relating to Securities to be Issued Under the Plan | 61 |
| | | 1. No Current Public Market for Securities | 61 |
| | | 2. Restrictions on Transfer | 62 |
| | | 3. Potential Dilution Caused by Options or Warrants | 62 |
| | | 4. Dividends | 63 |
| | | 5. Change of Control | 63 |
| | G. | Competition | 63 |
| | H. | Cyclicality | 63 |
| | I. | Reliance on Key Personnel | 63 |
| | J. | Debt Service | 63 |
| | K. | Litigation | 64 |
| | L. | Certain Tax Considerations | 64 |
| | M. | Customer Concentration | 64 |
| | N. | Post-Emergence Leverage | 64 |
| VIII. | | APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS | 64 |
| | A. | Offer and Sale of New Securities Pursuant to the Plan: Bankruptcy Code Exemption from Registration Requirements | 64 |
| | B. | Subsequent Transfers of New Securities | 65 |
| IX. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 67 |
| | A. | Certain U.S. Federal Income Tax Consequences of the Plan | 67 |
| | B. | U.S. Federal Income Tax Consequences to Certain Debtors | 68 |
| | | 1. Cancellation of Indebtedness Income | 68 |
| | | 2. Utilization of NOLs and Net Unrealized Built-in Losses | 69 |
| | | 3. U.S. Federal Alternative Minimum Tax | 70 |
| | | 4. Accrued Interest | 70 |
| | C. | U.S. Federal Income Tax Consequences to Claim Holders | 71 |
| | | 1. Holders of Senior Secured Note Claims and MHR Note Claims (Class 4) | 71 |
| | | 2. Holders of Subordinated Note Claims and Stub Note Claims (Class 5) | 74 |
| | | 3. Holders of General Unsecured Claims and Convenience Class Claims (Classes 6 and 7) | 76 |
| | D. | Other Tax Matters | 76 |
| | | 1. Information Reporting and Backup Withholding | 76 |
| | | 2. Importance of Obtaining Professional Tax Assistance | 77 |
| X. | | FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS | 77 |
| | A. | Feasibility of the Plan | 77 |
| | B. | Acceptance of the Plan | 79 |
| | C. | Best Interests Test | 79 |
| | D. | Liquidation Analysis | 80 |
| | E. | Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation | 81 |
| | F. | Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative | 81 |

XI.    ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION OF THE PLAN ............................................................................................................................82

    A.    Alternative Plan(s) of Reorganization ................................................82
    B.    Liquidation under Chapter 7 or Chapter 11 ........................................82

XII.    THE SOLICITATION; VOTING PROCEDURES.........................................83

    A.    Parties in Interest Entitled to Vote ....................................................83
    B.    Classes Entitled to Vote to Accept or Reject the Plan .........................83
    C.    Solicitation Order.............................................................................84
    D.    Waivers of Defects, Irregularities, Etc................................................84
    E.    Withdrawal of Ballots; Revocation......................................................84
    F.    Voting Rights of Disputed Claimants ..................................................85
    G.    Further Information; Additional Copies ...............................................85

# I.   INTRODUCTION

The debtors and debtors-in-possession in the above-referenced Chapter 11 Cases include the following related companies (collectively, the "<u>Debtors</u>" or the "<u>Company</u>"):

Ziff Davis Media Inc.

Ziff Davis Development Inc.

Ziff Davis Holdings Inc.

Ziff Davis Intermediate Holdings Inc.

Ziff Davis Internet Inc.

Ziff Davis Publishing Inc.

Ziff Davis Publishing Holdings Inc.

The Debtors submit this third amended disclosure statement (as amended, the "<u>Disclosure Statement</u>") pursuant to section 1125 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), for use in the solicitation of votes on the Second Amended Joint Chapter 11 Plan of Reorganization Dated as of May 6, 2008 (as may be amended, the "<u>Plan</u>").  A copy of the Plan is attached hereto as <u>Appendix A</u>.  All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Cases, and the anticipated organization, operations and financing of the Debtors upon successful emergence from chapter 11.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

By order entered on or about May 7, 2008, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information", in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, the Plan Supplement, and all exhibits and appendices hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. In the Debtors' cases, only Claims in Classes 4, 5, 6 and 7 are Impaired by and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims and Interests in Classes 1, 2 and 3 are Unimpaired by the Plan; accordingly, Holders thereof are conclusively presumed to have accepted the Plan. Interests in Class 8, which receive nothing under the Plan, are deemed to have rejected the Plan and the Holders of Interests in Class 8 are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION," AND ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT WITH RESPECT TO THE PRO FORMA FINANCIAL PROJECTIONS SET FORTH IN APPENDIX B ANNEXED HERETO (THE "PROJECTIONS") AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY

HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO, AND DO NOT INTEND TO, UPDATE THE PROJECTIONS; THUS, THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS. FURTHER, THE DEBTORS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE DEBTORS, MAY DIFFER FROM ACTUAL RESULTS.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND THEIR ESTATES. THE PLAN EMBODIES A COMPROMISE AND SETTLEMENT BETWEEN THE DEBTORS, CERTAIN HOLDERS OF OVER 80% OF THE SENIOR SECURED NOTES WHICH WERE ISSUED IN THE FACE AMOUNT OF $205,000,000, THE COMMITTEE AND CERTAIN CREDITORS. PURSUANT TO SUCH COMPROMISE AND SETTLEMENT, THE HOLDERS OF THE SENIOR SECURED NOTE CLAIMS HAVE AGREED TO COMPROMISE SUCH CLAIMS THROUGH RECEIPT OF CASH AS SET FORTH IN THE PLAN, NEW SENIOR SECURED NOTES IN THE ORIGINAL FACE AMOUNT OF $50,000,000 (PLUS THE AMOUNT OF THE CASH FUNDING AT EXIT), AND 90% OF NEW ZIFF DAVIS HOLDINGS COMMON STOCK (SUBJECT TO DILUTION AS SET FORTH IN THE PLAN). THEREFORE, THE PLAN RESULTS IN A SUBSTANTIAL DELEVERAGING OF THE DEBTORS' BALANCE SHEET. THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

## II.     OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Plan designates 6 Classes of Claims and 2 Classes of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The Plan Support Agreement (and the Term Sheet attached thereto as Exhibit A) that forms the basis of the Plan was negotiated among the Debtors, the Ad Hoc Senior Secured Note Holder Group, the Committee, the MHR Note Holders and the other parties thereto. The Debtors believe that the Plan presents the best means currently available for their emergence from Chapter 11.

## A.  General Structure of the Plan

The Plan is structured as a joint plan.  Subject to the terms and conditions specified in the Plan Support Agreement, the members of the Ad Hoc Senior Secured Note Holder Group, the Committee, certain of the Committee Members, Willis Stein and the MHR Note Holders will support the Plan and the members of the Ad Hoc Senior Secured Note Holder Group, each of the Committee Members, Willis Stein and the MHR Note Holders will vote in favor of the Plan; accordingly, it is expected that Classes 4, 5 and 6, each of which is an Impaired Class will vote to accept the Plan.  The Chapter 11 Cases were filed to implement a consensual restructuring which is embodied in the Plan in an efficient, expedient and economical fashion, with minimal disruption to the Debtors' ongoing business operations.

Prior to reaching the compromise embodied in the Plan, certain Senior Secured Note Holders, the Debtors, and certain Subordinated Note Holders, disagreed over, among other things, the enterprise value of the Debtors' businesses.  The Ad Hoc Senior Secured Note Holder Group contended that the Debtors' enterprise value is less than or equal to the amount of the Senior Secured Note Claims and the MHR Note Claims; therefore, they maintained that no other constituent (other than the MHR Note Holders) of the Debtors is entitled to any recovery under the Plan and applicable bankruptcy law.  Certain Subordinated Note Holders contended that the enterprise value of the Debtors greatly exceeds the amount of the Senior Secured Note Claims and the MHR Note Claims, but is less than the aggregate amount of all Claims against the Debtors; therefore, the Subordinated Note Holders contended that they (and the Stub Note Holders) are entitled to a greater percentage of the New Ziff Davis Holdings Common Stock to be issued under the Plan.

The Plan is based upon a compromise between the Debtors, the Committee, certain of the Committee Members, the Ad Hoc Senior Secured Note Holder Group, the MHR Note Holders and Willis Stein, and all parties reserve all their rights regarding valuation issues if the Plan is not confirmed.  As a result of the compromise, the Debtors anticipate that there will not be a valuation hearing in connection with Plan confirmation.

As of the Petition Date, the Debtors' secured bond debt totaled approximately $242 million.  As of the Petition Date, the Debtors' subordinated, unsecured bond debt totaled approximately $186 million.  As of the Petition Date, the Debtors' unsecured trade debt totaled approximately $12.3 million (exclusive of rejection damage claims).

Under the Plan, Holders of Allowed Class 4 Claims will receive (i) their pro rata share of New Senior Secured Notes in an initial principal amount of $50 million (plus the Cash Funding at Exit), (ii) their pro rata share of Cash (except for cash in operating accounts and the Cash Funding at Exit), (iii) their pro rata share of 90% of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants), and (iv) the proceeds of the Indemnity Escrow and other funds that may be paid to the Debtors in connection with the Enterprise Sale.

Holders of Allowed Class 5 Claims will receive their pro rata share of 10% of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants) and the Warrants exercisable into shares of New Ziff Davis Holdings Common Stock representing 5% of the shares of New Ziff

Davis Holdings Common Stock to be issued on the Effective Date, each of which shall entitle the holder to purchase from Reorganized Ziff Davis Holdings one fully paid and non assessable share of New Ziff Davis Holdings Common Stock at the price per share that implies a full recovery for the Senior Secured Note Holders and the MHR Note Holders, including both principal and interest at the contractual default rate through the Effective Date. The Plan also provides: (a) a pro rata Cash distribution to Class 6 Holders of General Unsecured Claims of $1,250,000; and (b) a Cash distribution to Holders of Class 7 Convenience Class Claims.

The following are certain additional material terms of the Plan:

- The Debtors will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of chapter 11 for the benefit of their creditors, customers, suppliers and employees.

- Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, allowed Miscellaneous Secured Claims, Allowed Miscellaneous Priority Claims, and Subsidiary Interests will be Unimpaired by the Plan or will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the Holders of such Claims.

- Old Ziff Davis Holdings Common Stock and Interests will be cancelled.

## B.     Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtors under the Plan. For certain Classes of Claims, estimated percentage recoveries also are set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including (where not Allowed by the Plan) the amount of Allowed Claims in each Class and the estimated value ascribed to the New Senior Secured Notes and the New Ziff Davis Holdings Common Stock and Warrants to be issued under the Plan.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Classes 4, 5, 6 or 7 will actually be realized by the Holders of Allowed Claims in such Classes.

The Debtors are not able to predict the market value of the New Ziff Davis Holdings Common Stock as of or after the Effective Date. The market values of securities issued under a plan of reorganization are subject to many unforeseeable circumstances. Such securities may be valued in the marketplace at various prices because of a number of factors, including, but not limited to, those discussed in Article VII.

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Unclassified — Administrative Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $13,796,000 | An Administrative Claim is a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary postpetition cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c) of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Collateral Trustee pursuant to the Cash Collateral Order.<br><br>Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for therein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (a) liabilities, accounts payable or other |

CHI:2085584.5

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Claims or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date and (b) contractual liabilities including those arising under loans or advances to the Debtors (including the Senior Secured Notes Indenture, the Note Purchase Agreement, the Subordinated Notes Indenture and the Stub Notes Indenture), whether or not incurred in the ordinary course of business of the Debtors subsequent to the Petition Date, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto. |
| | Administrative Claims are not classified and are treated as required by the Bankruptcy Code.  The Holders of such Claims are not entitled to vote on the Plan. |
| | Estimated Percentage Recovery: 100% |
| **Unclassified — Priority Tax Claims** <br><br> Estimated Aggregate Allowed Amount:  Approximately $100,000 | The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code. |
| | Under the Plan, Priority Tax Claims are Unimpaired. |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Priority Tax Claims are treated in accordance with sections 507(a)(8) and 1129(a)(9)(C) of the Bankruptcy Code. Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order. The Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |

CHI:2085584.5

| Type of Claim or Interest | Description and Treatment under Plan |
| --- | --- |
| **Class 1 — Miscellaneous Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Less than $100,000 | Class 1 consists of Miscellaneous Secured Claims, which are Secured Claims other than the Senior Secured Note Claims and the MHR Note Claims.<br><br>Class 1 Miscellaneous Secured Claims are Unimpaired. Each Holder of an Allowed Class 1 Miscellaneous Secured Claim shall receive, in the sole discretion of the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim on or as soon as practicable after the later of (i) the Effective Date and (ii) the date that such Miscellaneous Secured Claim becomes Allowed; and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class 1 Miscellaneous Secured Claim; (b) treatment such that such Miscellaneous Secured Claim is Reinstated; (c) the Property securing such Miscellaneous Secured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2 — Miscellaneous Priority Claims**<br><br>Estimated Aggregate Allowed Amount: Less than $20,000 | Class 2 consists of Miscellaneous Priority Claims, which are Claims entitled to priority treatment under section 507 of the Bankruptcy Code other than Priority Tax Claims or Administrative Claims.<br><br>Under the Plan, Class 2 Miscellaneous Priority Claims are Unimpaired. Each Holder of an Allowed Class 2 Miscellaneous Priority Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class 2 Claim becomes Allowed and (iii) a date agreed to by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, and the Holder of such Class 2 Miscellaneous Priority Claim; or (b) such other treatment on |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Class 2 Priority Claims representing (a) liabilities, accounts payable or other Claims, liabilities or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date and (b) contractual liabilities including those arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business of the Debtors subsequent to the Petition Date, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.<br><br>Estimated Percentage Recovery: 100% |
| **Class 3 — Subsidiary Interests** | Class 3 consists of any Debtor's Interests in any other Debtor.<br><br>Under the Plan, Class 3 Interests are Unimpaired. Each Holder of an Interest in Class 3 shall retain such Interest and its respective share or shares of common stock of the Subsidiary Debtors representing such Interest, but such Holder shall receive no distribution under the Plan on account of such Interest.<br><br>Estimated Percentage Recovery: 100% |
| **Class 4 — Senior Secured Note Claims and MHR Note Claims**<br><br>Estimated Aggregate Allowed Amount of Senior Secured and MHR Note Claims as of the Petition Date:<br><br>Approximately $242,554,647 plus interest accruing on and after the Petition Date through the Effective Date at the contractual default rate set forth in the Senior Secured Notes Indenture and Note Purchase Agreement, as applicable. | Class 4 consists of Senior Secured Note Claims arising under or in connection with the Senior Secured Notes Indenture and the MHR Note Claims arising under the Note Purchase Agreement.<br><br>Under the Plan, Class 4 Senior Secured Note Claims and MHR Note Claims are Impaired. In addition to the Adequate Protection provided to the Holders of Class 4 Claims and any orders of the Bankruptcy Court, on the Effective Date, the Holders of Class 4 Claims will receive the following treatment in full satisfaction, settlement, release, extinguishment and discharge of such Claims: (a) their pro rata share of the New Senior Secured Notes; (b) their pro rata share of all Cash of the Debtors (except for Cash in the Debtors' operating accounts and the Cash Funding at Exit |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | which shall be retained by the Reorganized Debtors to fund operations and working capital needs); (c) their pro rata share of ninety percent (90%) of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants); and (d) their pro rata share of the proceeds of the Indemnity Escrow.<br><br>Estimated Percentage Recovery: Uncertain at this time |
| **Class 5 — Subordinated Note Claims and Stub Note Claims**<br><br>Estimated Aggregate Allowed Amount of Subordinated Note Claims and Stub Note Claims: Approximately $186,389,244 | Class 5 consists of Subordinated Note Claims arising under the Subordinated Notes Indenture and Stub Note Claims arising under the Stub Note Indenture.<br><br>Under the Plan, Class 5 Claims are Impaired. On the Effective Date, each Holder of an Allowed Class 5 Claim will receive in full satisfaction, settlement, release, extinguishment and discharge of such Claims its *pro rata* share of ten percent (10%) of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants) and the Warrants exercisable into shares of New Ziff Davis Holdings Common Stock representing 5% of the shares of New Ziff Davis Holdings Common Stock to be issued on the Effective Date. Each Warrant shall entitle the holder to purchase from Reorganized Ziff Davis Holdings one fully paid and non assessable share of New Ziff Davis Holdings Common Stock at the price per share that implies a full recovery for the Holders of the Senior Secured Note and MHR Note Claims (including principal and interest at the contractual default rate through the Effective Date).<br><br>Estimated Percentage Recovery: Uncertain at this time |
| **Class 6 — General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $14,000,000 | Class 6 consists of General Unsecured Claims, which are all Allowed Claims excluding Administrative Claims, Priority Tax Claims, Professional Fee Claims, Miscellaneous Secured Claims, Miscellaneous Priority Claims, Senior Secured Note Claims, MHR Note Claims, Subordinated Note Claims, Stub Note Claims, and Convenience Class Claims. |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Under the Plan, Class 6 General Unsecured Claims are Impaired. On the later of (i) the Effective Date or as soon thereafter as is practicable, and (ii) the date such Claim is Allowed, each Holder of an Allowed Class 6 Unsecured Claim shall receive its *pro rata* share (determined by dividing such Holder's Allowed General Unsecured Claim by the sum of all Allowed General Unsecured Claims) of $1,250,000. |
| | Estimated Percentage Recovery: 9% |
| **Class 7 — Convenience Class Claims** <br><br> Estimated Aggregate Allowed Amount: <br><br> Approximately $915,000 | Class 7 consists of Convenience Class Claims, which are Allowed unsecured claims for which either of the following applies: (a) such Claim is in an amount less than or equal to $10,000; or (b) such Claim is in an amount greater than $10,000 but less than $50,000 and the Holder of such Claim has elected to have such Claim treated as a Convenience Class Claim in the amount of $10,000 by so indicating on the Ballot submitted to vote such Claim. <br><br> Under the Plan, Class 7 Convenience Class Claims are Impaired. On the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Class 7 Convenience Class Claim shall receive 50% of the Allowed Amount of such Claim (or such reduced Claim) in Cash. <br><br> Estimated Percentage Recovery: 50% |
| **Class 8 — Old Ziff Davis Holdings Common Stock and Interests** | Class 8 consists of Old Ziff Davis Holdings Common Stock and Interests. Such Interests include, but are not limited to, all series of common and preferred stock, and all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of Old Ziff Davis Holdings Common Stock or Interests. <br><br> Under the Plan, Class 8 Old Ziff Davis Holdings Common Stock and Interests are Impaired. Holders of Class 8 Old Ziff Davis Holdings Common Stock and Interests shall not receive or retain any property under the Plan on account of such Old Ziff Davis Holdings Common Stock and Interests. On the Effective Date, all Old Ziff Davis Holdings Common Stock and Interests shall be cancelled. <br><br> Estimated Percentage Recovery: 0% |

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS <u>STRONGLY</u> <u>RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.  THE AD HOC SENIOR SECURED NOTE HOLDER GROUP ALSO URGES YOU TO VOTE TO ACCEPT THE PLAN.  THE COMMITTEE RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

## III.  PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.  Notice to Holders of Claims and Interests**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.  No such information will be relied upon in making a determination to vote to accept or reject the Plan.

**B.  Voting Rights**

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan.  In these Chapter 11 Cases, under the Plan, only Holders of Claims in Classes 4, 5, 6 and 7 are entitled to vote on the Plan.  Claims and Interests in other Classes are either (i) Unimpaired and their Holders are deemed to have accepted the Plan, or (ii) receiving no distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Claims in the voting Classes are entitled to vote on the Plan. Holders of Allowed Claims in the voting Classes are entitled to vote the amount of their Allowed Claim. A Claim which is unliquidated, contingent or disputed (and therefore not an Allowed Claim) is entitled to cast a ballot in the amount of $1.00, unless and until the Claim amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors. However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.

Holders of Claims in the voting Classes may vote on the Plan only if they are Holders as of the Distribution Record Date, which Distribution Record Date is May 6, 2008.

## C. Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through their voting agent BMC Group Inc. (the "Voting Agent" or "BMC"), will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

**If by regular mail:**

BMC GROUP INC.
P.O. BOX 926
EL SEGUNDO, CA 90245-0926
ATTENTION: ZIFF DAVIS VOTING AGENT

**If by overnight courier or hand delivery:**

BMC GROUP INC.
444 N. NASH STREET
EL SEGUNDO, CA 90245
ATTENTION: ZIFF DAVIS VOTING AGENT

**If by telephone, for U.S. callers only:**

ZIFF DAVIS VOTING AGENT
(888) 909-0100

**If by telephone, for international callers:**

ZIFF DAVIS VOTING AGENT
(310) 256-3285

**D.      Voting Procedures, Ballots and Voting Deadline**

After reviewing the Plan, this Disclosure Statement and the letter from the Committee in the Plan included with the Disclosure Statement to holders of Class 5, 6 and 7 Claims, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot.  You should complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.  In addition, if your ballot is for a Class 6 General Unsecured Claim in an amount greater than $10,000 and less than $50,000, you are asked to indicate whether you elect to reduce your Claim to $10,000 and have it treated as a Class 7 Convenience Class Claim.

Each ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, and in electing whether or not to be treated in Class 7, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN JUNE 9, 2008, AT 5:00 P.M. EASTERN TIME (THE "<u>VOTING DEADLINE</u>") BY THE FOLLOWING:

**If by regular mail:**

BMC GROUP INC.
P.O. BOX 926
EL SEGUNDO, CA 90245-0926
ATTENTION:  ZIFF DAVIS VOTING AGENT

**If by overnight courier or hand delivery:**

BMC GROUP INC.
444 N. NASH STREET
EL SEGUNDO, CA 90245
ATTENTION:  ZIFF DAVIS VOTING AGENT

UNLESS      OTHERWISE      PROVIDED      IN      THE      INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED.  BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED.  BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID.  DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are available to be downloaded free of charge on the Ziff Davis Media Inc., *et al.* case website: www.bmcgroup.com/ziffdavis. If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

**If by regular mail:**

BMC GROUP INC.
P.O. BOX 926
EL SEGUNDO, CA 90245-0926
ATTENTION: ZIFF DAVIS VOTING AGENT

**If by overnight courier or hand delivery:**

BMC GROUP INC.
444 N. NASH STREET
EL SEGUNDO, CA 90245
ATTENTION: ZIFF DAVIS VOTING AGENT

**If by telephone, for U.S. callers only:**

ZIFF DAVIS VOTING AGENT
(888) 909-0100

**If by telephone, for international callers:**

ZIFF DAVIS VOTING AGENT
(310) 256-3285

For further information and general instruction on voting to accept or reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E.      Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for June 17, 2008 at 10:00 a.m. Eastern time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (i) be in writing,

(ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (iv) state with particularity the basis and nature of any objection to the Plan and (v) be filed, together with proof of service, with the Court electronically in accordance with this Court's Order Establishing Certain Notice, Case Management, and Administrative Procedures entered on March 10, 2008 (the "Case Management Order") and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before **4:00 p.m. (prevailing Eastern time) on June 9, 2008**. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## IV.    GENERAL INFORMATION CONCERNING THE DEBTORS

### A.    Overview of Business Operations

Ziff Davis Media is a wholly-owned indirect subsidiary of Ziff Davis Holdings, a Delaware corporation.  Ziff Davis Holdings is the ultimate parent of a group of affiliated companies that includes each of the Debtors and foreign non-Debtor affiliates (collectively, the "Company").  Ziff Davis Holdings is majority owned by various investment funds managed by Willis Stein, a private equity firm.

Ziff Davis Holdings was formed in 2000 by Willis Stein and its other shareholders to acquire certain publishing assets.  In April 2000, Ziff Davis Media through Ziff Davis Holdings acquired the assets comprising the publishing division of ZD Inc., an unrelated company, for approximately $780 million.  Substantially all of the Company's operations are conducted through one Debtor, Ziff Davis Media.

### B.    Description of the Debtors' Business Operations

The Company is an integrated media company serving the technology and videogame markets.  The Company provides comprehensive labs-based review, purchasing recommendations, and analysis of certain technology and videogame products to over 26 million individuals each month through their portfolio of 16 websites, three (3) award-winning magazines, and direct marketing services.  The Company manages its business through two business segments:  the "PCMag Network" and the "1UP Network."

PCMag Network.  The Company's PCMag Network provides technology purchasing information and recommendations specifically targeted to individual consumer and small and medium business technology purchasers.  The Company's PCMag Network reaches millions of technology purchasers annually through its monthly publication of *PC Magazine*, its maintenance of certain consumer-oriented websites, including principally pcmag.com and extremetech.com and its annual consumer electronics convention.

The PCMag Network through its print publications and websites provides extensive and detailed technology product reviews as a result of conducting labs-based product analysis and testing.  Upon completion of such analysis and testing, the Company publishes its testing results and makes recommendations to its subscribers and other readers.  Additionally, through its publications, the PCMag Network assists individual and small and medium business technology purchasers in obtaining the best possible price and service options in connection with their technology purchases.

The Company's revenues are comprised primarily of advertising, subscription and circulation revenues.  As a result, the Company's revenues are dependent, in part, on the ability

of the PCMag Network to provide technology product information to the highest possible number of individual, small and medium business consumers.

As of December 2007, the Debtors determined that approximately 6.7 million individuals review the PCMag Network's websites each month. Further, *PC Magazine* maintains an average readership per issue of approximately 4.4 million individuals. Approximately 60% of the Company's total revenues from continuing businesses in 2007, or $46 million, were obtained from the operations of the PCMag Network.

<u>1UP Network</u>. The Company's 1UP Network maintains print publications and websites that provide videogame users with videogame product reviews and news regarding the videogame industry. Additionally, in connection with their websites, the 1UP Network allows readers to enter and form discussions groups and other social networking forums, thereby providing videogame users with a community medium through which such users can obtain and discuss the latest videogame products.

The Company's 1UP Network has reached millions of videogame users through its annual print publications of *Electronic Gaming Monthly* and *Games for Windows*, and related Internet sites, consisting primarily of 1UP.com and Filefront.com. As of December 2007, the Debtors determined that approximately 22.9 million individuals review the 1UP Network's websites each month. Further, the aggregate (unduplicated) readership per issue for the two print publications is approximately 6.5 million individuals.

The readership of the 1UP Network's publications consists primarily of males between the ages of 18 and 34, which represent a significant advertising demographic. Accordingly, the 1UP Network's publications offer advertisers access to this significant advertising demographic. As this demographic prefers to obtain its information from Internet sources, the Company has been able to increase the advertising revenues generated from the 1UP Network's websites. The total revenues generated by the 1UP Network in 2007 were approximately $26 million.

## C. Sale of the Debtors' Enterprise Group

Prior to the summer of 2007, the Company managed a third business segment: the "Enterprise Group." The Enterprise Group provided extensive analysis, proprietary research, and evaluations of technology products and systems that impact company-wide information technology systems and operations. The Enterprise Group published three (3) magazines and maintained 17 websites that served as resources for senior-level corporate technology executives.

As described more fully below, prior to the Petition Date, the Debtors experienced a decline in their earnings and liquidity due to certain operational difficulties and high debt costs. As a result, in an effort to obtain additional liquidity in June 2007, the Debtors entered into a purchase and sale agreement under which the Debtors agreed to sell the Enterprise Group to Enterprise Media Group, Inc., an unrelated party formed by Insight Venture Partners, for an aggregate cash purchase price of approximately $150 million. This transaction closed on July 31, 2007. The proceeds at closing were approximately $125.1 million (net of fees and expenses). In August 2007, the Company used some of these proceeds to make a $6.4 million scheduled interest payment on the Senior Secured Notes. The current balance of the sale proceeds in the Segregated Account is approximately $20,489,247.

Since the sale of the Enterprise Group, the Company has continued to provide technology and videogame product review services through the PCMag Network and the 1UP Network.

## D. Organizational Structure

Ziff Davis Holdings, a Delaware corporation, is a holding company, which owns 100% of Ziff Davis Intermediate Holdings, a Delaware corporation. Ziff Davis Intermediate Holdings in turn owns 100% of Ziff Davis Media, the Debtors' primary operating entity. The corporate structure of the Debtors and their non-Debtor affiliate is reflected in Appendix C.

## E. Pre-Confirmation Management and Employees

1. Existing Board of Directors

The Debtors' boards of directors oversee the Debtors' management, review their long-term strategic plans and exercise direct decision making authority in key areas. For information on the post-Effective Date Board of Directors, see Section VI.I.4 hereof. Set forth below is information with respect to the members of each Debtors' current Board of Directors (each, a "Board" and collectively, the "Boards"):

(a) Ziff Davis Holdings and Ziff Davis Media

- *Robert F. Callahan*
- *John R. Willis*
- *Paul M. Mayfield*
- *Susan E. Alderton*
- *Avy H. Stein*

(b) Ziff Davis Intermediate Holdings, Ziff Davis Development Inc., Ziff Davis Internet Inc., Ziff Davis Publishing Holdings Inc., Ziff Davis Publishing Inc.

- *Jason Young*

The only non-employee director receiving compensation for service on the Boards is Susan E. Alderton, who is paid $50,000 per year for service on the Boards of Ziff Davis Holdings and Ziff Davis Media. Pursuant to certain agreements, Messrs. Stein, Willis and Mayfield were appointed to the Boards by Willis Stein and certain of its affiliates. Those entities with the power to appoint directors are Holders of certain of the Ziff Davis Holdings equity described below.

The Board of Ziff Davis Holdings has two standing committees:

(a) The Audit Committee. The Audit Committee has consisted of Susan E. Alderton and Paul M. Mayfield. The Audit Committee has been responsible, for among other things, the appointment, compensation, retention and oversight of the independent auditors, reviewing with the management and the independent auditors the Company's operating results and resolving any disagreements between the management and the auditors, establishing procedures to handle complaints regarding the Company or its accounting, considering the adequacy of the internal accounting and control procedures of the Debtors, and authorizing in advance the audit and non-audit services to be performed by the independent auditors.

(b)     The Compensation Committee.  The Compensation Committee has consisted of Robert F. Callahan and Avy H. Stein.  The Compensation Committee has been responsible for the review and recommendation of compensation arrangements for directors and officers, for the approval of such arrangements for other senior level employees, and for the administration of certain benefit and compensation plans of the Debtors.

2.     Existing Executive Officers

Set forth below are each of the Debtors' current executive officers:

(a)     Ziff Davis Holdings and Ziff Davis Media

- *Robert Callahan, Chairman of the Board*
- *Jason Young, Chief Executive Officer*
- *Mark Moyer, Chief Restructuring Officer*
- *Neil Glass, Chief Financial Officer*
- *Shirin Malkani, General Counsel*

(b)     Ziff Davis Development Inc., Ziff Davis Internet Inc., Ziff Davis Publishing Holdings Inc. and Ziff Davis Publishing Inc.

- *Jason Young, Chief Executive Officer*
- *Mark Moyer, Chief Restructuring Officer*
- *Neil Glass, Chief Financial Officer*
- *Shirin Malkani, General Counsel*

(c)     Ziff Davis Intermediate Holdings Inc.

- *Mark Moyer, Chief Restructuring Officer*
- *Neil Glass, Chief Financial Officer*
- *Shirin Malkani, General Counsel*

3.     Employees / Labor Relations

As of the Petition Date, the Company had more than 260 employees, of whom approximately 258 were full-time employees, and approximately eight (8) were part-time employees.  Approximately 8% of the employees are paid on an hourly basis and approximately 92% of employees are paid a salary.  None of the Debtors' employees are unionized.  In addition, the Debtors use the services of certain freelancers and other independent contractors.

The following officers and employees of the Debtors are subject to executive, employment, severance or separation agreements:

- *Norris Boothe*
- *Simon Cox*
- *Neil Glass*
- *Michael Hoffman*

- *Rajesh Jaikera*

- *Beverly Lewis*

- *Shirin Malkani*

- *James McCabe*

- *Mark Moyer*

- *Robyn Peterson*

- *Beth Repeta*

- *James Selden*

- *Michael Smrtic*

- *Stephen Sutton*

- *Lance Ulanoff*

- *Marci Yamaguchi*

- *Jason Young*

4.      Existing Compensation and Benefits

The Company has historically provided a competitive compensation and benefit package to its employees, consistent with its belief that the success of its businesses is dependent to a significant extent upon the efforts and abilities of its employees.

(a)      Severance Practices

Certain of the Company's management and key employees described above are subject to employment agreements containing fixed severance terms.  With respect to employees who do not have an employment agreement, the Company historically has awarded an employee severance pay if employment is terminated for reasons such as a reduction in the work force or job elimination.  In general, employees deemed eligible for severance benefits may receive two (2) weeks base salary for each full year of employment.  The maximum severance benefit for employees without employment agreements is 26 weeks base salary.

(b)      Bonus Plans

(1)      Non-management Sales Incentive Program.  In the ordinary course of business, to incentivize certain non-management employees and to maximize advertising sales which constitute a significant portion of the Debtors' revenue, the Debtors offer a bonus-based sales incentive program (as modified on an annual basis, the "Sales Incentive Program").  Under the Sales Incentive Program, an employee can earn bonuses, in addition to base salary, for a percentage of the revenue that the Debtors recognize generated by that employee's sales of advertising for the Debtors' print publications (the "Print Ad Sales") or websites (the "Online Ad Sales").  Certain employees can also earn bonuses based on the level of new business and existing business, including referrals that result in additional business.  The Sales Incentive Program further provides for certain additional bonuses which will be paid on all sales in-excess of budgeted levels if an employee reaches or exceeds his or her sales goals for the year.

Employees under the Sales Incentive Program receive 100% of the earned standard bonus rate on all net sales on a monthly basis. Any bonuses for Online and Print Ad Sales are paid on the last day of the month following the calendar month of billed advertising.

(2) <u>Annual Management Incentive Program</u>. Approximately 35 employees participate in the annual management incentive target bonus program (as modified on an annual basis, the "<u>Management Incentive Program</u>," together with the Sales Incentive Programs, the "<u>Incentive Programs</u>"), which is open to employees holding certain management positions ranging from editorial content, subscriber circulation, sales, marketing and technology managers. The Management Incentive Program has been in effect since prior to the Debtors' inception in 2000. It is typical of the incentive programs used by other companies in the Debtors' industry to incentivize management. The Management Incentive Program is designed to focus the attention of participants on results that are directly tied to the Debtors' performance and to share in that success by providing financial rewards to selected individuals who make major contributions toward the Debtors' goals. Individual bonus payments are calculated within the discretion of the Debtors' Chief Executive Officer based on the following three (3) factors: (a) a percentage of base salary; (b) the Debtors' overall annual earnings performance compared to the earnings target set at the beginning of each year by the Debtors' board of directors; and (c) each individual's performance as recommended by the Debtors' designated leadership team. The bonus pool available for distribution pursuant to the Management Incentive Program is approved by the Board of Directors of Ziff Davis Media.

Upon completion of the Debtors' financial statements in March of the year following the year in which the Debtors' and the individual's performance is reviewed, the Board of Directors reviews the Debtors' and each eligible bonus participant's performance to determine the incentive bonus amounts, if any, to be paid to each eligible employee.

In addition, certain members of Senior Management described above are subject to employment agreements that provide for base salary and discretionary bonus compensation.

(c) Retirement Plan

The Company maintains a retirement savings plan meeting the requirements of Section 401(k) of the Internal Revenue Code for the benefit of all full-time employees. After six (6) months of service, the Debtors make matching contributions in an amount equal to 50% of the first 4% of the employee's eligible compensation that the employee contributes each pay period.

(d) Postconfirmation Compensation and Benefits

Under the Plan, except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) any officer, director or employee compensation and benefit program that entitled such Persons to acquire any Old Ziff Davis Holdings Common Stock or Interests, (b) executory  contracts or

plans specifically rejected pursuant to the Plan, and (c) executory contracts or plans as have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts. Notwithstanding any other provision of the Plan, any entitlement to acquire Old Ziff Davis Holdings Common Stock or Interests held as of the Effective Date by any officer, director or employee of any of the Debtors, whether automatic or contained in a compensation and benefit program, shall be terminated and any resulting Claims shall be Disallowed. Further, future compensation and benefit decisions will be made by the Boards of Directors of the Reorganized Debtors. Depending upon such decisions, there is no assurance that key employees will continue in the employ of the Reorganized Debtors.

### F.  Pre-Confirmation Capital Structure of the Company

1.  Prepetition Equity

Ziff Davis Holdings' authorized capital stock consists of: (a) 100,000,000 shares of common stock, of which 2,311,049 shares have been issued; (b) 400,000 shares of Series A Redeemable Preferred Stock, of which 329,127.5 shares have been issued; (c) 142,500 shares of Series B Redeemable Preferred Stock, of which 98,285.6 shares have been issued; (d) 7,500 shares of Series C Convertible Preferred Stock, of which 5,172.9 shares have been issued; (e) 100,000 shares of Series D Redeemable Preferred Stock, of which 80,207.3 shares have been issued; and (f) 30,000 shares of Series E Redeemable Preferred Stock, of which 28,526.4 shares have been issued. In addition, it had issued approximately 43,800,000 warrants.

(a)  Redeemable Preferred Stock

*Series A Redeemable Preferred Stock* — The Company is authorized to issue 400,000 shares of series A redeemable preferred stock, $0.01 par value per share, (the "Series A Preferred Stock"). At December 31, 2006 and 2005 there were approximately 329,128 shares issued and outstanding. Prior to March 6, 2002, dividends on the Series A Preferred Stock accrued at a rate of 12% per annum. Commencing on March 6, 2002, dividends on the Series A Preferred Stock have accrued at a rate of 6.5% per annum. Each share of Series A Preferred Stock has that number of votes equal to $1,000 per share, plus all accrued and unpaid dividends, *divided by* $7.50. The Series A Preferred Stock has a liquidation preference of $1,000 per share, plus all accrued and unpaid dividends and a scheduled mandatory redemption date of March 31, 2010. In the event of an initial public offering of the Company's common stock, holders of the Series A Preferred Stock may require the Company, upon written notice, to redeem all or any portion (as specified by such holders) of the outstanding shares of Series A Preferred Stock (plus all accrued and unpaid dividends thereon) at a price of $1,000 per share or convert all or any portion (as specified by such holders) of the outstanding shares of Series A Preferred Stock (plus all accrued and unpaid dividends thereon) into a number of shares of common stock equal to $1,000 per share of Series A Preferred Stock *divided by* the price per share of common stock received by the Company in the initial public offering.

*Series B Redeemable Preferred Stock* — The Company is authorized to issue 142,500 shares of series B redeemable preferred stock, $0.01 par value per share, (the "Series B Preferred Stock"). At December 31, 2006 and 2005 there were approximately 98,286 shares issued and outstanding. Prior to March 6, 2002, dividends on the Series B Preferred Stock accrued at a rate of 12.632% per annum. Commencing on March 6, 2002, dividends on the Series B Preferred Stock have accrued at a rate of 10.85% per annum. Each share of Series B Preferred Stock has that number of votes equal to $1,000 per share, plus all accrued and unpaid

dividends, divided by $7.50. The Series B Preferred Stock has a liquidation preference of $1,000 per share, plus all accrued and unpaid dividends and a scheduled mandatory redemption date of March 31, 2010. In the event of an initial public offering of the Company's common stock, holders of the Series B Preferred Stock may require the Company, upon written notice, to redeem all or any portion (as specified by such holders) of the outstanding shares of Series B Preferred Stock (plus all accrued and unpaid dividends thereon) at a price of $1,000 per share or convert all or any portion (as specified by such holders) of the outstanding shares of Series B Preferred Stock (plus all accrued and unpaid dividends thereon) into a number of shares of common stock equal to $1,000 per share of Series B Preferred Stock *divided by* the price per share of common stock received by the Company in the initial public offering.

*Series C Convertible Preferred Stock* — The Company is authorized to issue 7,500 shares of series C convertible preferred stock, $0.01 par value per share, (the "Series C Preferred Stock"). At December 31, 2006 and 2005 there were approximately 5,173 shares issued and outstanding. The Series C Preferred Stock shall not be entitled to receive any regularly scheduled dividend, however, holders would be entitled to dividends in the amount which would have been paid with respect to the common stock issuable upon conversion of the Series C Preferred Stock, in the event cash dividends be paid upon the Company's common stock. Each share of Series C Preferred Stock has that number of votes equal to $1,000 per share, plus all accrued and unpaid dividends, *divided by* the conversion price of the Series C Preferred Stock (which currently is $0.60 but which may be adjusted from time to time to account for stock splits, subdivisions and other similar events). The Series C Preferred Stock is convertible by the holders thereof at any time into shares of common stock. The number of shares of common stock obtained per share of Series C Preferred Stock will be determined by dividing $1,000, plus all accrued and unpaid dividends, by the conversion price, which currently is $0.60, but which may be adjusted from time to time to account for stock splits, subdivisions and other similar events. The Series C Preferred Stock has a liquidation preference of $1,000 per share, plus all accrued and unpaid dividends and a scheduled mandatory redemption date of March 31, 2010. In the event of an initial public offering of the Company's common stock, holders of the Series C Preferred Stock may require the Company, upon written notice, to redeem all or any portion (as specified by such holders) of the outstanding shares of Series C Preferred Stock (plus all accrued and unpaid dividends thereon) at a price of $1,000 per share or convert all or any portion (as specified by such holders) of the outstanding shares of Series C Preferred Stock (plus all accrued and unpaid dividends thereon) into a number of shares of common stock equal to $1,000 per share of Series C Preferred Stock *divided by* the price per share of common stock received by the Company in the initial public offering.

*Series D Redeemable Preferred Stock* — The Company is authorized to issue 100,000 shares of Series D Preferred Stock. At December 31, 2006 and 2005 there were approximately 80,207 shares issued and outstanding. Dividends on the Series D Preferred Stock accrue at a rate of 22.0% per annum. Each share of Series D Preferred Stock has that number of votes equal to $1,000 per share, plus all accrued and unpaid dividends, *divided by* $7.50. The Series D Preferred Stock has a liquidation preference of $1,000 per share, plus all accrued and unpaid dividends and a scheduled mandatory redemption date on the earlier of (1) March 31, 2010 or (2) the date of the consummation of a change of control of the Company at a price per share of Series D Preferred Stock equal to $1,000, plus all accrued and unpaid dividends thereon. In the event of an initial public offering of the Company's common stock, holders of the Series D Preferred Stock may require the Company, upon written notice, to redeem all or any portion (as

specified by such holders) of the outstanding shares of Series D Preferred Stock (plus all accrued and unpaid dividends thereon) at a price of $1,000 per share or convert all or any portion (as specified by such holders) of the outstanding shares of Series D Preferred Stock (plus all accrued and unpaid dividends thereon) into a number of shares of common stock equal to $1,000 per share of Series D Preferred Stock *divided by* the price per share of common stock received by the Company in the initial public offering.

*Series E Redeemable Preferred Stock* — The Company is authorized to issue 30,000 shares of Series E Preferred Stock. At December 31, 2006 and 2005 there were approximately 28,526 shares issued and outstanding, respectively. Dividends on the Series E Preferred Stock accrue at a rate of 10% per annum. Such dividends will be payable in cash only if declared for payment by the Company's Board of Directors. Each share of Series E Preferred Stock has that number of votes equal to $1,000 per share, plus all accrued and unpaid dividends thereon, *divided by* $7.50. The Series E Preferred Stock has a liquidation preference of $1,000 per share, plus all accrued and unpaid dividends thereon and a scheduled mandatory redemption date on the earlier of (1) March 31, 2010 or (2) the date of the consummation of a change of control of the Company at a price per Series E Preferred Share equal to $1,000, plus all accrued and unpaid dividends thereon. In the event of an initial public offering of the Company's common stock, holders of the Series E Preferred Stock may require the Company, upon written notice, to redeem all or any portion (as specified by such holders) of the outstanding shares of Series E Preferred Stock (plus all accrued and unpaid dividends thereon) at a price of $1,000 per share or convert all or any portion (as specified by such holders) of the outstanding shares of series E preferred stock (plus all accrued and unpaid dividends thereon) into a number of shares of common stock equal to $1,000 per share of Series E Preferred Stock *divided by* the price per share of common stock received by the Company in the initial public offering.

(b)     Common Stock Warrants

The Company has issued approximately 43,800,000 warrants each representing the right to purchase one share of Old Ziff Davis Holdings common stock at an exercise price of $0.001. The warrants may be exercised on any date from and after August 12, 2002 and prior to and including August 12, 2012. Warrants may be exercised by the payment of the exercise price either in cash, other equity securities of Ziff Davis Media or in a "cashless exercise", by tendering other warrants.

For purposes of the Plan, all of the above-described Interests have been classified as Old Ziff Davis Holdings Common Stock and Interests, all of which are Class 8 Interests which are being cancelled under the Plan.

2.     Prepetition Secured Notes

As of the Petition Date, the Company had approximately $500 million in total debt obligations, including approximately $225 million of secured funded debt. The Company's secured funded debt consists of: (a) $205 million in principal amount of Senior Secured Notes, secured by substantially all of the Debtors' assets; and (b) $20 million in principal amount of MHR Notes, secured by substantially all of the Debtors' assets.

In April 2005, the Debtors completed a private placement transaction pursuant to which under that certain indenture dated April 22, 2005 by and among Ziff Davis Media as

issuer, the Company's domestic affiliates as guarantors, and the Senior Secured Indenture Trustee, Ziff Davis Media issued $205 million (principal amount) of Senior Secured Notes at a variable interest rate of 3-month LIBOR plus 6.0% which mature in 2012. The Debtors used the proceeds obtained from the private placement of the Senior Secured Notes to repay the Debtors' prior $405 million senior credit facility (of which $174 million was outstanding) with the remaining balance of approximately $25 million used to fund the Debtors' working capital and investment needs.

In connection with the issuance of the Senior Secured Notes, on April 22, 2005, Ziff Davis Media as issuer, the Company's domestic affiliates (except Ziff Intermediate Holdings) as guarantors, and the Collateral Trustee entered into a first lien security agreement (the "First Lien Security Agreement"). The Debtors' obligations to such holders are secured by valid, binding, enforceable, perfected liens that have priority over any and all other security interests (other than the liens securing the obligations to the MHR Note Holders and certain permitted liens) in substantially all of the Debtors' assets.

Additionally, to obtain further financing for its operations, on February 15, 2007, the Company entered into that certain note purchase agreement by among Ziff Davis Media as issuer, the Company's domestic affiliates (except Ziff Intermediate Holdings) as guarantors, and several purchasers of the notes thereto under which the Company issued an aggregate of $20 million in principal amount of MHR Notes due 2012.

Pursuant to the First Lien Security Agreement, the MHR Notes and guarantees (other than the guarantee of Ziff Davis Holdings) are secured by valid, binding, enforceable, perfected liens that have priority over any and all other security interests (other than the liens securing the obligations to the Senior Secured Note Holders and certain permitted liens) in substantially all of the Debtors' assets. The MHR Notes are secured on an equal and ratable basis with the Senior Secured Notes.

The obligations with respect to the Senior Secured Note Claims and the MHR Note Claims are treated in Class 4 of the Plan.

3.      Prepetition Unsecured Notes

In addition to the Senior Secured Notes and the MHR Notes, prior to the Petition Date, the Debtors also incurred certain unsecured debt obligations. As of the Petition Date, the Company had $186 million of unsecured note obligations. The Company's unsecured note obligations consist of approximately: (a) $152.5 million in principal amount of obligations in connection with the Subordinated Notes due 2009; and (b) $12.3 million in principal amount of 12% Stub Notes due 2010.

On July 21, 2000, pursuant to the Stub Notes Indenture by and among Ziff Davis Media as issuer, the Company's domestic affiliates (other than Ziff Davis Intermediate Holdings) as guarantors, and the Stub Notes Indenture Trustee, Ziff Davis Media issued $250 million of Stub Notes. Under the Stub Notes Indenture, the Stub Notes accrue interest at the per annum rate of 12.0% on a semi-annual basis. The Stub Notes mature in July 2010.

In 2002, in an effort to restructure their debt obligations, Ziff Davis Media issued the Subordinated Notes due 2009 pursuant to the Subordinated Notes Indenture dated as of August 12, 2002 by and among Ziff Davis Media as issuer, the Company's domestic affiliates (other than Ziff Davis Intermediate Holdings) as guarantors, and the Subordinated Notes

Indenture Trustee. Under the Subordinated Notes Indenture, the Subordinated Notes accrue interest in semi-annual periods at the per annum rates of 12.0% to 14.0%.

For the first four years, interest on the Subordinated Notes could be paid, at the Company's option, either in cash or by compounding such interest on the Subordinated Notes, and the Company elected to compound such interest. Commencing in August 2006, the Subordinated Notes accrue 12.0% interest on a cash basis. The first cash interest payment of $9.15 million was made in February 2007. As described below, the Company did not make the cash interest payment due in August 2007.

The Subordinated Notes were issued in connection with a financial restructuring pursuant to which a substantial majority of the holders of the Stub Notes exchanged their Stub Notes for a combination of cash, Subordinated Notes, preferred stock, and warrants to purchase common stock. As a result of the 2002 financial restructuring, the Stub Notes are subordinated to all existing and future senior indebtedness (other than the Subordinated Notes), including the Senior Secured Note Claims and MHR Note Claims.

The obligations with respect to the Subordinated Note Claims and the Stub Note Claims are treated in Class 5 of the Plan.

## G.        Summary of Assets

The Debtors filed Schedules with the Bankruptcy Court that detail the assets owned by each of the Debtors. Such assets include cash on hand, bank accounts and investments, security deposits, insurance policies, stock interests, accounts receivable, intellectual property, vehicles, office equipment, furnishings and supplies, machinery, fixtures, equipment and supplies used in business, inventory, and other items of personal property. The Schedules will provide asset values on a net book basis, which are not reflective of actual values. The Schedules may be reviewed on the Bankruptcy Court electronic case filing system, on the Debtors' case website at www.bmcgroup.com/ziffdavis or during business hours in the offices of the Clerk of the Bankruptcy Court. Information regarding the Debtors' assets is also available in the Liquidation Analysis attached hereto as Appendix D.

## H.        Historical Financial Information

Attached as Appendix E is selected financial data for the Debtors for the annual periods ended December 31, 2006 and December 31, 2007 and for the 2008 period ended March 1, 2008. The financial data as of December 31, 2007 and March 1, 2008 has not yet been audited. Further historical financial information for years 2005 and prior may be obtained from the Company's Annual Reports and Forms 10-K which may be viewed at http://ziffdavis.com/about/investor.

## I.        Events Leading to Commencement of the Chapter 11 Cases

The publishing business of ZD Inc., the Debtors' predecessor, reached its apex in both size and profitability during the Internet-based business boom of the late 1990s. During this period, those publishing assets generated annual revenues of approximately $500 million and cash earnings margins in excess of twenty percent. In April 2000, Ziff Davis Holdings acquired those publishing assets of ZD Inc. As a result of the acquisition, the Company's current organization structure, as set forth in Appendix C attached hereto, was formed.

After the 2000 acquisition, the Company anticipated that it would be able to expand its publishing business and build complimentary websites to grow its Internet business. The Company believed that such expansion would increase its advertising and subscription revenues as a result of the favorable business conditions faced by the Company's technology and Internet-based business advertising consumers during the late 1990s. In particular, the Company expected that such favorable conditions would allow its technology and Internet-based business customers to develop new products that could be advertised in the Company's publications.

However, beginning in 2000, the factors that had caused the growth of Internet-based businesses during the late 1990s deteriorated. Such deteriorating conditions negatively impacted the Debtors' businesses. As conditions for Internet-based businesses worsened, certain technology firms were not able to remain in business and liquidated. The liquidation of these technology firms reduced the number of actual and potential companies whose products were or could be advertised in the Debtors' magazines and eliminated the market available for certain of the Debtors' magazines. As a result of the disappearance of a large portion of the Debtors' market and the decrease in the advertising budgets of surviving technology firms, the Debtors' experienced declining advertising revenues and were forced to discontinue publishing a number of magazines. The Debtors' print advertising revenues have decreased from $215 million in 2001 to $40 million in 2007.

**J.      Decreasing Demand for Technology and Videogame Print Publications**

Compounding the Debtors' decreasing advertising revenues, during the early 2000s, the Debtors also suffered decreasing revenues from subscriptions to their print magazines. Beginning in the late 1990s, the Internet became an increasingly widely-used information medium. As many of the Debtors' magazine subscribers are individual technology consumers, videogame users, and corporate technology executives, they quickly adapted to obtaining their technology and videogame product information from Internet, rather than print, sources.

As a result of the 2000 acquisition, the Debtors maintained a highly leveraged capital structure that prevented them from developing sufficient digital businesses in a timely manner to satisfy their subscribers' demands to obtain their technology and videogame purchasing information and news from websites. The Debtors' magazine subscribers canceled their print magazine subscriptions or allowed them to lapse and the Debtors were compelled to discontinue publication of various of their print magazines, including Sync, ExtremeTech, Official U.S. PlayStation Magazine, Ziff Davis Smart Business, Yahoo! Internet Life, Family PC, Interactive Week, Expedia Travels, Smart Partner, GMR, Game Now and Xbox Nation.

As the Debtors have experienced reduced subscription numbers and discontinuation of certain print magazines, the Debtors' subscription and magazine circulation revenues have declined from $50 million in 2001 to $18 million in 2007.

The Debtors' decreasing subscription and advertising revenues were the principal cause of the Debtors experiencing a decline in total annual revenues from approximately $300 million in 2001 to approximately $76 million in 2007 (excluding revenues from the businesses sold to Enterprise Media Group, Inc.).

**K.      The Debtors' Significant Leverage and Termination of the Forbearance Agreement**

As the Debtors experienced decreasing revenues and operational difficulties, they continued to maintain significant leverage and, as such, attendant high debt costs. As of

December 31, 2007, the Debtors' books reflected approximately $500 million of debt obligations and assets (including goodwill) of only approximately $313 million. Additionally, as of June 30, 2007, the Debtors maintained a working capital deficit of approximately $401 million, of which $378 million was the Company's secured and unsecured indebtedness that was classified as a current liability as a result of the Company's failure to make interest payments when due on their outstanding note issuances (described below).

As a result of the Debtors' significant leverage, the Debtors did not have sufficient capital available to invest to expand their digital businesses. Accordingly, over the past four years, the Debtors have suffered net losses ranging from approximately $85 million to $134 million. Additionally, during this same period, the Debtors have experienced a significant percentage decline in their liquidity.

In connection with their operational and financial difficulties and declining cash flow, on August 15, 2007, the Debtors issued a press release announcing that they were exploring various options to restructure their debt and, in connection therewith, the Debtors would not make the next scheduled interest payment on the Subordinated Notes. The failure to make this interest payment constituted a default under the terms of the Subordinated Notes Indenture.

Additionally, the failure to make this interest payment constituted an event of default under section 6.01(4) of the Senior Secured Notes Indenture relating to the Senior Secured Notes and section 7.01(4) of the agreement governing the MHR Notes, thereby enabling the prepetition secured debt to be accelerated.

On November 7, 2007, in hopes of reaching a settlement with the Holders of the Senior Secured Notes and the MHR Notes regarding a recapitalization and restructuring of the Debtors' operations and finances, the Debtors reached an agreement (the "Forbearance Agreement") with the Collateral Trustee, pursuant to which the Collateral Trustee agreed to forbear from demanding immediate turnover of the Debtors' cash and cash proceeds, including the net proceeds of approximately $118.7 million (net of fees and expenses) received in connection with the Debtors' sale of the Enterprise Group (the "Remaining Net Proceeds").

Under the Forbearance Agreement, the Debtors agreed to maintain the Remaining Net Proceeds in a segregated bank account at Merrill Lynch (the "Segregated Account"). Additionally, under the Forbearance Agreement, the Debtors could not use the Remaining Net Proceeds without triggering termination of the Forbearance Agreement unless such withdrawn funds were used to pay any obligations owed to the Senior Secured Note Holders and the MHR Note Holders or fees and expenses incurred by the legal or financial advisors to the Ad Hoc Senior Secured Note Holder Group.

From November 7, 2007 through the end of January 2008, the Debtors continued to try to achieve a consensual restructuring that would be supported by the Ad Hoc Senior Secured Note Holder Group and a group of certain Holders of the Subordinated Notes. However, as the end of January neared without resolution, the Debtors determined that to continue their operations, they would require access to $20 million of the Remaining Net Proceeds maintained in the Segregated Account. Accordingly, on January 25, 2008, the Debtors notified the Collateral Trustee and counsel for the Ad Hoc Senior Secured Note Holder Group that the Debtors intended to withdraw $20 million of the Remaining Net Proceeds from the Segregated Account for the Debtors' operations (the "Withdrawal Notice").

As funding the Debtors' operations was not a permitted use of the funds under the Forbearance Agreement, by letter dated January 29, 2008 the Collateral Trustee terminated the Forbearance Agreement and demanded immediate turnover of the funds in the Segregated Account. In addition, the Collateral Trustee sent a letter to Merrill Lynch dated January 29, 2008, exercising control over the Segregated Account, and further instructed Merrill Lynch to immediately pay to it all funds held in the Segregated Account. The Collateral Trustee took the position, and continues to take the position that the Remaining Net Proceeds held in the Segregated Account are not property of the Debtors' Estates. The Debtors disagree and believe that the Remaining Net Proceeds are property of the Estates.

By letter dated February 6, 2008, the Collateral Trustee requested that the Debtors retract the Withdrawal Notice and commit in writing that, prior to any bankruptcy filing, they would not seek to withdraw or transfer funds from the Segregated Account to anyone other than the Collateral Trustee. The Debtors and the Ad Hoc Senior Secured Note Holder Group, each reserving their respective rights with respect to the Segregated Account, agreed to attempt to reach a consensual resolution.

On February 8, 2008, the Debtors and the Collateral Trustee issued a joint letter of direction to Merrill Lynch instructing Merrill Lynch that no funds shall be withdrawn or transferred from the Segregated Account unless and until the Debtors and the Collateral Trustee provide a further, joint-written direction to Merrill Lynch, or as otherwise ordered by a court of competent jurisdiction. The February 8th letter reserved for the Collateral Trustee the right to exercise control over the Segregated Account. By letter to Merrill Lynch dated February 9, 2008, the Collateral Trustee, pursuant to its rights under section 6(iv) of the Collateral Trust Agreement, provided written authorization to Merrill Lynch to transfer title to the Segregated Account from the Debtors to the Collateral Trustee.

## L.    Plan Negotiations; Consensual Plan Efforts

Prior to the Petition Date, the Debtors and the Ad Hoc Senior Secured Note Holder Group reached an agreement on the terms of a plan of reorganization. That agreement was incorporated into a Plan Support Agreement by and among the Debtors and the Ad Hoc Senior Secured Note Holder Group dated as of February 29, 2008 (the "February 29 Plan Support Agreement"). The February 29 Plan Support Agreement incorporated a term sheet that set forth the principal terms of the reorganization plan agreed upon between the Debtors and the Ad Hoc Senior Secured Note Holder Group (the "February 29 Term Sheet").

Subsequent to execution of the February 29 Plan Support Agreement and after the Petition Date, the Debtors, the Ad Hoc Senior Secured Note Holder Group, the Committee, the MHR Note Holders and Willis Stein commenced discussions regarding the terms of a consensual plan of reorganization. After extensive negotiations, these parties have reached an agreement on a consensual plan of reorganization that would substantially reduce the Debtors' funded indebtedness and de-leverage the Debtors' balance sheet. Accordingly, the Debtors, the Ad Hoc Senior Secured Note Holder Group, the Committee, the MHR Note Holders and Willis Stein have executed the Plan Support Agreement dated as of April 30, 2008. The Plan Support Agreement incorporates the Term Sheet, which sets forth the principal terms of the consensual reorganization plan. The terms of the Plan Support Agreement and Term Sheet, embodied in the Second Amended Joint Chapter 11 Plan of Reorganization Dated as of May 6, 2008, include the following:

- that Holders of Allowed Class 4 Claims will receive (a) the balance of certain net proceeds due to the Debtors from the Enterprise Sale, (b) New Senior Secured Notes in the principal amount of $50,000,000 plus an amount equal to the Cash Funding at Exit, and (c) 90% of the New Ziff Davis Holdings Common Stock (subject to dilution);

- that Holders of Allowed Class 5 Claims will receive (a) 10% of the New Ziff Davis Holdings Common Stock (subject to dilution), and (b) the Warrants exercisable into shares of New Ziff Davis Holdings Common Stock representing 5% of the shares of New Ziff Davis Holdings Common Stock to be issued on the Effective Date (subject to dilution);

- that each Holder of an Allowed Class 6 Unsecured Claim shall receive its *pro rata* share (determined by dividing such Holder's Allowed General Unsecured Claim by the sum of all Allowed General Unsecured Claims) of $1,250,000;

- that each Holder of an Allowed Class 7 Convenience Class Claim shall receive 50% of the Allowed Amount of such Claim (or such reduced Claim) in Cash;

- that the Senior Secured Note Holders and the MHR Note Holders will allow the Debtors to retain sufficient cash proceeds from the Enterprise Sale to fund operations during the Chapter 11 Cases as well as to fund the Debtors' business plan and operations after emergence from chapter 11;

- that the Debtors will use their reasonable best efforts to obtain exit financing to fund their working capital and other needs post emergence from chapter 11; provided, that in the event the Debtors are unable to obtain such financing, then the Debtors (with the consent of the Majority Senior Secured Note Holders) shall have available to them up to $7.5 million of remaining proceeds from the Enterprise Sale to fund their working capital needs post-emergence from chapter 11;

- that the members of the Ad Hoc Senior Secured Note Holder Group, the Committee, certain members of the Committee, the MHR Note Holders and Willis Stein will support approval of the Disclosure Statement, and upon receipt of such Bankruptcy Court approval, agree to vote to accept and otherwise support confirmation of the Plan;

- the terms of the Cash Collateral Order;

- Plan distributions and treatment of secured, administrative, priority and unsecured Claims;

- that the Reorganized Debtors' Senior Management shall be substantially the same as the Company's senior management prior to the Effective Date;

- that the Reorganized Debtors' Board of Directors shall have seven members, five of which will be appointed by the Majority Senior Secured Note

Holders, one which will be appointed by MHR and one being the Reorganized Debtors' Chief Executive Officer;

- the terms of the New Management Incentive Plan; and

- that the Debtors will assume all existing employment and severance agreements of certain members of Senior Management on and as of the Effective Date.

The Debtors intend to use these Chapter 11 Cases to effectuate the restructuring contemplated by the modified Term Sheet and the modified Plan Support Agreement. Pursuant to the terms of the Plan, the Debtors propose to de-leverage their balance sheet, address operational issues as necessary and work with their principal stakeholders to return to profitability and to place themselves in a position for future growth.

## V.     THE CHAPTER 11 CASES

### A.     Continuation of Business; Stay of Litigation

As described above, on March 5, 2008, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess and reorganize their businesses and prevents creditors from obtaining an unfair recovery advantage while the reorganization is ongoing.

### B.     First Day Motions

On the first day of the Chapter 11 Cases, the Debtors filed several applications and motions seeking certain relief by virtue of so-called "first day orders." First day motions and orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. The first day motions filed in the Chapter 11 Cases are typical of motions filed in large Chapter 11 cases across the country. Such motions sought, among other things, the following relief:

- joint administration of the Debtors' bankruptcy cases;

- interim use of cash collateral (as further discussed below);

- the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date;

- payment of employees' prepetition compensation, benefits and expense reimbursement amounts;

- an extension of the statutory period during which utilities are prohibited from altering, refusing or discontinuing services and/or requiring adequate assurance of payment as a condition of receiving services; and

- an extension of time to file the Schedules.

## C.  Retention of Professionals

The Debtors are represented in the Chapter 11 Cases by Winston & Strawn LLP ("Winston").  The Debtors obtained the financial advisory and investment banking services of Alvarez & Marsal North America, LLC ("Alvarez & Marsal").  BMC was authorized to provide claims, noticing and balloting services to the Debtors.  The Debtors also have obtained authority to retain a number of other professional firms to assist them in the ordinary course of their businesses.

## D.  Creditors' Committee

On March 14, 2008, the office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee"), consisting of the following entities: Concordia Partners, L.P.; Deutsche Bank Trust Company Americas, as Subordinated Notes Indenture Trustee and Stub Subordinated Notes Indenture Trustee; Joshua Tree Capital Partners; MHR Fund Management LLC; River Run Fund, LTD.; RR Donnelly & Sons Company; and Sony Computer Entertainment.

## E.  Authorization to Use Cash Collateral of Existing Lenders

The Debtors believe that the Remaining Net Proceeds in the Segregated Account constitute the Collateral Trustee's cash collateral within the meaning of section 363(a) of the Bankruptcy Code.  The Collateral Trustee and the Ad Hoc Senior Secured Note Holder Group believe that the Remaining Net Proceeds in the Segregated Account are being held by Merrill Lynch in trust for the Collateral Trustee, pursuant to section 7(d) of the First Lien Security Agreement.  Alternatively, the Collateral Trustee and the Ad Hoc Senior Secured Note Holder Group believe that title to the Segregated Account and the Remaining Net Proceeds therein was transferred to the Collateral Trustee prior to the Petition Date.  The Debtors believe the Remaining Net Proceeds in the Segregated Account are property of the Debtors' estates and that any effort by the Collateral Trustee to transfer title to the Remaining Net Proceeds was not legally effective.

Rather than dispute ownership of the Remaining Net Proceeds in the Segregated Account, the Debtors, the Collateral Trustee and the Ad Hoc Senior Secured Note Holder Group agreed that the Debtors may use a portion of the Remaining Net Proceeds in the Segregated Account and any cash collateral (as defined in section 363(a) of the Bankruptcy Code) in accordance with the terms of a stipulated order and a budget approved by the Ad Hoc Senior Secured Note Holder Group.  The Collateral Trustee and the Ad Hoc Senior Secured Note Holder Group agree that the Debtors' cash on hand as of the Petition Date, and all cash received by the Debtors during the Chapter 11 Cases are the Debtors' cash collateral subject to the Collateral Trustee's security interest.

Cash collateral is defined in section 363 of the Bankruptcy Code and includes, but is not limited to, "cash, negotiable instruments, documents of title, securities, deposit accounts, . . . other cash equivalents. . . and . . . proceeds, products, offspring, rents or profits of property subject to a security interest. . ." 11 U.S.C. § 363(a). Under the Bankruptcy Code, the Debtors are prohibited from using, selling or leasing cash collateral unless either the appropriate creditors consent or the Bankruptcy Court, after notice and a hearing, authorizes such action.

On the Petition Date, the Debtors filed the Motion of the Debtors for Interim and Final Orders (A) Authorizing the Debtors' Use of Cash Collateral; (B) Granting Adequate Protection Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code; and (C) Scheduling a Final Hearing for Approval of the Debtors' Use of Cash Collateral [Docket No. 12] (the "Cash Collateral Motion"). The terms of the Cash Collateral Motion were agreed upon by the Collateral Trustee and the Ad Hoc Senior Secured Note Holder Group.

By the Cash Collateral Motion, the Debtors sought (i) authority on an interim basis to use cash collateral in an amount not in excess of $5 million in accordance with a proposed budget, (ii) authority on an interim basis to provide adequate protection to the Collateral Trustee, the Senior Secured Note Holders and the MHR Note Holders, (iii) a final hearing on the Cash Collateral Motion, (iv) authority on a final basis to use cash collateral in accordance with a proposed budget, and (v) authority on a final basis to provide adequate protection to the Collateral Trustee, the Senior Secured Note Holders and the MHR Note Holders.

On March 10, 2008, the Court entered the Stipulation and Interim Order (A) Authorizing the Debtors' Use of Cash Collateral, (B) Granting Adequate Protection Pursuant to sections 105, 361 and 363 of the Bankruptcy Code and (C) Scheduling a Final Hearing for Approval of the Debtors' Use of Cash Collateral [Docket No. 53]. By the interim order, the Court authorized the Debtors, among other things, to use up to $5 million of the Debtors' cash collateral pending a final hearing.

On March 31, 2008, the Court entered the Stipulation and Final Order (A) Authorizing the Debtors' Use of Cash Collateral and (B) Granting Adequate Protection Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code [Docket No. 114] (the "Cash Collateral Order"). By the Cash Collateral Order, the Court, among other things: (i) authorized the Debtors to use an additional $12 million of the Debtors' cash collateral in accordance with a budget approved by the Collateral Trustee and the Ad Hoc Senior Secured Note Holder Group, (ii) directed the Debtors to turnover all Remaining Net Proceeds in the Segregated Account except for the Cash Funding at Exit and the Challenge Period Reserve (as defined in the Cash Collateral Order), (iii) granted the Collateral Trustee, for the benefit of itself and the Senior Secured Note Holders and the MHR Note Holders, replacement liens in the Debtors' assets (excluding claims pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code), adequate protection compensation for any diminution in value of the Remaining Net Proceeds and Cash Collateral, superpriority administrative expense claims which have priority over all other administrative expense claims except for the Carve Out (as defined in the Cash Collateral Order) and other adequate protection including payment of the Ad Hoc Senior Secured Note Holder Group's and the Collateral Trustee's reasonable professional fees, and (iv) established May 13, 2008 as the deadline by which any person or entity may challenge the liens of the Collateral Trustee, the Senior Secured Note Holders and MHR Note Holders.

The terms of the Cash Collateral Order were agreed upon by the Debtors, the Collateral Trustee and the Ad Hoc Senior Secured Note Holder Group.

**F.      Postpetition and Post Confirmation Funding**

The Debtors do not anticipate requiring debtor-in-possession financing to operate their businesses during the course of the Chapter 11 Cases.  In the event that the Debtors or the Reorganized Debtors determine in the exercise of their reasonable business judgment (and with the consent of the Majority Senior Secured Note Holders) that an Exit Facility is necessary or appropriate, an Exit Facility may be entered into with the proceeds thereof used to fund operations and/or make payments required under the Plan.  Alternatively, the Debtors have negotiated for up to $7,500,000 of cash collateral to be available as Cash Funding at Exit for the Debtors' use after the Effective Date in accordance with the terms of the Plan.

## VI.      SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

**A.      Overall Structure of the Plan**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and other stakeholders.  Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and

interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be Reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Reorganized Debtors will distribute Cash, securities and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

**B.      Substantive Consolidation**

The Plan does not provide for the substantive consolidation of the Debtors' assets and liabilities. The Debtors, however, reserve the right to seek substantive consolidation by motion if they conclude that substantive consolidation is necessary or appropriate for effectuation of the Plan.

**C.      Reorganized Capital Structure Created by Plan**

The Plan sets forth the following capital structure for the Reorganized Debtors upon their emergence from Chapter 11:

- Exit Facility. The Debtors may elect (subject to the agreement of the Majority Senior Secured Note Holders) to obtain an Exit Facility on the Effective Date. If they do so, it will be on terms negotiated at arms length, and would likely be secured by liens upon and security interests in substantially all of the Debtors' assets, senior to the liens and security interests of the New Senior Secured Notes.

- The New Senior Secured Notes. The New Senior Secured Notes will be distributed to the Senior Secured Note Holders and the MHR Note Holders on the Effective Date, in the aggregate original principal amount of $50 million. The $50 million original principal amount of the New Senior Secured Notes will increase by an amount equal to the Cash Funding at Exit that remains with the Reorganized Debtors and that is not distributed to the Holders of Allowed Class 4 Claims on the Effective Date. The New Senior Secured Notes will

mature three years after the Effective Date at which time all remaining outstanding principal and interest will be due and payable. The New Senior Secured Notes will be secured by first priority liens on substantially all of the Debtors' assets, subject only to indebtedness and liens permitted by the New Senior Secured Notes Indenture.

- **The form of the New Senior Secured Notes and the New Senior Secured Note Documents.** These forms will be included in the Plan Supplement.

- **The New Ziff Davis Holdings Common Stock and Warrants.** The New Ziff Davis Holdings Common Stock will be distributed to the Collateral Trustee for the benefit of Holders of Allowed Class 4 Claims and to the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee for the benefit of Holders of Allowed Class 5 Claims on the Effective Date, as provided in the Plan (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants), and the Warrants will be distributed to the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee for the benefit of Holders of Allowed Class 5 Claims on the Effective Date, as provided in the Plan.

- **Issuance and Distribution of New Securities.** The new securities to be issued and distributed pursuant to the Plan to Holders of Class 4 Claims and Class 5 Claims will be issued in exchange for Allowed Claims in such Classes and will be exempt from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

## D. Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy

Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. In the event any Class rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class. Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and Interests. See Section X.F herein. Although the Debtors believe that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1.      Treatment of Unclassified Claims under the Plan

(a)      Administrative Claims

An Administrative Claim is defined in the Plan as a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary postpetition cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Collateral Trustee pursuant to the Cash Collateral Order.

Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the

case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (a) liabilities, accounts payable or other Claims, liabilities or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date and (b) contractual liabilities including those arising under loans or advances to the Debtors (including the Senior Secured Notes Indenture, the Note Purchase Agreement, the Subordinated Notes Indenture and the Stub Notes Indenture), whether or not incurred in the ordinary course of business of the Debtors subsequent to the Petition Date, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases will be paid by the Reorganized Debtors.

Under the Plan, applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (a) from the Petition Date through the Effective Date or (b) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(3) through (b)(5) of the Bankruptcy Code, must be Filed no later than forty-five (45) days after the Effective Date or such later date as the Bankruptcy Court approves, and must be served on (a) the Debtors, Ziff Davis Media Inc., 28 East 28th Street, New York, New York, 10016 (Attn:  Shirin Malkani, General Counsel), (b) counsel to the Debtors, Winston & Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60601 (Attn:  Mark K. Thomas and Daniel J. McGuire), (c) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004 and (d) any other party designated by the Bankruptcy Rules or any order of the Court to receive notice. Applications that are not timely Filed will be barred and will not be considered by the Court. The Reorganized Debtors will pay any valid claims for Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

  (b)   Priority Tax Claims

The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the

Bankruptcy Code.  The Debtors have estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $100,000.

Priority Tax Claims are Unimpaired.  Under the Plan, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Priority Tax Claim is based, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.  The Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

2.      Treatment of Classified Claims and Interests under the Plan

(a)      Class 1:  Miscellaneous Secured Claims

Class 1 Miscellaneous Secured Claims are Unimpaired under the Plan.  Each Holder of an Allowed Class 1 Miscellaneous Secured Claim shall receive, in the sole discretion of the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Miscellaneous Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee), as the case may be, and the Holder of such Class 1 Miscellaneous Secured Claim; (b) treatment such that such Miscellaneous Secured Claim is Reinstated; (c) the Property securing such Miscellaneous Secured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(b)      Class 2:  Miscellaneous Priority Claims

Class 2 Miscellaneous Priority Claims are Unimpaired under the Plan.  Each Holder of an Allowed Class 2 Miscellaneous Priority Claim shall receive in full satisfaction,

settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class 2 Claim becomes Allowed, and (iii) a date agreed to by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, and the Holder of such Class 2 Miscellaneous Priority Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Class 2 Priority Claims representing (i) liabilities, accounts payable or other Claims, or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date and (ii) contractual liabilities including those arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business of the Debtors subsequent to the Petition Date, shall be paid or performed by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

(c)      Class 3: Subsidiary Interests

Class 3 Interests are Unimpaired under the Plan and the Holders thereof are deemed to have accepted the Plan. Each Holder of an Allowed Interest in Class 3 shall retain such Interest and its respective share or shares of common stock of the Subsidiary Debtors representing such Interest, but such Holder shall receive no distribution under the Plan on account of such Interest.

(d)      Class 4: Senior Secured Note Claims and MHR Note Claims

Class 4 Senior Secured Note Claims and MHR Note Claims are Impaired under the Plan. On the Effective Date, the Collateral Trustee will receive, for pro rata distribution to Holders of Allowed Senior Secured Note Claims and MHR Note Claims, the following in full satisfaction, settlement, release, extinguishment and discharge of such Claims: (a) the New Senior Secured Notes; (b) all Cash of the Debtors (except for Cash in the Debtors' operating accounts and the Cash Funding at Exit which shall be retained by the Reorganized Debtors to fund operations and working capital needs); (c) ninety percent (90%) of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants); and (d) all proceeds received by the Debtors or the Reorganized Debtors, as the case may be, of the Indemnity Escrow.

(e)      Class 5: Subordinated Note Claims and Stub Note Claims

Class 5 Subordinated Note Claims and Stub Note Claims are Impaired under the Plan. On the Effective Date, each Holder of an Allowed Class 5 Claim will receive in full satisfaction, settlement, release, extinguishment and discharge of such Claims (subject to the rights of the Subordinated Note Indenture Trustee and the Stub Note Indenture Trustee to first satisfy unpaid fees and expenses therefrom pursuant to Section 7.07 of the Subordinated Notes Indenture and Section 7.07 of the Stub Notes Indenture to the extent of any such fees and expenses that are not paid pursuant to Sections 3.03 and 13.11 of the Plan) its pro rata share of ten percent (10%) of the New Ziff Davis Holdings Common Stock (which shares issued on the

Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants) and the Warrants exercisable into shares of New Ziff Davis Holdings Common Stock representing 5% of the shares of New Ziff Davis Holdings Common Stock to be issued on the Effective Date. Each Warrant shall entitle the holder to purchase from Reorganized Ziff Davis Holdings one fully paid and non assessable share of New Ziff Davis Holdings Common Stock at the price per share that implies a full recovery for the Holders of the Senior Secured Note Claims and MHR Note Claims (including principal and interest at the contractual default rate through the Effective Date).

(f)     Class 6:  General Unsecured Claims

Class 6 General Unsecured Claims are Impaired under the Plan. On the later of (i) the Effective Date or as soon thereafter as is practicable, or (ii) the date such Claim is Allowed, each Holder of an Allowed Class 6 General Unsecured Claim shall receive its pro rata share of Cash in the amount of $1,250,000. Holders of Allowed Class 6 General Unsecured Claims greater than $10,000 and less than $50,000 may elect in the alternative, to reduce their Allowed Class 6 Claim to $10,000 and to have such Claim treated as a Class 7 Convenience Class Claim.

(g)     Class 7:  Convenience Class Claims

Class 7 Convenience Class Claims are Impaired under the Plan. On the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Class 7 Convenience Class Claim shall receive 50% of the Allowed Amount of such Claim in Cash.

(h)     Class 8:  Old Ziff Davis Holdings Common Stock and Interests

Class 8 Old Ziff Davis Holdings Common Stock and Interests are Impaired under the Plan. Holders of Class 8 Old Ziff Davis Holdings Common Stock and Interests shall not receive or retain any property under the Plan on account of such Old Ziff Davis Holdings Common Stock and Interests. Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Class 8 Old Ziff Davis Holdings Common Stock and Interests are deemed to reject the Plan. On the Effective Date, all Old Ziff Davis Holdings Common Stock and Interests shall be cancelled.

## E.     Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. The Debtors and the Reorganized Debtors specifically reserve all rights, remedies, claims, defenses and Causes of Action, including, without limitation, those described in Appendix F.

## F.     Allowed Claims, Distribution Rights and Objections to Claims

1.     Allowance Requirement

Only Holders of Allowed Claims are entitled to receive distributions under the Plan. An Allowed Administrative Claim is a Claim or any portion thereof that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become Allowed by failure to object pursuant to Section 8.05 of the Plan. An Allowed Claim is such Claim or any

portion thereof (other than an Administrative Claim) of (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that at the time of the Effective Date the Debtors, Reorganized Debtors or the Majority Senior Secured Note Holders have not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

2.      Date of Distribution

All Distributions to Holders of Allowed Claims as of the Effective Date will be made as and when provided in the Plan.

3.      Making of Distributions

The Reorganized Debtors will, with the consent of the Majority Senior Secured Note Holders, designate the Person to serve as the Disbursing Agent under the Plan, and, unless such person is Reorganized Ziff Davis Holdings, will file a written notice of such designation at least five (5) days before the Confirmation Hearing. Except for distribution to Holders of Allowed Senior Secured Note Claims and MHR Note Claims, which shall be made to the Collateral Trustee for the benefit of such Holders, distributions to Holders of Allowed Claims will be made by the Disbursing Agent (a) to the last known addresses of such Holders, or (b) to the addresses set forth in any written notices of address changes delivered to the Disbursing Agent. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest. Unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of undeliverable distributions made by the Disbursing Agent will be returned to the Reorganized Debtors until such distributions are claimed.

At the close of business on the Distribution Record Date, the transfer ledgers for the Subordinated Notes and the Stub Notes shall be closed, and there shall be no further changes in the record holders of such notes. Except as provided in the Plan, the Debtors, the Reorganized Debtors, the Disbursing Agent, the Subordinated Notes Indenture Trustee, the Stub Notes Indenture Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of the Subordinated Notes or the Stub Notes occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes under the Plan with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

All Property distributed on account of Claims must be claimed within the later of (a) one (1) year after the Effective Date or (b) one (1) year after such distribution is made to such Holder or, in the case of a distribution made in the form of a check, must be negotiated and a

request for reissuance be made as provided for in Section 5.05 of the Plan. All Unclaimed Property will be retained by and will revest in the Reorganized Debtors and will no longer be subject to distribution. All full or partial payments made by the Disbursing Agent and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of Debtors pursuant to the Plan. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Reorganized Debtors and any Claims filed in these cases. Pursuant to section 1143 of the Bankruptcy Code, all claims in respect of Unclaimed Property shall be deemed Disallowed under Section 5.06 of the Plan and the Holder of any Claim Disallowed under Section 5.06 of the Plan will be forever barred, expunged, estopped and enjoined from assertion in any manner against the Debtors or their respective Properties or the Reorganized Debtors or their respective Properties.

4.      Objection Procedures

Unless otherwise ordered by the Court after notice and a hearing, under the Plan, the Reorganized Debtors shall have the exclusive right, on and after the Effective Date, to File objections to Claims (other than Claims specifically Allowed in the Plan) and shall serve a copy of each such objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than the latest of (a) 180 days after the Effective Date, (b) 180 days after the date on which any Claim is Filed, or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above. The foregoing deadlines may be extended by order of the Court. An objection to any Claim shall be deemed properly served on the Holder thereof if the Reorganized Debtors effect service in any of the following manners: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004, (ii) by first class mail, postage prepaid, on the signatory on the proof of claim or interest or other representative identified in the proof of claim or interest or any attachment thereto, or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

## G.      Disposition of Executory Contracts and Unexpired Leases

1.      Contracts and Leases Deemed Assumed

The Plan provides for the deemed assumption of all executory contracts or unexpired leases that have not been otherwise disposed of. Specifically, each Debtor will be deemed to have assumed, as of the Effective Date, each executory contract and unexpired lease to which it is a party unless such contract or lease (a) has expired or terminated pursuant to its own terms, (b) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (c) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (d) is listed on the Schedule of Rejected Contracts filed with the Plan Supplement; provided, however, that the Debtors shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Rejected Contracts upon notice to the counterparty to such contract or lease (i) to delete any executory contract or unexpired lease listed therein, thus providing for its assumption pursuant to Section 6.01 of the Plan or (ii) to add any executory contract or unexpired lease thereto, thus providing for its rejection pursuant to Section 6.01 of the Plan. The Confirmation

Order will constitute an order of the Bankruptcy Court under section 365(a) of the Bankruptcy Code approving the contract and lease assumptions described above, as of the Effective Date.

Under the Plan, each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property will include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

2.      Cure with Respect to Assumed Contracts and Leases

Except to the extent that (a) a different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 6.01 of the Plan, or (b) any executory contract or unexpired lease shall have been assumed pursuant to an order of the Bankruptcy Court which order shall have approved the cure amounts with respect thereto, the Reorganized Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, no later than May 30, 2008, file as part of the Plan Supplement and serve on the counterparties to all executory contracts or unexpired leases a notice of intent to assume together with a proposed cure schedule, listing the cure amounts of all executory contracts and unexpired leases to be assumed. The nondebtor parties to such executory contracts and unexpired leases being assumed shall have thirty (30) days from service of such notice and cure schedule to object to the cure amounts specified therein. Service of such notice and cure schedule shall be sufficient if served on the other party to the executory contract or unexpired lease at the address indicated on (a) the contract or lease, (b) any proof of claim filed by such other party in respect of such contract or lease, or (c) the Reorganized Debtors' books and records; provided, however, that if such a notice and cure schedule served by the Reorganized Debtors to one of the foregoing addresses and is promptly returned as undeliverable, the Reorganized Debtors shall attempt re-service of the notice and cure schedule on an alternative address, if any, from the above listed sources. If any objections are filed, and cannot be resolved by agreement, the Bankruptcy Court shall hold a hearing to determine the cure amount with respect to the executory contract or unexpired lease subject to the objection or to otherwise resolve such objection. Any party failing to object (whether to the proposed cure amount or otherwise) within thirty (30) days after service of the notice and proposed cure amount by the Reorganized Debtors shall be forever barred from asserting, collecting, or seeking to collect from the Reorganized Debtors any amounts in excess of the proposed cure amount or from otherwise objection to the assumption, by the Debtors, of such executory contract or unexpired lease. Notwithstanding the foregoing, or anything else in Article VI of the Plan, with respect to any executory contract or unexpired lease which is subject to a cure amount objection, the Reorganized Debtors shall retain the right, until five (5) Business Days after any order fixing the cure amount becomes a Final Order, to reject such executory contract or unexpired lease.

3. Rejection Damages

Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Section 6.01 of the Plan must be filed with the Bankruptcy Court no later than the later of (a) twenty (20) days after the Effective Date, or (b) thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period shall be forever barred. The Reorganized Debtors shall have the exclusive right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.05 of the Plan.

4. Compensation and Benefit Programs

The Plan provides that except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) any officer, director or employee compensation and benefit program that entitled such Persons to receive or to acquire any Old Ziff Davis Holdings Common Stock or Old Other Interests, (b) executory contracts or plans specifically rejected pursuant to the Plan, and (c) executory contracts or plans as have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts.

## H.    Revesting of Assets; Release of Liens

Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of each Debtor, including, but not limited to, all Avoidance Actions and all Causes of Action shall automatically be retained and revest in the relevant Reorganized Debtor or its respective successor, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security Holders on the Effective Date with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests, being extinguished except as otherwise provided in the Plan or in connection with the New Senior Secured Notes. As of the Effective Date, each Reorganized Debtor may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses, or related support services incurred after the Effective Date without any application to the Bankruptcy Court.

## I.    Post-Consummation Corporate Structure, Management and Operation

1. Continued Corporate Existence

The Plan provides that the Reorganized Debtors will continue to exist after the Effective Date as separate corporate entities, in accordance with the applicable laws in the respective jurisdictions in which they are incorporated and pursuant to their respective

certificates or articles of incorporation, and by-laws, in effect prior to the Effective Date, except to the extent such certificates or articles of incorporation, and by-laws are amended pursuant to the Plan. The Plan contemplates that New Debtor Certificates of Incorporation and By-laws, including amendments to the certificates of incorporation, articles of organization, by-laws partnership agreements or other governing charter documents, as appropriate, of the Debtors will be included in the Plan Supplement. Further, in the event that the Majority Senior Secured Note Holders agree, Reorganized Ziff Davis Holdings will be converted into a Delaware limited liability company and all references in this Disclosure Statement and the Plan to corporate documents or actions shall be deemed to include analogous actions with respect to limited liability company documents or actions.

2.  Post-Consummation Governance Documents

The Certificates of Incorporation and by-laws of each Debtor, as applicable, will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, (a) authorization to issue 1,000,000 shares of New Ziff Davis Holdings Common Stock and the Warrants, (b) a prohibition on the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code, (c) a prohibition on the repurchase, by the Debtors, of New Ziff Davis Holdings Common Stock or the issuance of dividends or other Cash distributions on New Ziff Davis Holdings Common Stock until such time as the New Senior Secured Notes are repaid in full, (d) provisions for a seven member Board of Directors of Reorganized Ziff Davis Holdings which shall be comprised of five members appointed by the Ad Hoc Senior Secured Note Holder Group, one member appointed by MHR and the other member being the acting Chief Executive Officer, (e) such other provisions as required by the New Shareholder Agreement, and (f) other provisions ordinary and customary in such situations, so long as they are not inconsistent with any of the provisions contained in the foregoing (a) through (e).

3.  Cancellation of Old Securities and Agreements

On the Effective Date, except as otherwise provided for in the Plan, (a) the Old Ziff Davis Holdings Common Stock and the Old Other Interests, and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor will be cancelled, and (b) the obligations of the Debtors under any agreements, indentures, or certificates of designations governing the Old Ziff Davis Holdings Common Stock and the Old Other Interests and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor will be discharged except to the extent refinanced in connection with the New Senior Secured Notes Indenture.

On the Effective Date, except as otherwise provided for in the Plan, (a) the Subordinated Notes and the Stub Notes shall be deemed extinguished, cancelled and of no further force or effect, and (b) the obligations of the Debtors and the Reorganized Debtors under any agreements or indentures governing the Subordinated Notes or the Stub Notes (including the Subordinated Notes Indenture and the Stub Notes Indenture) shall be discharged without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the party of the Bankruptcy Court or any Person; provided, however, that the Subordinated Notes, the Stub Notes, the Subordinated Notes Indenture and the Stub Notes Indenture shall continue in effect solely for the purposes of (i) allowing the holders of the Subordinated Notes and the Stub Notes to receive the distributions provided for in Section 3.09

of the Plan, (ii) allowing the Disbursing Agent or the Subordinated Notes Indenture Trustee or the Stub Notes indenture Trustee, as the case may be, to make distributions on account of the Subordinated Note Claims and the Stub Note Claims, and (iii) preserving the rights of the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee with respect to their respective fees and expenses (including legal fees) to the extent not paid pursuant to Section 13.11 of the Plan, including, without limitation, the liens identified in Section 13.12 of the Plan and any indemnification rights provided by the Subordinated Notes Indenture and/or the Stub Notes Indenture.

Subsequent to the performance by the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee or its agents of any duties that are required under the Plan or the Confirmation Order or under the terms of the Subordinated Notes Indenture and the Stub Notes Indenture, the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee and its agents and their successors and assigns shall be relieved of, and released from, all obligations arising under the Subordinated Notes Indenture, the Stub Notes Indenture, or other applicable agreements or law and the Subordinated Notes Indenture and the Stub Notes Indenture shall be deemed to be discharged.

4.      Officers and Directors of Reorganized Debtors

The Plan provides that the existing senior officers of Reorganized Ziff Davis Holdings will serve initially in the same capacities after the Effective Date until replaced or removed in accordance with the certificates of incorporation and by-laws of such entities.

Under the Plan, the initial Board of Directors of Reorganized Ziff Davis Holdings will have seven (7) members, with five (5) appointed by the Ad Hoc Senior Secured Note Holder Group, one (1) appointed by MHR and the other member being the acting Chief Executive Officer.  The names of the new directors will be set forth in the Plan Supplement.  The designation of directors will be made at least five (5) days prior to the earlier of the deadline for voting on, or objecting to, the Plan.  Such designations will be final and binding for all purposes.

5.      New Management Incentive Plan

On the Effective Date, Reorganized Ziff Davis Holdings will adopt the New Management Incentive Plan, a copy of which will be included in the Plan Supplement.

6.      Funding of Reorganized Debtors

The Reorganized Debtors expect to be able to fund their operations, pay administrative and priority claims as provided in the Plan, and service the debt instruments contemplated by the Plan, through cash receipts.  It is not presently expected that exit financing or other new financing will be required, however, the Debtors are still evaluating the possibility of the need for additional financing.

7.      Exemption from Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan, including any Liens granted by the Debtors to secure the New Senior Secured Notes will not be taxed under any law imposing a stamp tax or other similar tax.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

8.    Corporate Action

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or cause to be taken all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, (a) the cancellation of the Old Ziff Davis Holdings Common Stock and Old Other Interests, (b) the issuance of the New Ziff Davis Holdings Common Stock and the Warrants, (c) the election of directors and officers in accordance with Section 10.02 of the Plan, (d) the adoption of the New Debtors Certificates of Incorporation and By-laws, (e) the issuance of the New Senior Secured Notes, (f) the execution and delivery of the New Senior Secured Note Documents, (g) to the extent necessary, the execution and delivery of the new Senior Management Contracts, (h) the adoption of the New Management Incentive Plan, (i) if required by the Majority Senior Secured Note Holders, the conversion of Reorganized Ziff Davis Holdings into a limited liability company under Delaware law, and (j) the entry into an Exit Facility if the Debtors, with the approval of the Majority Senior Secured Note Holders, determine that such an Exit Facility is necessary and appropriate. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate officers and directors of the Debtors and the Reorganized Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan in the name and on behalf of the Debtors and the Reorganized Debtors.

## J.    Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

1.    Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

• The Debtors have disclosed (a) the identity and affiliations of (i) any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Reorganized Debtors, (ii) any affiliate of the Debtors participating in a joint plan with the Debtors or (iii) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest Holders and with public policy), and (b) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

• With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. See Section X.D.

• The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the Holder of any such Claim has agreed to a different treatment.

• If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

• Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See Section X.A.

• The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

Further, even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Debtors must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the plan "not discriminate unfairly" and be "fair and equitable" with respect to such class. The Debtors do not anticipate that any Class of Claims will vote to reject the Plan. However, in the

event any Class votes to reject the Plan, the Debtors believe they will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting class.

2.    Conditions to Confirmation Date and Effective Date

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part by the Debtors, subject to the consent of the Majority Senior Secured Note Holders without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

The conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) the form and substance of the Confirmation Order shall have been approved by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee in their reasonable discretion); (b) the Confirmation Order shall authorize the issuance of the New Ziff Davis Holdings Common Stock, the Warrants and the other transactions contemplated by the Plan; and (c) the Confirmation Order shall provide that the provisions of the Confirmation Order are non-severable and mutually dependent.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Confirmation Order shall have been entered and shall not be stayed by order of a court of competent jurisdiction; (b) all documents and agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered by the parties thereto; (c) the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents created, amended, supplemented, modified or adopted in connection with the Plan; (d) the New Debtors Certificates of Incorporation and By-laws shall be in form, scope and substance reasonably satisfactory to the Debtors, the Majority Senior Secured Note Holders and the Committee and shall have been filed with the applicable authority of each such Debtors' jurisdiction of incorporation or organization in accordance with such jurisdiction's applicable law; (e) all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained; (f) the New Senior Secured Notes shall have been issued; (g) the New Senior Secured Note Documents shall have been entered into by the parties thereto; (h) the Exit Facility, if applicable, shall have been entered into by the parties thereto; (i) the New Management Incentive Plan (in form, scope and substance reasonably satisfactory to the Debtors, the Majority Senior Secured Note Holders and the Committee) shall have been adopted; (j) the New Shareholder Agreement and the Warrant Agreement (in form, scope and substance reasonably satisfactory to the Debtors, the Majority Senior Secured Note Holders and the Committee) shall have been entered into; (k) the New Senior Secured Notes, the New Senior Secured Note Documents, the Senior Management Contracts and the Exit Facility be in form and substance reasonably acceptable to the Debtors and the Majority Senior Secured Note Holders; and (l) no order of a court of competent jurisdiction shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan.

## K. Releases, Discharge, Injunctions, Exculpation and Indemnification

### 1. Releases by Debtors in Favor of Third Parties

The Plan provides for certain releases to be granted by the Debtors on and as of the Effective Date. Specifically, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan; provided, however, that no Releasee shall be released or discharged from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors.

The Debtors do not believe that there are any valid claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities that they hold against any of the persons to be released pursuant to this provision.

As to the Debtors' directors, officers and employees, the consideration for such release is the service rendered by such individuals during the pendency of the Chapter 11 Cases and the need for their continued dedication after the Effective Date to fully consummate a successful reorganization. The Debtors will be hampered in their consummation efforts if their directors, officers and employees are subject to claims and potential litigation that will distract their attention from operational and other business matters. None of such individuals are currently the target of any claim or litigation, and the Debtors are not aware of any credible theory on which an entity might pursue claims and litigation against such individuals.

As to the Majority Senior Secured Note Holder, the Committee Members, MHR, the MHR Note Holders and Willis Stein, the consideration for such release is, among other things, their agreement to compromise their Claims, support the Plan and accept the treatment provided for their Claims under the Plan.

### 2. Releases by Creditors of Claims Against Third Parties

In furtherance of the release provisions of the Plan, effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of the Persons set forth below under the Plan and, if applicable, the Cash, securities, contracts, releases and other agreements or documents to be delivered in connection with the Plan, each Holder of a Claim or Interest who votes in favor of the Plan, and any Affiliate of any such Holder (as well as any trustee or agent on behalf of each such Holder shall be deemed to have forever waived, released

and discharged (i) the Debtors, (ii) the Reorganized Debtors, and (iii) the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder)), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan.

        3.      Discharge and Discharge Injunction

        Confirmation of the Plan effects a discharge of all Claims against the Debtors. To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), and except as otherwise provided in the Plan or in the Confirmation Order all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims. Upon the Effective Date, and except as expressly contemplated in the Plan, the Debtors, and each of them, shall (a) be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, debts (as such term is defined in section 101(12) of the Bankruptcy Code), Liens, security interests, and encumbrances of and against all Property of the respective Estates, the Debtors, or the Reorganized Debtors that arose prior to the Effective Date, including without limitation, all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) such Claim has been Allowed pursuant to section 502 of the Bankruptcy Code, or (ii) the Holder of such Claim has voted to accept the Plan and (b) terminate all Interests of the Holders of Old Ziff Davis Holdings Common Stock and Old Other Interests. Further, as of the Effective Date, all entities, including, without limitation, all Holders of Claims or Interests, shall be barred and enjoined from asserting against the Debtors or the Reorganized Debtors, their successors or their property any other or further Claims, debts, rights, Causes of Action, liabilities or Interests relating to the Debtors based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date, except for those obligations expressly created by, or reserved in, the Plan. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests of the Holders of Old Ziff Davis Holdings Common Stock and Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge and termination shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

        In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently

enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security Holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following actions against the Debtors, the Reorganized Debtors or their property on account of any such discharged Claims, debts or liabilities or such terminated Interests or rights: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or enforcing in any manner directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (e) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

4. Exculpation Relating to Chapter 11 Cases

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Cases. Specifically, the Plan provides that, none of the Debtors, Reorganized Debtors or Exculpated Persons shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in good faith in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all prepetition activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases, provided, however, that the exculpation will not apply to any act of gross negligence or willful misconduct.

5. Post-Effective Date Indemnifications

To the extent not inconsistent with the Plan, any obligations of the Debtors, pursuant to their respective articles of incorporation or by-laws, applicable state law or their specific agreement, to indemnify a Person with respect to all present and future actions, suits and proceedings against the Debtors, the Reorganized Debtors or such indemnified Person, based upon any act or omission related to service with, or for or on behalf of, the Debtors or the Reorganized Debtors, shall survive Confirmation of the Plan and shall not be impaired by Confirmation of the Plan, but shall be deemed and treated as executory contracts that are assumed and, as applicable, amended by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code, except to the extent any such obligation has been released, discharged or modified pursuant to the Plan. Such indemnification obligations shall survive unaffected by the Plan and shall be performed and honored by the Reorganized Debtors.

## L. Preservation of Rights of Action

Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by the Plan, nothing, including, but not limited to, the failure of the Debtors or the

Reorganized Debtors to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors or the Reorganized Debtors with respect to any Claim or Interest, including, but not limited to, all rights of the Debtors or Reorganized Debtors to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the Holder thereof.

Further, except as otherwise provided in the Plan, all Causes of Action, including Avoidance Actions, shall automatically be retained and preserved and will revest in the Reorganized Debtors. Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors (as representatives of the Debtors' Estates) will retain and have the exclusive right to enforce and prosecute such Causes of Action (including Avoidance Actions) against any Entity, that arose before the Effective Date (including, without limitation, those Causes of Action identified on Appendix F hereto), other than those expressly released or compromised as part of or pursuant to the Plan.

In addition, except to the extent that any Claim is Allowed, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action (including Avoidance Actions) and claims of every type and nature whatsoever which the Estates, the Debtors or the Reorganized Debtors may have against their Creditors, but neither the failure to do so nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Debtors of any such claims or Causes of Action (including Avoidance Actions) the Debtors may have against such Creditors, and all such claims and Causes of Action (including Avoidance Actions) which are not expressly released pursuant to the Plan shall be reserved to and retained by the Reorganized Debtors.

The Debtors reserve the right to settle or otherwise not pursue any pending or potential claims, rights of action, suits or proceedings against any of the parties listed herein. Neither the listing nor the failure to list any party herein should prejudice the Debtors' rights to pursue any claims, rights of action, suits or proceedings that have arisen or may arise in the future in the ordinary course of the Debtors' businesses.

## M.        Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

- classify, re-classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim or Interest pursuant to the Plan;

- grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

- determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

- ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

- construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtors in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

- determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan and the Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

- hear any application of the Debtors or Reorganized Debtors to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and the Plan or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

- determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

- enter a final decree closing the Chapter 11 Cases;

- determine and resolve any and all controversies relating to the rights and obligations of the Disbursing Agent in connection with the Chapter 11 Cases;

- allow, disallow, determine, liquidate, reduce, re-classify or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

- permit the Debtors to recover all assets of the Debtors and Property of their respective Estates, wherever located;

- hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Debtors thereafter, including Avoidance Actions, proceedings with respect to the rights of the Debtors to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to

recover on account of any claim or Cause of Action that the Debtors may have; and

- hear any other matter not inconsistent with the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above, nothing in the Plan shall prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## N. Amendment, Alteration and Revocation of Plan

The Debtors (with the consent of the Majority Senior Secured Note Holders, MHR, the Committee and Willis Stein, which consent may not be unreasonably withheld) may alter, amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may, so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

The Debtors reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan. If the Plan is withdrawn or if the Confirmation Date does not occur, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## O. Plan Implementation Documents

The documents necessary to implement the Plan include the following:

the New Debtors Certificates of Incorporation and By-laws;

the New Shareholder Agreement;

the New Management Incentive Plan;

the Exit Facility, if applicable;

the New Senior Secured Notes;

the New Senior Secured Note Documents;

the Schedule of Rejected Contracts;

the Senior Management Contracts; and

the Warrant Agreement.

Such documents will be submitted in substantially the form to be implemented on the Effective Date as part of the Plan Supplement, which will be filed with the Clerk of the

Bankruptcy Court on or before May 30, 2008. All documents in the Plan Supplement shall be in form, scope, and substance satisfactory to the Debtors and the Majority Senior Secured Note Holders. Further, the form of the New Debtors Certificates of Incorporation and By-laws, the New Shareholder Agreement, New Management Incentive Plan and the Warrant Agreement in the Plan Supplement shall each be in form, scope and substance reasonably satisfactory to the Debtors, the Majority Senior Secured Note Holders and the Committee. Upon such filing, all documents included in the Plan Supplement may be viewed and downloaded free of charge from the Debtors' case website at [www.bmcgroup.com/ziffdavis](www.bmcgroup.com/ziffdavis), viewed and downloaded from the Bankruptcy Court electronic case filing system or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors' Voting Agent at the address set forth in Section III.C or to the Debtors' counsel, Winston & Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60607 (Attn: Mark K. Thomas and Daniel J. McGuire).

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes 4, 5, 6 and 7 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

**A.        General Considerations**

The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain Claims and Interests receive no distributions pursuant to the Plan. Nevertheless, reorganization of certain of the Debtors' businesses and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtors' customers, suppliers, employees, communities and other stakeholders.

**B.        Certain Bankruptcy Considerations**

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, (see Section X.A), and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Section X.D. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix D for a liquidation analysis of the Debtors.

If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' relations with their

customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtors cannot predict the ultimate amount of all their liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

## C.        Claims Estimations

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

## D.        Conditions Precedent to Consummation

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## E.        Inherent Uncertainty of Financial Projections

The Projections set forth in Appendix B hereto have been prepared by management of the Debtors in consultation with their financial advisors and cover the projected operations of the Reorganized Debtors through fiscal year 2010. These Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms, realization of the operating strategy of the Debtors, industry performance, no material adverse changes in applicable legislation or regulations, or the administration thereof, or regulations, exchange rates or generally accepted accounting principles, general business and economic conditions, competition, retention of key management and other key employees, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters. Certain additional material assumptions are disclosed on Appendix B, and the projections should be read in conjunction with these assumptions.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to business, economic and competitive uncertainties and contingencies. Accordingly, the Projections are only the Debtors' educated, good faith estimates and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may increase over time. The projected financial information contained herein should not be regarded as a guaranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or

will be achieved.  However, the Debtors believe that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

**F.        Certain Risk Factors Relating to Securities to be Issued Under the Plan**

1.    *No Current Public Market for Securities*

The New Senior Secured Notes, the New Ziff Davis Holdings Common Stock and the Warrants that will be issued pursuant to the Plan are securities for which there may be no market.

There is no present intention to register the New Ziff Davis Holdings Common Stock and Warrants.  So long as the New Ziff Davis Holdings Common Stock and Warrants are not registered under the Exchange Act, the New Ziff Davis Holdings Common Stock and Warrants will not be listed on a securities exchange or quoted on an interdealer quotation system.  Even if the New Ziff Davis Holdings Common Stock and Warrants were to be registered under the Exchange Act, no assurance can be made that the New Ziff Davis Holdings Common Stock and Warrants will be listed on a securities exchange or included in an interdealer quotation system.  As a result, such securities may be traded only infrequently in transactions arranged through brokers or otherwise, and reliable market quotations for the New Ziff Davis Holdings Common Stock and Warrants may not be available.

The New Senior Secured Notes will not be listed on any national or regional securities exchange and may be traded only infrequently in transactions arranged through brokers or otherwise, and reliable market quotations for any of the New Senior Secured Notes may not available.  A debt security with a small outstanding principal amount available for trading (a small "float"), such as the New Senior Secured Notes, may command a lower price than would a comparable debt security with a greater float.  Following consummation of the Plan, Holders of the New Senior Secured Notes may attempt to obtain offers for the New Senior Secured Notes; however, there can be no assurance that any trading market will exist for the New Senior Secured Notes following the consummation of the Plan.  The extent of the market for the New Senior Secured Notes following consummation of the Plan will depend upon the number of Holders of the New Senior Secured Notes at such time, the interest in maintaining a market in the New Senior Secured Notes on the part of securities firms, banks, and other lending institutions, and other factors.  There can be no assurance that any market in the New Senior Secured Notes will exist and no assurance as to the prices at which the New Senior Secured Notes may trade after the consummation of the Plan.

Accordingly, there can be no assurance as to the development or liquidity of any market for the New Senior Secured Notes, the Warrants or the New Ziff Davis Holdings Common Stock.  If a trading market does not develop or is not maintained, Holders of the New Senior Secured Notes, Warrants and the New Ziff Davis Holdings Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, the Reorganized Debtors.

Persons to whom the New Senior Secured Notes, Warrants or the New Ziff Davis Holdings Common Stock are issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, any market that does develop for any of such securities may be volatile. Other factors, such as the restrictions on transferability discussed below and the likelihood that Reorganized Ziff Davis Holdings will not declare dividends for the foreseeable future, may further depress any market for the New Ziff Davis Holdings Common Stock and Warrants.

2.    *Restrictions on Transfer*

If the parties receiving New Ziff Davis Holdings Common Stock enter into a "lock-up" in order to protect certain tax attributes of the Reorganized Debtors, any attempted sale, purchase, transfer, assignment, conveyance, pledge, disposition or other transaction (including the exercise of options or Warrants) ("Transfer"), without the prior written consent of Reorganized Ziff Davis Holdings' Board of Directors, of any shares of New Ziff Davis Holdings Common Stock to any Person (including a group of Persons making a coordinated acquisition) may be restricted. Further the New Shareholder Agreement may restrict or condition the ability to Transfer shares of New Ziff Davis Holdings Common Stock.

Resales by certain persons who are deemed to be "underwriters" pursuant to section 1145(b) of the Bankruptcy Code will be restricted. For further discussion, see Section VIII.B below.

3.    *Potential Dilution Caused by Options or Warrants*

If options or Warrants to purchase the New Ziff Davis Holdings Common Stock are exercised or other equity interests are granted under the New Management Incentive Plan or the Board of Reorganized New Ziff Davis Holdings issues equity securities in the future, such equity interests will dilute the ownership percentage represented by the New Ziff Davis Holdings Common Stock distributed on the Effective Date under the Plan. If any of the options or Warrants issued under the Plan are exercised, the resulting issuance of New Ziff Davis Holdings Common Stock will dilute the ownership percentage represented by the New Ziff Davis Holdings Common Stock distributed on the Effective Date under the Plan.

Subject to the terms of the Warrant Agreement, issuances of New Ziff Davis Common Stock subsequent to the Effective Date shall not alter the number of Shares of New Ziff Davis Common Stock into which the Warrants may be exercised. For example, if on the Effective Date in the aggregate 1000 shares of New Ziff Davis Common Stock are issued to Holders of Claims in Classes 4 and 5, then the Warrants shall be for an aggregate of 50 shares of New Ziff Davis Common Stock. If an additional 40 shares of New Ziff Davis Common Stock are issued after the Effective Date under the New Management Incentive Plan, the Warrants shall continue to be exercisable into 50 shares of New Ziff Davis Common Stock.

In the future, additional equity financings or other share issuances by Reorganized Ziff Davis Holdings could adversely affect the market price of New Ziff Davis Holdings Common Stock. Sales by existing Holders of a large number of shares of New Ziff Davis Holdings Common Stock in the public market or the perception that additional sales could occur could cause the market price of New Ziff Davis Holdings Common Stock to decline. If additional shares of New Ziff Davis Holdings Common Stock are issued, as will be permitted by Reorganized Ziff Davis Holdings' charter, such equity interests will dilute the ownership

percentage represented by the New Ziff Davis Holdings Common Stock distributed on the Effective Date under the Plan.

    4.     *Dividends*

The Reorganized Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Ziff Davis Holdings Common Stock in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which Reorganized Ziff Davis Holdings may become a party may limit the ability of Reorganized Ziff Davis Holdings to pay dividends.

    5.     *Change of Control*

The Debtors' Articles of Incorporation and Bylaws, the New Debtors Certificates of Incorporation and By-laws, as well as the Delaware General Corporation Law, contain provisions that may have the effect of delaying, deterring or preventing a change in control of the Debtors.

## G.    Competition

The high degree of competition in the Debtors' businesses and the potential for new competitors to enter into those businesses could cause actual results to differ from those expected by the Debtors.

## H.    Cyclicality

The Debtors' businesses follow the cyclical nature of the general advertising industry whereby there are periods of greater business activity due to general consumer trends. Their periods of greatest business activity are during the fourth quarters of each year. There is also a natural increase in the fourth quarter due to holiday spending which positively impacts the Debtors' consumer driven businesses.

Finally, there have been occasional general downward trends in the Debtors' industry. While no such general downward trend is anticipated during the period of the Debtors' projections, there can be no assurance that general market conditions relating to the Debtors' services will not impair the Debtors' future financial performance.

## I.    Reliance on Key Personnel

The Debtors operate a business that is highly dependent on skilled employees. A loss of a significant number of key management or sales employees could have a material adverse effect on the Reorganized Debtors.

The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain and motivate their officers and key employees. There can be no assurance that the Reorganized Debtors will be able to retain and employ qualified management and sales personnel.

## J.    Debt Service

The Debtors' business plan projects that the Reorganized Debtors should be able to comfortably meet their obligations under the New Senior Secured Notes while growing their businesses and enhancing their cash position. No guaranty can be made, however, that the performance in the business plan will be achieved. Further, if the Reorganized Debtors fall

materially short of their business plan, there is no guaranty that they will be able to meet the debt service obligations under the New Senior Secured Notes.

**K.** **Litigation**

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

**L.** **Certain Tax Considerations**

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article IX regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to Holders of Claims who are entitled to vote to accept or reject the Plan.

**M.** **Customer Concentration**

While the Debtors do not believe that their customer concentration is unusually heavy, their top ten (10) customers account for approximately twenty one and seven tenths percent (21.7%) of overall revenues, and the Debtors' largest customer accounts for approximately three and three tenths percent (3.3%) of overall revenue. Moreover long term contracts are not customary in the Debtors' industry and, as a result, the loss of the Debtors' largest customers or a group of large customers could materially adversely effect the Reorganized Debtors' post-emergence financial performance.

**N.** **Post-Emergence Leverage**

While the Debtors believe that they are currently well positioned competitively, and that the Projections contemplate adequate ongoing capital investment to maintain and improve the Reorganized Debtors' competitive position, there can be no assurance that if the Reorganized Debtors materially under-perform their Projections, the leverage represented by any Exit Facility and the New Senior Secured Notes will not have an adverse effect on their businesses.

## VIII. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

It is not currently expected that any registration statement will be filed under the Securities Act or any state securities laws with respect to the issuance or distribution of the New Senior Secured Notes, the Warrants or the New Ziff Davis Holdings Common Stock under the Plan or their subsequent transfer or resale. The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and state securities laws exempt from federal and state securities registration requirements with respect to (a) the offer and the sale of such securities pursuant to the Plan and (b) subsequent transfers of such securities.

**A.** **Offer and Sale of New Securities Pursuant to the Plan: Bankruptcy Code Exemption from Registration Requirements**

Holders of certain Allowed Claims will receive certain New Senior Secured Notes and New Ziff Davis Holdings Common Stock and Warrants pursuant to the Plan. Section

1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a pre-petition or administrative expense claim against the debtor or an interest in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale of the New Senior Secured Notes and New Ziff Davis Holdings Common Stock and Warrants under the Plan will be exempt from registration under the Securities Act and state securities laws.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the Holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

## B.    Subsequent Transfers of New Securities

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under the plan from the Holders of such securities, if the offer to buy is: (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The term "issuer" is defined in Section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities.  Moreover, the legislative history of

section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Senior Secured Notes, New Ziff Davis Holdings Common Stock or Warrants pursuant to the Plan, resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New Senior Secured Notes, New Ziff Davis Holdings Common Stock or Warrants unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

Pursuant to the Plan, certificates evidencing New Senior Secured Notes, New Ziff Davis Holdings Common Stock or Warrants received by a Holder of 10% of any class of such securities will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Whether or not any particular person would be deemed to be an "underwriter," or an "affiliate" of the Reorganized Debtors, would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any such person would be such an "underwriter" or "affiliate." **Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under Rule 144 and the circumstances under which such securities may be sold in reliance upon such Rule**.

**In each of the provinces of Canada either a resale exemption is available or application may be made for an exemption from the relevant first trade restrictions in order for the securities issued under the Plan to be freely tradable by Canadian Holders through an exchange or a market outside of Canada or to a person or company outside of Canada.**

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW SENIOR SECURED NOTES, THE NEW ZIFF DAVIS HOLDINGS COMMON STOCK, THE WARRANTS, OR THE BANKRUPTCY MATTERS DESCRIBED HEREIN. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR AND PARTY-IN-

INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW SENIOR SECURED NOTES, THE NEW ZIFF DAVIS HOLDINGS COMMON STOCK OR THE WARRANTS.

## IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Certain U.S. Federal Income Tax Consequences of the Plan

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN TO CERTAIN DEBTORS AND HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS SUMMARY IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE OR DIFFERING INTERPRETATION, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR OTHER PASSTHROUGH ENTITY, AND HOLDERS OF SENIOR SECURED NOTE CLAIMS, MHR NOTE CLAIMS, SUBORDINATED NOTE CLAIMS, AND STUB NOTE CLAIMS THAT DO NOT HOLD THESE CLAIMS AS CAPITAL ASSETS). IN ADDITION, THIS SUMMARY DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN.

EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN. EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT

DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER. NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "<u>IRS</u>") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

**To ensure compliance with United States Internal Revenue Service Circular 230, (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written by us to be relied upon, and cannot be relied upon by Holders, for purposes of avoiding penalties that may be imposed on such Holders under the Code; (b) such discussion is written to support the promotion of the Plan; and (c) each Holder of a claim should seek advice based on such Holder's particular circumstances from an independent tax advisor.**

**B.** **U.S. Federal Income Tax Consequences to Certain Debtors**

1. Cancellation of Indebtedness Income

Under the Code, a U.S. taxpayer generally recognizes discharged indebtedness ("<u>COD</u>") income in an amount equal to the difference between the "adjusted issue price" of the indebtedness discharged and the sum of the amount of any cash, the "issue price" of any new debt instruments, and the fair market value of any stock or other property transferred in satisfaction of the discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged. COD income generally does not include the discharge of indebtedness to the extent payment of the liability would have given rise to a deduction.

The Debtors intend to take the position that the New Senior Secured Notes are debt instruments for U.S. federal income tax purposes. The Debtors also intend to take the position that the right to the amounts based on the proceeds for the Indemnity Escrow are debt instruments for U.S. federal income tax purposes (such instruments shall be referred for purposes of this discussion as the "<u>Indemnity Escrow Proceed Rights</u>").

Based on the foregoing positions, the Debtors expect to realize COD income with respect to the settlement of the Senior Secured Note Claims and MHR Note Claims in an amount equal to the excess of (1) the adjusted issue price of the Senior Secured Notes and MHR Notes over (2) the sum of (a) the Cash paid for the Senior Secured Notes and MHR Notes, (b) the issue price of the New Senior Secured Notes, (c) the issue price of the Indemnity Escrow Proceed Rights, and (d) the fair market value of the New Ziff Davis Holdings Common Stock issued for the Senior Secured Notes and MHR Notes. The Debtors also expect to realize COD income upon the issuance of New Ziff Davis Holdings Common Stock and Warrants in satisfaction of the Subordinated Note Claims and Stub Note Claims. The amount of the COD income will equal the excess of (1) the adjusted issue price of the Subordinated Notes and Stub Notes over (2) the sum of (a) the fair market value of the New Ziff Davis Holdings Common Stock issued therefor and (b) the fair market value of the Warrants.

U.S. taxpayers that recognize COD income generally are required to include such amounts in gross income for purposes of determining their U.S. federal income taxes for the

year.  However, the Debtors, because they are under the jurisdiction of a court in a title 11 case, will not be required to include COD income in their gross income.  Instead of recognizing the COD income, the Debtors will be required to reduce certain tax attributes (e.g., net operating loss and net operating loss carryovers (collectively, "NOLs"), general business credit carryovers, foreign tax credit carryovers and tax basis in property (collectively, "Tax Attributes")) by the amount of the COD income excluded from gross income.  In general, to the extent the tax basis in property of the Debtors is reduced, it will be limited to the excess of the aggregate tax bases of the relevant taxpayer's property over the aggregate of such Debtors' liabilities immediately after the discharge.  The reduction in Tax Attributes occurs on the first day of the taxable year following the realization of such COD income.

2.     Utilization of NOLs and Net Unrealized Built-in Losses

In general, when a corporation undergoes an "ownership change," which the Debtors are expected to undergo as a result of the consummation of the Plan, Section 382 of the Code ("Section 382") limits the corporation's ability to utilize NOLs and, if the corporation has a net unrealized built-in loss in its assets (i.e., losses economically accrued but unrecognized as of the date of the ownership change), limits the recognition of those built-in losses upon the sale or depreciation of those assets following the ownership change.  The annual limitation on a corporation's use of NOLs and certain recognized built-in losses following an "ownership change" is generally equal to the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate" (currently 4.55% for ownership changes occurring in April of 2008).

By election, a special rule under Section 382, applicable to corporations under the jurisdiction of a court in a title 11 case, applies in calculating the appropriate annual Section 382 limitation.  Under this special rule, the annual Section 382 limitation would be calculated by reference to the lesser of (i) the value of New Ziff Davis Holdings Common Stock (with certain adjustments) immediately after the Effective Date (as opposed to immediately before the Effective Date) or (ii) the value of Reorganized Ziff Davis Holdings' assets (determined without regard to liabilities) immediately before the Effective Date.  Although this elective calculation for corporations in bankruptcy may significantly increase the annual Section 382 limitation, Reorganized Ziff Davis Holdings' ability to use NOLs and recognized built-in losses to offset taxable income generated after consummation of the Plan would still be expected to be significantly limited if this election were made.

Another provision under Section 382 provides a complete exception from the application of the annual Section 382 limitation for corporations under jurisdiction of a court in a title 11 case if certain additional requirements are met (the "Bankruptcy Exception").  If the Debtors are able to apply the Bankruptcy Exception, there will be no annual limitation (other than with respect to alternative minimum tax discussed below) on the use of pre-change NOLs or built-in losses to offset post-change income on account of consummation of the Plan; however the amount of pre-change NOLs available to be carried over to a post-Effective Date year will be reduced by the amount of interest that had been deducted during the taxable year leading up to the Effective Date and during the three preceding taxable years in respect of indebtedness exchanged for stock under the Plan.  Remaining NOLs will also generally be subject to reduction of Tax Attributes as described above under "Cancellation of Indebtedness Income."

The Debtors expect to be eligible for the Bankruptcy Exception if certain historic creditors (and possibly creditors of certain other Debtors) own at least 50% of the total voting power, and of the total value, of the stock of Reorganized Ziff Davis Holdings as a result of the consummation of the Plan on the Effective Date. Even if Reorganized Ziff Davis Holdings is eligible to and elects to apply the Bankruptcy Exception (and is therefore not subject to an annual Section 382 limitation as a result of the consummation of the Plan), a second ownership change occurring within two years after consummation of the Plan would eliminate any ability to use any NOL carryovers to offset taxable income earned or gains recognized from the sale of assets, in either case, after such second ownership change. At the present time, there can be no assurance that a second ownership change will not occur within two years after the Effective Date of the Plan and, as a result, it is not presently known whether the Reorganized Debtors will attempt to utilize the Bankruptcy Exception. If they do not utilize the Bankruptcy Exception, or such exception is not available, the Reorganized Debtors will be eligible to elect the other special rule discussed above for computing the Section 382 limitation.

3.     U.S. Federal Alternative Minimum Tax

For purposes of computing Reorganized Ziff Davis Holdings' regular tax liability, all of its taxable income recognized in a taxable year generally may be offset by NOLs (to the extent permitted under the Code and subject to various limitations, including Section 382, as discussed above). Even if all of Reorganized Ziff Davis Holdings' regular federal income tax liability for a given year is reduced to zero by virtue of its NOLs, Reorganized Ziff Davis Holdings may still be subject to the alternative minimum tax (the "AMT"). The AMT imposes a tax equal to the amount by which 20% of a corporation's alternative minimum taxable income ("AMTI") exceeds the corporation's regular tax liability. AMTI is calculated pursuant to specific rules in the Code which eliminate or limit the availability of certain tax deductions and which include as income certain amounts not generally included in computing the corporation's regular tax liability (however any COD income excluded from Reorganized Ziff Davis Holdings' regular taxable income, as described above, would also be excluded from its AMTI). Of particular importance to Reorganized Ziff Davis Holdings is that in calculating AMTI, only 90% of a corporation's AMTI may be offset by net operating loss carryovers (as computed for AMT purposes), resulting in an effective tax rate of 2% on AMTI sheltered by NOLs. Additionally, a corporation with a net unrealized built-in loss in its assets must adjust the tax basis of its assets for AMT purposes, on a consolidated basis, to their fair market values, resulting in an increase in AMTI.

Any AMT a corporation pays will generally be allowed as a nonrefundable credit against its regular federal income tax liability in future tax years when the corporation is no longer subject to AMT.

4.     Accrued Interest

To the extent a portion of the consideration issued to Holders of Claims is attributable to accrued but unpaid interest, certain Debtors may be entitled to interest deductions in the amount of such accrued interest to the extent such interest is otherwise deductible under the Code and not already deducted. Although the ability of parties to allocate consideration between accrued interest and principal is uncertain in some cases, the Debtors believe that a portion of the consideration transferred to the Senior Secured Note Holders and the MHR Note Holders will be attributable to accrued and unpaid interest. Accordingly, the Debtors may be

entitled to interest deductions in the amount of such accrued interest to the extent such interest is otherwise deductible under the Code and not already deducted.

## C.     U.S. Federal Income Tax Consequences to Claim Holders

1.     Holders of Senior Secured Note Claims and MHR Note Claims (Class 4)

<u>General</u>.  A Holder of Senior Secured Note Claims or MHR Note Claims will realize gain or loss on the exchange of a Senior Secured Note or MHR Note pursuant to the Plan in an amount equal to the difference between (i) the amount realized and (ii) the Holder's adjusted tax basis in the Senior Secured Note or MHR Note.  A Holder's amount realized should equal the sum of (a) the issue price of the New Senior Secured Note received by such Holder, (b) the issue price of the Indemnity Escrow Proceed Rights received by such Holder, (c) the fair market value of all the contingent payments due under the Indemnity Escrow Rights received by such Holder, (d) the fair market value of the New Ziff Davis Holdings Common Stock received by such Holder, and (e) the Cash received by such Holder.  Whether a Holder will recognize the gain or loss realized for U.S. federal income tax purposes depends on whether the exchange will qualify as a "tax free reorganization" for U.S. federal income tax purposes.

Whether the exchange will qualify as a "tax-free reorganization" (and the tax consequences of any reorganization) will depend upon, among other things, whether the Senior Secured Notes, MHR Notes, the New Senior Secured Notes, the Indemnity Escrow Proceed Rights constitute "securities" for U.S. federal income tax purposes.  A Holder will generally recognize no gain or loss upon exchanging an issuer's securities for stock or other securities of such issuer (except that consideration received for a claim for accrued but unpaid interest must be included as current income).  By contrast, a Holder will recognize gain upon exchanging (i) an issuer's obligations that are not securities for securities of such issuer or (ii) an issuer's securities for obligations of such issuer that are not securities.  An instrument constitutes a "security" for these purposes if, based on all the facts and circumstances, the instrument constitutes a meaningful investment in the issuer of the instrument.  Although there are a number of factors that may affect the determination of whether a debt instrument is a "security," one of the most important factors is the original term of the instrument, or the length of time between the issuance of the instrument and its maturity.  Generally, corporate debt instruments with an original term of less than five years are not considered securities, while corporate debt instruments with an original term of ten years or more are considered securities.  The Senior Secured Notes had an original term of seven years.  The MHR Notes had an original term of five years.  The Debtors intend to take the position that the Senior Secured Notes and MHR Notes all constitute securities for U.S. federal income tax purposes.  The Debtors, however, plan to take the position that New Senior Secured Notes and Indemnity Escrow Proceed Rights are not securities for U.S. federal income tax purposes.  Based on this determination, although not free from doubt, the Debtors believe that exchange of the Senior Secured Notes and MHR Notes pursuant to the Plan should constitute a "tax-free reorganization" for U.S. federal income tax purposes and the receipt of the Cash, the New Senior Secured Notes, and the Indemnity Escrow Proceed Rights constitute the receipt of "boot" for U.S. federal income tax purposes.

Based on these positions, a Holder should not recognize any loss realized on the exchange of the Senior Secured Notes or MHR Notes pursuant to the Plan.  A Holder of Senior Secured Notes or MHR Notes should, however, recognize any gain realized in an amount equal to the lesser of (1) the gain realized on the exchange of the Senior Secured Notes or MHR Notes

pursuant to the Plan and (2) the sum of (a) the Cash received by such Holder in exchange for the Senior Secured Notes or MHR Notes, (b) the fair market value of the New Senior Secured Notes received by such Holder in exchange for the Senior Secured Notes or MHR Notes, and (c) the fair market value of the Indemnity Escrow Proceed Rights received by such Holder in exchange for the Senior Secured Notes or MHR Notes.  Any gain recognized in a taxable exchange generally will be capital gain (except to the extent of any accrued market discount and any portion attributable to accrued but unpaid interest, in each case not previously included in the Holder's income), and will be long-term capital gain assuming that at the time of the exchange, the Senior Secured Notes or MHR Notes were held for more than one year.

A Holder's aggregate tax basis in the New Ziff Davis Holdings Common Stock received in respect of a Senior Secured Note or MHR Note should generally be equal to the adjusted tax basis of the Senior Secured Notes or MHR Notes exchanged therefor plus any gain recognized on the exchange less (1) the sum of (a) the Cash received, (b) the fair market value of the New Senior Secured Notes received, and (c) the fair market value of the Indemnity Escrow Proceed Rights received.  The holding period for the New Ziff Davis Holdings Common Stock received in respect of Senior Secured Notes or MHR Notes should include the holding period of the Senior Secured Notes or MHR Notes.  A Holder's initial tax basis in the Indemnity Escrow Proceed Rights should also equal their fair market value.  A Holder's initial tax basis in the New Senior Secured Notes should equal the fair market value of the New Senior Secured Notes.  The Holder's holding period in such instruments should begin on the date immediately following the date of the exchange.

If a Holder recognizes gain as a result of the exchange of the Senior Secured Notes or MHR Notes pursuant to the Plan, the Holder may be eligible to use the installment sale method for reporting the gain that results from receiving the New Senior Secured Notes and the Indemnity Escrow Proceed Rights.  Using the installment sale method could alter the usual method for determining a Holder's tax basis in the New Ziff Davis Holdings Common Stock and the Holder's tax basis in the New Senior Secured Notes and the Holder's tax basis in the Indemnity Escrow Proceed Rights.  Holders should consult with their own tax advisors to determine the U.S. federal income tax consequences of using the installment sale method.

Market Discount.  The Treasury Department is expected to promulgate regulations that will provide that any accrued "market discount" not treated as ordinary income upon a tax-free exchange of market-discount bonds (generally, bonds acquired for less than their issue price) would carry over to any nonrecognition property received in the exchange.  If such regulations are promulgated and applicable to the Plan, any accrued but unrecognized market discount on an exchanged claim that constitutes a security would carry over to any New Ziff Davis Holdings Common Stock received pursuant to the Plan.  Any gain recognized by a Holder upon a subsequent disposition of such New Ziff Davis Holdings Common Stock also would be treated as ordinary income to the extent of any accrued market discount not previously included in such Holder's income.

Holders are urged to consult their tax advisors as to the application and U.S. federal income tax consequences of the market discount rules.

Accrued Interest.  As discussed above, the manner in which the consideration received pursuant to the Plan is to be allocated between accrued but unpaid interest and principal for U.S. federal income tax purposes is unclear under present law.  Although the ability of parties

to allocate consideration between accrued interest and principal is uncertain in some cases, the Debtors believe that a portion of the consideration transferred to the Senior Secured Note Holders will be attributable to accrued and unpaid interest and intend to take the position that a portion of the consideration distributed to Holders of the Senior Secured Note Claims and MHR Note Claims pursuant to the Plan is allocable to accrued and unpaid interest on such Claims, which such Senior Secured Note Holders will be required to recognize as income if not already recognized.

Conversely, a Senior Secured Note Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security or a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.

Holders are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

Tax Consequences of Holding and Disposing of the New Ziff Davis Holdings Common Stock, New Senior Secured Notes and Indemnity Escrow Proceed Rights. Holders are urged to consult with their own tax advisors regarding the U.S. federal income tax treatment of holding and disposing of the New Ziff Davis Holdings Common Stock. Holders are also urged to consult with their own tax advisors regarding the U.S. federal income tax consequences of holding and disposing of a New Senior Secured Note and Indemnity Escrow Proceed Rights, including the application of the following rules to their own tax situation.

a. Issue Price of New Senior Secured Notes. The "issue price" of the New Senior Secured Notes will depend on whether the Senior Secured Notes, the MHR Notes and the New Senior Secured Notes are "publicly traded" within the meaning of applicable Treasury Regulations, and will not include amounts treated as received with respect to accrued interest on the Senior Secured Notes and MHR Notes (which would be taxable as ordinary income). If either the Senior Secured Notes, MHR Notes or New Senior Secured Notes are publicly traded, the issue price of the New Senior Secured Notes will equal the fair market value of the New Senior Secured Notes (if the New Senior Secured Notes are publicly traded) or the Senior Secured Notes or MHR Notes (if the Senior Secured Notes or MHR Notes are publicly traded), in each case on the date of the exchange. If none of the Senior Secured Notes, MHR Notes or New Senior Secured Notes are publicly traded, the issue price of the New Senior Secured Notes will equal their imputed principal amount (generally, the present value of payments due under the New Senior Secured Notes, discounted using the appropriate applicable federal rate, compounded semi-annually). The Debtors plan on taking the position that the Senior Secured Notes, MHR Notes, and New Senior Secured Notes are not publicly traded.

b. Original Issue Discount ("OID") with respect to New Senior Secured Notes. Pursuant to the exchange of Senior Secured Notes and MHR Notes for New Senior Secured Notes, the New Senior Secured Notes will be treated as issued with OID in an amount equal to the excess, if any (to the extent that it exceeds a statutorily defined *de minimus* amount), of the stated redemption prices at maturity of the New Senior Secured Notes over their respective issue prices. A Holder that is deemed to hold New Senior Secured Notes with OID generally will be required to include OID in gross income under a constant yield method in advance of the

receipt of cash attributable to that income regardless of the Holder's method of tax accounting. The amount of OID required to be included in gross income with respect to the New Senior Secured Notes may differ from the amount of OID required to be included in gross income with respect to the Senior Secured Notes and MHR Notes.

      c.     <u>Issue Price of the Indemnity Escrow Proceed Rights</u>.  The "issue price" of the Indemnity Escrow Proceed Rights will depend on whether the Indemnity Escrow Proceed Rights, the MHR Notes and the New Senior Secured Notes are "publicly traded" within the meaning of applicable Treasury Regulations, and will not include amounts treated as received with respect to accrued interest on the Senior Secured Notes and MHR Notes (which would be taxable as ordinary income).  If either the Senior Secured Notes, MHR Notes or Indemnity Escrow Proceed Rights are publicly traded, the issue price of the Indemnity Escrow Proceed Rights will equal the fair market value of the Indemnity Escrow Proceed Rights (if the Indemnity Escrow Proceed Rights are publicly traded) or the Senior Secured Notes or MHR Notes (if the Senior Secured Notes or MHR Notes are publicly traded), in each case on the date of the exchange.  If none of the Senior Secured Notes, MHR Notes or Indemnity Escrow Proceed Rights are publicly traded, the issue price of the Indemnity Escrow Proceed Rights should equal the lesser of the noncontingent principal payments and the present value of all noncontingent payments.  The Debtors plan on taking the position that the Senior Secured Notes, MHR Notes, and Indemnity Escrow Proceed Rights are not publicly traded.

      d.     <u>Treatment of Payments on Indemnity Escrow Proceed Rights</u>.  Assuming that none of the Senior Secured Notes, MHR Notes, or Indemnity Escrow Proceeds Rights are publicly traded, a holder of Indemnity Escrow Proceed Rights that receives a payment will be required for U.S. federal income tax purposes to treat a portion of the payment as the receipt of interest and a portion as the receipt of principal.   The interest portion shall equal the amount of the payment less the present value of the payment determined by discounting the payment back to the issue date utilizing a discount rate (generally, the appropriate applicable federal rate using appropriate compounding for the month of issuance).  To the extent that the payment is treated as interest it will be included in taxable income of the recipient.  To the extent it is treated as principal, it first reduces the holder's adjusted tax basis.  To the extent it exceeds the adjusted tax basis, it should be taxed as capital gains and, long-term capital gains, if the holder's holding period exceeds one year.  Similar rules apply for purposes of characterizing the amount realized on any subsequent taxable disposition of the Indemnity Escrow Proceed Rights.

     2.     Holders of Subordinated Note Claims and Stub Note Claims (Class 5)

      <u>General</u>.  A Holder of Subordinated Notes and Stub Notes will realize gain or loss on the exchange of a Subordinated Note and Stub Note pursuant to the Plan in an amount equal to the difference between (i) the amount realized and (ii) the Holder's adjusted tax basis in the Subordinated Note or Stub Note.  A Holder's amount realized should equal the sum of (a) the fair market value of the New Ziff Davis Holdings Common Stock received by such Holder and (b) the fair market value of the Warrant received by such Holder.  Whether a Holder will recognize the gain or loss realized for U.S. federal income tax purposes depends on whether the exchange will qualify as a "tax free reorganization" for U.S. federal income tax purposes.

      Whether the exchange will qualify as a "tax-free reorganization" (and the tax consequences of any reorganization) will depend upon, among other things, whether the Subordinated Notes, Stub Notes, and Warrants constitute "securities" for U.S. federal income tax

purposes. A Holder will generally recognize no gain or loss upon exchanging an issuer's securities for stock or other securities of such issuer (except that consideration received for a claim for accrued but unpaid interest must be included as current income). By contrast, a Holder will recognize gain upon exchanging (i) an issuer's obligations that are not securities for securities of such issuer or (ii) an issuer's securities for obligations of such issuer that are not securities. An instrument constitutes a "security" for these purposes if, based on all the facts and circumstances, the instrument constitutes a meaningful investment in the issuer of the instrument. Although there are a number of factors that may affect the determination of whether a debt instrument is a "security," one of the most important factors is the original term of the instrument, or the length of time between the issuance of the instrument and its maturity. Generally, corporate debt instruments with an original term of less than five years are not considered securities, while corporate debt instruments with an original term of ten years or more are considered securities. In addition, instruments such as the Warrants generally constitute "securities" for the "tax-free reorganization" rules. The Debtors intend to take the position that the Subordinated Notes and the Stub Notes constitute securities for U.S. federal income tax purposes. The Debtors also plan on taking the position that the Warrants constitute securities for purposes of the "tax-free reorganization" rules. Accordingly, although not free from doubt, the Debtors believe that the receipt of the New Ziff Davis Holdings Common Stock and Warrants in respect of the Subordinated Notes or the Stub Notes pursuant to the Plan should constitute a "tax free reorganization."

Based on these positions, a Holder should not recognize any gain or loss realized on the exchange of the Subordinated Notes or Stub Notes for the New Ziff Davis Holding Common Stock and Warrants pursuant to the Plan. A Holder's aggregate tax basis in the New Ziff Davis Holdings Common Stock and Warrants received pursuant to the Plan for the Subordinated Notes or Stub Notes should generally be equal to the Holder's adjusted tax basis in its Subordinated Notes or Stub Notes. A Holder's basis will be allocated between the Ziff Davis Holdings Common Stock and Warrants based on relative fair market values. The holding period for the New Ziff Davis Holdings Common Stock and Warrants received by a Holder of Subordinated Notes or Stub Notes pursuant to the Plan should include the holding period of the Subordinated Notes and Stub Notes.

Holders are urged to consult their own tax advisors to determine the U.S. federal income tax consequences of holding and disposing of the New Ziff Davis Holdings Common Stock and the Warrants.

Accrued Interest. As discussed above, the manner in which the consideration received pursuant to the Plan is to be allocated between accrued but unpaid interest and principal for U.S. federal income tax purposes is unclear under present law. Although the ability of parties to allocate consideration between accrued interest and principal is uncertain in some cases, the Debtors intend to take the position that the consideration distributed to Holders of the Subordinated Note and Stub Note Claims is attributed first to unpaid principal and then to accrued but unpaid interest.

3. Holders of General Unsecured Claims and Convenience Class Claims (Classes 6 and 7)

The Debtors believe that the receipt of Cash in respect of the General Unsecured Claims and Convenience Class Claims pursuant to the Plan should be treated as a taxable exchange for U.S. federal income tax purposes.

A Holder who receives Cash upon consummation of the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes equal to the difference between such Holder's adjusted tax basis, if any, in the General Unsecured Claim and the Cash received in exchange therefore.

Holders of General Unsecured Claims and Convenience Class Claims are expected to receive a Cash distribution on or around the Effective Date. However, if a Holder of a General Unsecured Claim or Convenience Class Claim recognizes gain on the exchange and is entitled to receive deferred cash payments, such Holder may be eligible to report any gain from such cash payments under the installment method, which generally results in the recognition of gain as the deferred cash payments are received, unless such Holder affirmatively elects out of the installment method. Holders of General Unsecured Claims and Convenience Class Claims who receive cash deferred payments should consult their tax advisor regarding the application of the installment method and the possibility that they will need to treat a part of the proceeds as interest.

## D. Other Tax Matters

1. Information Reporting and Backup Withholding

Certain payments, including certain distributions pursuant to the Plan, payments of interest on the New Senior Secured Notes, payments of dividends, if any, on the New Ziff Davis Holdings Common Stock and the proceeds from the sale or other taxable disposition of the New Senior Secured Notes or the New Ziff Davis Holdings Common Stock or the Warrants, may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding (at the then applicable rate (currently 28%)) unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

2.     Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

# X.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

## A.     Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have prepared and relied upon the Projections, which are annexed to this Disclosure Statement as Appendix B.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations.  Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections were developed by Senior Management in consultation with the Debtors' financial advisor.  Collectively, Senior Management possesses decades of experience in the Debtors' industry, and the Projections rely, in part, on the judgment developed through that experience.  In addition, they are based on Senior Management's knowledge of the Debtors' businesses and customers, and by reference to publicly available projections for industry revenue growth.

The Projections, however, are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, realization of the Debtors' operating strategy for the Reorganized Debtors, industry performance, no material adverse changes in applicable legislation or regulations, or the administration thereof, exchange rates or generally accepted accounting principles, general business and economic conditions, competition, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters.  To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to business, economic and competitive uncertainties and contingencies.  Accordingly, the Projections are only an educated, good faith estimate and are necessarily contingent in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may be

adverse. The Projections should therefore not be regarded as a guaranty by the Debtors or any other Person that the results set forth in the Projections will be achieved. The Projections were prepared by the Debtors, and not by any of their creditors, and the Debtors' creditors make no representations concerning the reasonableness of the Projections. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein and in the Projections should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or will be achieved. The Projections should be read together with the assumptions set forth in the Projections and information in <u>Article VII</u> of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections. The Debtors, however, believe that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of the Projections or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: This Disclosure Statement and the financial projections contained herein and in the Projections include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical fact included in this Disclosure Statement are forward-looking statements, including, without limitation, financial projections, the statements, and the underlying assumptions, regarding the timing of, completion of and scope of the current restructuring, the Plan, debt and equity market conditions, the cyclicality of the Debtors' industry, current and future industry conditions, the potential effects of such matters on the Debtors' business strategy, results of operations or financial position, the adequacy of the Debtors' liquidity and the market sensitivity of the Debtors' financial instruments. The forward-looking statements are based upon current information and expectations. Estimates, forecasts and other statements contained in or implied by the forward-looking statements speak only as of the date on which they are made, are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to evaluate and predict. Although the Debtors believe that the expectations reflected in the forward-looking statements are reasonable, parties are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Certain important factors that could cause actual results to differ materially from the Debtors' expectations or what is expressed, implied or forecasted by or in the forward-looking statements include developments in the Chapter 11 Cases, adverse developments in the timing or results of the Debtors' business plan (including the time line to emerge from chapter 11), the timing and extent of changes in economic conditions, industry capacity and operating rates, the supply-demand balance for the Debtors' services, competitive products and pricing pressures, federal and state regulatory developments, the Debtors' financial leverage, motions filed or actions taken in connection with the bankruptcy proceedings, the availability of skilled personnel, the Debtors' ability to attract or retain high quality employees and operating hazards attendant to the industry. Additional factors

that could cause actual results to differ materially from the Projections or what is expressed, implied or forecasted by or in the forward-looking statements are stated herein in cautionary statements made in conjunction with the forward-looking statements or are included elsewhere in this Disclosure Statement.

## B.    Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes 4, 5, 6 and 7 will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

## C.    Best Interests Test

As noted above even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtors in their chapter 11 cases that are allowed in the chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and

unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

## D. Liquidation Analysis

For purposes of the best interests test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as <u>Appendix D</u> (the "<u>Liquidation Analysis</u>"), which concludes that in a chapter 7 liquidation, other than the Senior Secured Note Holders and the MHR Note Holders, no Holders of prepetition Claims would receive any recovery whatsoever. The Plan, which proposes to make available Cash proceeds to General Unsecured Creditors, a Cash distribution to Convenience Class Claims, and 10% of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants) and the Warrants to Subordinated and Stub Note Holders, thus proposes to distribute more to these classes than the Debtors believe they would receive in a chapter 7 liquidation. Moreover, the Liquidation Analysis projects that the Senior Secured Note Holders' and the MHR Note Holders' recovery in a chapter 7 liquidation would be in the range of $11,252,000 to $29,665,000. The Plan, in contrast, proposes to distribute to the Senior Secured Note Holders and the MHR Note Holders with Allowed Class 4 Claims (a) their pro rata share of the New Senior Secured Notes; (b) their pro rata share of all Cash of the Debtors (except for Cash in the Debtors' operating accounts and the Cash Funding at Exit which shall be retained by the Reorganized Debtors to fund operations and working capital needs); (c) their pro rata share of ninety percent (90%) of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants); and (d) their pro rata share of the proceeds of the Indemnity Escrow. The Debtors believe that the aggregate value of the consideration provided to the Senior Secured Note Holders and the MHR Note Holders under the Plan should far exceed the range that the Liquidation Analysis projects as a recovery to such creditors in a chapter 7 liquidation. Thus the Debtors believe that the Senior Secured Note Holders and the MHR Note Holders, too, are better off under the Plan than in a chapter 7 liquidation. These conclusions are premised upon the assumptions set forth in <u>Appendix D</u>, which the Debtors and Alvarez & Marsal believe are reasonable.

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation

Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

### E.     Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation

It is impossible to determine with certainty the value each Holder of a General Unsecured Claim, a Senior Secured Note Claim, a MHR Note Claim, a Subordinated Note Claim or a Stub Note Claim will receive under the Plan as a percentage of any Allowed Claim. This difficulty in estimating the value of recoveries for such Holders is primarily due, in the case of General Unsecured Claims, to the uncertainty surrounding the amount of General Unsecured Claims that will ultimately be Allowed, and in addition, in the case of Class 4 and Class 5 Claims, to the difficulty in assessing the market for the New Ziff Davis Holdings Common Stock and predicting whether and for how long the Holders will hold the New Ziff Davis Holdings Common Stock.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

### F.     Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In the event any Class of Impaired Claims rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes 4, 5, 6, 7 and 8.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is

entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Classes 4, 5, 6 and 7 and Interests in Class 8.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims in Classes 4, 5, 6 and 7 the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

## A. Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

## B. Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. It is, however, possible to predict that the Senior Secured Note Holders and the MHR Note Holders would assert that they held security interests in all assets to be liquidated, likely resulting in nothing to distribute to any other Class of Claims or Interests.

The Debtors believe that a liquidation under chapter 7 would cause a substantial diminution in the Debtors' Estates given the substantial premium in the enterprise value of their businesses over the liquidation value of their assets, and the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, conversion to a chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most chapter 7 trustees are disinclined to continue operations.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could theoretically be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the commencement of a liquidation resulted in the Debtors' businesses incurring operating losses, the Debtors efforts to liquidate their assets over a longer period of time could theoretically result in a lower net distribution to Creditors than they would receive through a chapter 7 liquidation. Nevertheless, because there would be no need to appoint a chapter 7 trustee and hire new professionals, a chapter 11 liquidation might be less costly than a chapter 7 liquidation and thus provide larger net distributions to Creditors than in a chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain.

The Debtors believe that any liquidation under chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated under the Plan.

## XII. THE SOLICITATION; VOTING PROCEDURES

### A. Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### B. Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims in Classes 4, 5, 6 and 7 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1, 2 and 3 are deemed to have accepted the Plan and Class 8 is deemed to have rejected the Plan and, therefore, none of the Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

### C. Solicitation Order

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, by downloading the Solicitation Order from the Debtors' case website at www.bmcgroup.com/ziffdavis or by making written request upon the Debtors' counsel or Voting Agent.

### D. Waivers of Defects, Irregularities, Etc.

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to seek rejection of any and all ballots not in proper form. The Debtors further reserve the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

### E. Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the Voting Agent in a timely manner via either: (i) regular mail at BMC Group Inc., P.O. Box 926, El Segundo, CA 90245-0926 (Attention: Ziff Davis Voting Agent), or (ii) hand delivery or overnight courier at BMC Group Inc., 444 N. Nash Street, El Segundo, CA 90245 (Attn: Ziff Davis Voting Agent). The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed

ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

## F.     Voting Rights of Disputed Claimants

Holders of Disputed Claims in Classes 4, 5, 6 and 7 whose Claims are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Distribution Record Date or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Distribution Record Date (collectively, the "Disputed Claimants") are not permitted to vote on the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed and served upon the Debtors' counsel and the Voting Agent no later than 5:00 p.m. (Eastern time) on the fourteenth (14th) day after the later of (i) the Solicitation Date and (ii) the date of service of an objection, if any, to such claim. The ballot of any creditor filing such a motion, will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing. Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan. Nothing herein affects the Debtors' right to object to any Proof of Claim after the Distribution Record Date. With respect to any such objection, the Debtors may request that any vote cast by the Holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met.

## G.     Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

**If by regular mail:**

BMC GROUP INC.
P.O. BOX 926
EL SEGUNDO, CA 90245-0926
ATTENTION: ZIFF DAVIS VOTING AGENT

**If by overnight courier or hand delivery:**

BMC GROUP INC.
444 N. NASH STREET
EL SEGUNDO, CA 90245
ATTENTION: ZIFF DAVIS VOTING AGENT

**If by telephone, for U.S. callers only:**

ZIFF DAVIS VOTING AGENT
(888) 909-0100

**If by telephone, for international callers:**

ZIFF DAVIS VOTING AGENT
(310) 256-3285

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in Classes 4, 5, 6 and 7 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before June 9, 2008 at 5:00 p.m. prevailing Eastern time.

Dated: May 6, 2008

ZIFF DAVIS MEDIA INC.; ZIFF DAVIS DEVELOPMENT INC.; ZIFF DAVIS HOLDINGS INC.; ZIFF DAVIS INTERMEDIATE HOLDINGS INC.; ZIFF DAVIS INTERNET INC.; ZIFF DAVIS PUBLISHING INC.; and ZIFF DAVIS PUBLISHING HOLDINGS INC.

By: /s/ Jason Young
Name: Jason Young
Title: Chief Executive Officer

**<u>Appendix A</u>**

Second Amended Joint Chapter 11 Plan of Reorganization

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| Ziff Davis Media Inc., et al.,[1] | ) | |
| | ) | Case No. 08-10768 (BRL) |
| Debtors. | ) | Jointly Administered |
| | ) | |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## DATED AS OF MAY 6, 2008

 The above-captioned debtors and debtors in possession hereby submit their Second Amended Joint Chapter 11 Plan of Reorganization Dated as of May 6, 2008.

Dated: May 6, 2008     WINSTON & STRAWN LLP


         By: /s/ Daniel J. McGuire

         David Neier (DN 5391)
         Carey D. Schreiber (CS 3896)
         WINSTON & STRAWN LLP
         200 Park Avenue
         New York, New York  10166
         Telephone:  (212) 294-6700
         Facsimile:  (212) 294-4700

         -and-

         Mark K. Thomas (admitted *pro hac vice*)
         Daniel J. McGuire (admitted *pro hac vice*)
         Mindy D. Cohn (admitted *pro hac vice*)
         WINSTON & STRAWN LLP
         35 West Wacker Drive
         Chicago, Illinois  60601
         Telephone:  (312) 558-5600
         Facsimile:  (312) 558-5700

         *Attorneys for Debtors and Debtors in Possession*

---

[1] The Debtors in these cases include:  Ziff Davis Media Inc.; Ziff Davis Development Inc.; Ziff Davis Holdings Inc.; Ziff Davis Intermediate Holdings Inc.; Ziff Davis Internet Inc.; Ziff Davis Publishing Inc.; and Ziff Davis Publishing Holdings Inc.

ARTICLE I  DEFINITIONS, INTERPRETATION AND EXHIBITS...........................................1

    Section 1.01.  Definitions...........................................................................................1

    Section 1.02.  Rules of Interpretation ...............................................................15

    Section 1.03.  Exhibits ......................................................................................16

ARTICLE II  CLASSIFICATION OF CLAIMS AND INTERESTS.......................................16

    Section 2.01.  Generally....................................................................................16

    Section 2.02.  Unclassified Claims ...................................................................16

    Section 2.03.  Unimpaired Classes ...................................................................16

    Section 2.04.  Impaired Classes Entitled to Vote.............................................16

    Section 2.05.  Impaired Class Deemed to Reject..............................................17

ARTICLE III  PROVISIONS FOR TREATMENT OF CLASSES OF  CLAIMS AND
INTERESTS .......................................................................................................17

    Section 3.01.  Satisfaction of Claims and Interests...........................................17

    Section 3.02.  Unclassified Claims, Classified Unimpaired and Impaired Claims
and Classified Interests ..........................................................................17

    Section 3.03.  Administrative Claims ................................................................17

    Section 3.04.  Priority Tax Claims ....................................................................18

    Section 3.05.  Class 1:  Miscellaneous Secured Claims ...................................18

    Section 3.06.  Class 2:  Miscellaneous Priority Claims ....................................19

    Section 3.07.  Class 3:  Subsidiary Interests .....................................................19

    Section 3.08.  Class 4:  Senior Secured Note Claims and MHR Note Claims .................19

    Section 3.09.  Class 5:  Subordinated Note Claims and Stub Note Claims ......................20

    Section 3.10.  Class 6:  General Unsecured Claims...........................................20

    Section 3.11.  Class 7:  Convenience Class Claims...........................................20

    Section 3.12.  Class 8:  Old Ziff Davis Holdings Common Stock and Interests ..............20

ARTICLE IV  ACCEPTANCE OR REJECTION OF THE PLAN; CRAMDOWN...................20

    Section 4.01.  Acceptance by Impaired Classes of Claims and Interests .........................20

    Section 4.02.  Voting Classes ...........................................................................21

    Section 4.03.  Ballot Instructions......................................................................21

    Section 4.04.  Cramdown..................................................................................21

ARTICLE V  PROVISIONS GOVERNING DISTRIBUTIONS  UNDER THE PLAN ............21

    Section 5.01.  Timing of Distributions..............................................................21

    Section 5.02.  Distributions to Holders of Allowed Claims .............................................22

    Section 5.03.  Delivery of Distributions ...........................................................22

Section 5.04. Application of Distribution Record Date ....................................................22

Section 5.05. Method of Cash Distributions..................................................................22

Section 5.06. Failure to Negotiate Checks....................................................................22

Section 5.07. Unclaimed Distributions .........................................................................23

Section 5.08. Limitation on Distribution Rights ............................................................23

Section 5.09. Fractional Dollars...................................................................................23

Section 5.10. Compliance With Tax Requirements.........................................................23

Section 5.11. De Minimis Distributions ........................................................................24

Section 5.12. Documentation Necessary to Release Liens .............................................24

ARTICLE VI EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
INDEMNIFICATION OBLIGATIONS; BENEFIT PROGRAMS .................................24

Section 6.01. Treatment of Executory Contracts and Unexpired Leases ........................24

Section 6.02. Cure of Defaults for Assumed Contracts and Leases ...............................25

Section 6.03. Resolution of Objections to Assumption of Executory Contracts
and Unexpired Leases ..............................................................................25

Section 6.04. Bar Date for Claims for Rejection Damages .............................................26

Section 6.05. Treatment of Rejection Damages Claims .................................................26

Section 6.06. Executory Contracts and Unexpired Leases Entered Into and Other
Obligations Incurred After the Petition Date .............................................26

Section 6.07. Reorganized Debtors' Indemnification Obligations ..................................27

Section 6.08. Benefit Programs ...................................................................................27

ARTICLE VII MEANS FOR IMPLEMENTATION OF THE PLAN .....................................27

Section 7.01. Corporate Action....................................................................................27

Section 7.02. Articles of Organization..........................................................................28

Section 7.03. Issuance of New Ziff Davis Holdings Common Stock...............................28

Section 7.04. Issuance of Warrants..............................................................................28

Section 7.05. New Senior Secured Notes .....................................................................28

Section 7.06. Operations Between the Confirmation Date and the Effective Date ..........29

Section 7.07. Revesting of Assets................................................................................29

Section 7.08. Approval of Agreements..........................................................................29

Section 7.09. Adoption or Assumption of Senior Management Contracts.......................29

Section 7.10. Adoption of New Management Incentive Plan...........................................29

Section 7.11. Exit Funding...........................................................................................30

Section 7.12. Deregistration........................................................................................30

Section 7.13. Cancellation of Subordinated Notes and Stub Notes................................30

Section 7.14. Release and Discharge of Subordinated Notes Indenture Trustee
and Stub Notes Indenture Trustee.............................................................31

CHI:2085596.5

ARTICLE VIII  PRESERVATION OF CAUSES OF ACTION AND RIGHT TO DEFEND AND CONTEST ....................................................................31

Section 8.01.  Preservation of Rights.................................................................31

Section 8.02.  Rights of Action........................................................................31

Section 8.03.  Setoffs .....................................................................................31

Section 8.04.  No Payment or Distribution Pending Allowance.........................32

Section 8.05.  Resolution of Disputed Claims ..................................................32

ARTICLE IX  CONDITIONS TO CONSUMMATION OF THE PLAN ...................32

Section 9.01.  Confirmation Order....................................................................32

Section 9.02.  Conditions to Effective Date.......................................................32

Section 9.03.  Waiver of Conditions to Consummation .....................................33

Section 9.04.  Effect of Failure or Absence of Waiver of Conditions Precedent to the Effective Date of the Plan ......................................................34

ARTICLE X  OPERATION AND MANAGEMENT OF THE REORGANIZED DEBTORS ......................................................................................34

Section 10.01.  Post-Effective Date Operation of Business.................................34

Section 10.02.  Post Effective Date Officers and Directors.................................34

ARTICLE XI  EFFECTS OF CONFIRMATION .................................................34

Section 11.01.  Discharge ................................................................................34

Section 11.02.  Injunction. ..............................................................................35

Section 11.03.  Exculpation .............................................................................36

Section 11.04.  Releases...................................................................................36

Section 11.05.  Indemnification ........................................................................37

Section 11.06.  Other Documents and Actions ..................................................37

Section 11.07.  Term of Injunctions or Stays.....................................................37

Section 11.08.  Preservation of Insurance .........................................................38

Section 11.09.  Guaranties ...............................................................................38

Section 11.10.  Subordination Rights ...............................................................38

Section 11.11.  No Successor Liability...............................................................38

ARTICLE XII  RETENTION OF JURISDICTION ..............................................38

Section 12.01.  Exclusive Jurisdiction of Bankruptcy Court...............................38

Section 12.02.  Failure of Bankruptcy Court to Exercise Jurisdiction..................40

ARTICLE XIII  MISCELLANEOUS PROVISIONS .............................................41

Section 13.01.  Binding Effect of Plan ..............................................................41

Section 13.02.  Withdrawal of the Plan .............................................................41

Section 13.03.  Final Order .............................................................................41

Section 13.04.  Modification of the Plan ...........................................................41

CHI:2085596.5

Section 13.05. Business Days ........................................................................41

Section 13.06. Severability ...........................................................................42

Section 13.07. Governing Law .......................................................................42

Section 13.08. Dissolution of Committee and Ad Hoc Senior Secured Note
Holder Group ........................................................................42

Section 13.09. Payment of Fees and Expenses of the Senior Secured Notes
Indenture Trustee and the Collateral Trustee..............................42

Section 13.10. Retention of Lien ....................................................................42

Section 13.11. Payment of Fees and Expenses of the Subordinated Notes
Indenture Trustee and the Stub Notes Indenture Trustee.................42

Section 13.12. Retention of Lien ....................................................................43

Section 13.13. Payment of Statutory Fees ........................................................43

Section 13.14. Post-Confirmation Operating Reports ...........................................43

Section 13.15. Notices .................................................................................43

Section 13.16. Filing of Additional Documents ..................................................43

Section 13.17. Section 1125 of the Bankruptcy Code. ..........................................44

Section 13.18. Section 1146 Exemption ............................................................44

Section 13.19. Section 1145 Exemption ............................................................44

Section 13.20. Time ....................................................................................44

Section 13.21. No Attorneys' Fees ..................................................................44

Section 13.22. No Injunctive Relief .................................................................44

Section 13.23. Non-Voting Equity Securities ......................................................45

Section 13.24. Continued Confidentiality Obligations ...........................................45

Section 13.25. No Admissions or Waivers .........................................................45

Section 13.26. Entire Agreement ....................................................................45

Section 13.27. Waiver ..................................................................................45

Section 13.28. Bar Date for Professionals ..........................................................45

CHI:2085596.5

# INTRODUCTION

This second amended joint plan of reorganization under chapter 11 of the Bankruptcy Code (as amended or modified hereafter in accordance with its terms, the "Plan"), dated as of May 6, 2008, is proposed by Ziff Davis Media Inc., Ziff Davis Development Inc., Ziff Davis Holdings Inc., Ziff Davis Intermediate Holdings Inc., Ziff Davis Internet Inc., Ziff Davis Publishing Inc., and Ziff Davis Publishing Holdings Inc. (collectively, the "Debtors"). Reference is made to the Disclosure Statement accompanying the Plan for a discussion of the Debtors' history, business, results of operations, historical financial information, properties, projections for future operations and risk factors, a summary and analysis of the Plan, and certain related matters. The Debtors are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL CREDITORS OF THE DEBTORS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

Capitalized terms used herein shall have the meanings set forth in Article I hereof. The Debtors have obtained Bankruptcy Court authority to have the Chapter 11 Cases jointly administered for administrative and procedural purposes only. Accordingly, the Plan is being proposed as a joint plan of reorganization of the Debtors for administrative and procedural purposes only. The Plan is not premised upon the substantive consolidation of the Debtors or the Chapter 11 Cases and nothing herein shall be otherwise construed. The Debtors, however, reserve the right to seek substantive consolidation by motion or amendment to the Plan if they conclude that substantive consolidation is necessary or appropriate for effectuation of the Plan. Claims against, and Interests in, the Debtors (other than Administrative Claims and Priority Tax Claims) are classified in Article II hereof and treated in Article III hereof.

## ARTICLE I
## DEFINITIONS, INTERPRETATION AND EXHIBITS.

Section 1.01. Definitions. Unless the context requires otherwise, the following terms shall have the following meanings whether presented in the Plan or the Disclosure Statement with initial capital letters or otherwise. As used herein:

"Adequate Protection Claims" means all liens and claims of the Collateral Trustee on behalf of the Senior Secured Note Holders and on behalf of the MHR Note Holders granted pursuant to the Cash Collateral Order or subsequent order of the Bankruptcy Court.

"Ad Hoc Senior Secured Note Holder Group" means the group of Senior Secured Note Holders, consisting of: Blackport Capital Fund LTD.; Dune Capital LLC; MacKay Shields

LLC; Perry Corporation; Mast Capital Management, LLC; Strategic Value Partners, LLC; Stonehill Capital Management LLC; and, Tennenbaum Capital Partners, LLC.

"Administrative Claim" means a Claim for: (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default under an assumed executory contract or unexpired lease, (iii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; (b) any fees, charges or interest assessed against the Debtors' respective Estates under section 1930 of title 28 or section 3717 of title 31 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Collateral Trustee pursuant to the Cash Collateral Order.

"Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"Allowed" means, with reference to any Claim, (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that at the time of the Effective Date the Debtors, Reorganized Debtors or the Majority Senior Secured Note Holders have not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

"Allowed Claim" means a Claim that is Allowed.

"Allowed Interest" means an Interest that is Allowed.

"Avoidance Actions" means any and all Causes of Action which a trustee, debtor-in-possession, the estate or other appropriate party in interest may assert under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code (other than those which are released or dismissed as part of and pursuant to the Plan) or under other similar or related state or federal statutes or common law, including fraudulent conveyance laws.

CHI:2085596.5

"Ballot" means the forms of ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote on the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the instructions regarding voting.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date, together with all amendments and modifications thereto that subsequently may be made applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or, if such court ceases to exercise jurisdiction over these proceedings, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases.

"Bankruptcy Rules" means: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code; (c) the Local Rules of the Bankruptcy Court; and (d) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

"Bar Date" means the applicable bar date by which a proof of Claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court.

"Business Day" means any day which is not a Saturday, a Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), or a day on which banking institutions in the State of New York are authorized or obligated by law, executive order or governmental decree to be closed.

"Cash" means money, currency and coins, negotiable checks, balances in bank accounts and other lawful currency of the United States of America and its equivalents.

"Cash Collateral Order" means the Final Order entered by the Bankruptcy Court authorizing and approving the Debtors' use of cash collateral pursuant to section 363 of the Bankruptcy Code, and any extensions or amendments thereof.

"Cash Funding at Exit" means, in the event that the Reorganized Debtors cannot obtain exit financing to fund their working capital and other needs after emergence from the Chapter 11 cases, up to $7,500,000 of cash proceeds from the Segregated Account.

"Causes of Action" means any and all actions, claims, rights, defenses, third-party claims, damages, executions, demands, crossclaims, counterclaims, suits, choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or

CHI:2085596.5

derivatively, at law, in equity or otherwise, accruing to the Debtors or the Reorganized Debtors, including, but not limited to, the Avoidance Actions.

"Chapter 11 Cases" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on the Petition Date.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Claims Objection Deadline" means the latest of (a) 180 days after the Effective Date, (b) 180 days after the date on which any Claim is Filed, or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above.

"Class" means each class, subclass or category of Claims or Interests as classified in Article II of the Plan.

"Collateral Trustee" means U.S. Bank National Association, as Collateral Trustee under that certain First Lien Security Agreement dated as of April 22, 2005 among Ziff Davis Media Inc., the guarantors party thereto from time to time, and U.S. Bank National Association, as Collateral Trustee.

"Committee" means any committee appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee is from time to time constituted and reconstituted.

"Committee Members" means the members of the Committee.

"Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order.

"Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held before the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Convenience Class Claims" means any Claim that would otherwise be a General Unsecured Claim, but as to which one of the following applies:  (a) such Claim is in an amount less than or equal to $10,000; or (b) such Claim is in an amount greater than $10,000 but less than $50,000, and the Holder of such Claim has elected to have such Claim treated as a Class 7 Convenience Class Claim in the amount of $10,000 by so indicating on the Ballot submitted to vote such Claim.

CHI:2085596.5

"Creditor" means any Person that is the Holder of any Claim against any of the Debtors.

"Day(s)" means, unless expressly otherwise provided, calendar day(s).

"Debtors" shall have the meaning set forth in the Introduction.

"Disallowed" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (a) has been withdrawn, in whole or in part, by agreement of the Debtors or Reorganized Debtors and the Holder thereof; (b) has been withdrawn, in whole or in part, by the Holder thereof; or (c) has been disallowed, in whole or part, by Final Order of a court of competent jurisdiction. In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance or withdrawal.

"Disallowed Claim" means a Claim, or any portion thereof, that is Disallowed.

"Disallowed Interest" means an Interest, or any portion thereof, that is Disallowed.

"Disbursing Agent" means Reorganized Ziff Davis Media or such other Entity that is designated by Reorganized Ziff Davis Media to disburse Property pursuant to the Plan.

"Disclosure Statement" means the Debtors' Third Amended Disclosure Statement With Respect to the Second Amended Joint Chapter 11 Plan of Reorganization Dated as of May 6, 2008, including all exhibits, appendices, schedules and annexes, if any, attached thereto, as submitted by the Debtors, as the same may be altered, amended, supplemented or modified from time to time, and which was prepared and distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018.

"Disputed" means any Claim or Interest that has been neither Allowed nor Disallowed.

"Disputed Claim" means a Claim, or any portion thereof, that is Disputed. For purposes of the Plan, a Claim that has been neither Allowed nor Disallowed shall be considered a Disputed Claim.

"Disputed Interest" means an Interest, or any portion thereof, that is Disputed. For purposes of the Plan, an Interest that has been neither Allowed nor Disallowed shall be considered a Disputed Interest.

"Distribution Record Date" means the record date for determining entitlement to receive distributions under the Plan on account of Subordinated Note Claims and Stub Note Claims, which date shall be the 3rd Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern time.

"Effective Date" means the first Business Day following the date on which all conditions to consummation set forth in Article IX of the Plan have been satisfied or waived (if

capable of being duly and expressly waived), provided that no stay of the Confirmation Order is then in effect.

"Enterprise Sale" means the transaction whereby certain assets were sold and liabilities assigned to Enterprise Media Group, Inc. pursuant to the Enterprise Purchase and Sale Agreement dated as of June 20, 2007.

"Entity" means any individual, corporation, limited or general partnership, joint venture, association, joint stock company, limited liability company, estate, trustee, United States Trustee, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof.

"Estates" means the estates created in these Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code upon commencement of the Chapter 11 Cases.

"Exculpated Persons" means: (a) directors, officers and employees of the Debtors, as of the Petition Date but prior to the Effective Date, and the Debtors' agents and professionals, (b) the Ad Hoc Senior Secured Note Holder Group, (c) the Collateral Trustee and the Senior Secured Notes Indenture Trustee, (d) MHR, (e) the MHR Note Holders, (f) affiliates of the parties identified in subclauses (d) and (e) that have previously held or currently hold MHR Note Claims against the Debtors and the investment managers and general partners of such affiliates, (g) the Committee and the Committee Members, (h) Willis Stein, (i) the respective current and former officers, directors, employees, agents, stockholders, managers, members, affiliates, partners, advisors and professionals of the parties identified in subclauses (a) through (h).

"Exit Facility" means a new working capital credit facility, if any, that Reorganized Ziff Davis Media may enter into on or after the Effective Date only with the consent of the Majority Senior Secured Note Holders.

"File, Filed or Filing" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

"Final Decree" means the final decree entered by the Bankruptcy Court after the Effective Date and pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) of the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending; provided, however, that the possibility that a motion may be filed pursuant to Rules 9023 or 9024 of the Bankruptcy Rules or Rules 59 or 60(b) of the Federal Rules of Civil Procedure shall not mean that an order or judgment is not a Final Order.

"General Unsecured Claims" means all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, Professional Fee Claims, Miscellaneous Secured

CHI:2085596.5

Claims, Miscellaneous Priority Claims, Senior Secured Note Claims, MHR Note Claims, Subordinated Note Claims, Stub Note Claims, and Convenience Class Claims.

"Holder" means an Entity holding a beneficial interest in a Claim or Interest and, when used in conjunction with a Class or type of Claim or Interest, means a holder of a beneficial interest in a Claim or Interest in such Class or of such type.

"Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Impaired Claim" means a Claim which is Impaired.

"Impaired Interest" means an Interest which is Impaired.

"Indemnity Escrow" means the escrow established in connection with the Enterprise Sale.

"Interests" means any and all equity interests, ownership interests or shares in the Debtors issued by the Debtors prior to the Petition Date (including, without limitation, all capital stock, stock certificates, common stock, preferred stock, partnership interests, rights, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights and liquidation preferences, puts, calls or commitments of any character whatsoever relating to any such equity, ownership interests or shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock) whether or not certificated, transferable, voting or denominated "stock" or a similar security, and any Claim or Cause of Action related to or arising from any of the foregoing.

"Liens" means, with respect to any asset or Property (or the rents, revenues, income, profits or proceeds therefrom), and in each case, whether the same is consensual or nonconsensual or arises by contract, operation of law, legal process or otherwise: (a) any and all mortgages, liens, pledges, attachments, charges, leases evidencing a capitalizable lease obligation, conditional sale or other title retention agreement, or other security interest or encumbrance or other legally cognizable security devices of any kind in respect of any asset or Property, or upon the rents, revenues, income, profits or proceeds therefrom; or (b) any arrangement, express or implied, under which any Property is transferred, sequestered or otherwise identified for the purpose of subjecting or making available the same for the payment of debt or performance of any other obligation in priority to the payment of general unsecured Creditors.

"Majority Senior Secured Note Holders" means Holders of Senior Secured Notes holding more than 51% of the aggregate principal dollar amount of the Senior Secured Notes issued under the Senior Secured Notes Indenture.

"MHR" means MHR Institutional Partners III LP.

"MHR Notes" means the Notes issued to MHR pursuant to the Note Purchase Agreement in the aggregate principal amount of $20,000,000.

"MHR Note Claims" means the secured claims of the Holders of MHR Notes issued under the Note Purchase Agreement (including interest accrued on and after the Petition Date through the Effective Date at the contractual default rate set forth in the Note Purchase Agreement) and any Adequate Protection Claim granted to such Holders under the Cash Collateral Order or any subsequent order of the Bankruptcy Court.

"MHR Note Holders" means the Holders of the MHR Notes issued under the Note Purchase Agreement, together with their successors and assigns.

"Miscellaneous Priority Claims" means any Claim against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

"Miscellaneous Secured Claims" means any Secured Claim (other than the Senior Secured Note Claims and the MHR Note Claims).

"New Debtors Certificates of Incorporation and By-Laws" means the Amended and Restated certificates of incorporation, articles of organization, by-laws or other governing charter documents, as appropriate, of Ziff Davis Media Inc., Ziff Davis Development Inc., Ziff Davis Holdings Inc., Ziff Davis Intermediate Holdings Inc., Ziff Davis Internet Inc., Ziff Davis Publishing Inc., and Ziff Davis Publishing Holdings Inc which will be included in the Plan Supplement. The Plan Supplement will include the forms of the New Debtors Amended and Restated Certificate Amendments in substantially the form to be implemented on the Effective Date.

"New Management Incentive Plan" means the equity incentive plan to be adopted by Reorganized Ziff Davis Holdings on the Effective Date, the form of which will be Filed under seal with the Bankruptcy Court, and which is incorporated herein by reference.

"New Senior Secured Note Documents" means the New Senior Secured Notes Indenture, the New Senior Secured Notes, and the guarantees, security agreements, collateral trusts, and other documents contemplated by the foregoing, in each case as amended from time to time in accordance with their terms. The Plan Supplement will include a form of the New Senior Secured Note Documents in substantially the form to be implemented on the Effective Date.

"New Senior Secured Notes Indenture" means the Indenture pursuant to which the New Senior Secured Notes will be issued. The Plan Supplement will include a form of the New Senior Secured Notes Indenture in substantially the form to be implemented on the Effective Date.

"New Senior Secured Notes" means the new senior secured notes in the aggregate principal amount of $50,000,000, plus an amount equal to the Cash Funding at Exit, to be issued to Holders of Senior Secured Note Claims and Holders of MHR Note Claims. The New Senior Secured Notes will be subject to and governed by the New Senior Secured Notes Indenture. The

8

New Senior Secured Notes will be issued to the Holders of the Senior Secured Note Claims and MHR Note Claims on the Effective Date by Reorganized Ziff Davis Media and will be guaranteed by the other Reorganized Debtors. The New Senior Secured Notes will be secured by first priority liens on and security interests in all Property of the Reorganized Debtors; provided, however, that such liens and security interests may be junior in priority to liens and security interests securing any Exit Facility, if consummated, with and only with the consent of the Majority Senior Secured Note Holders. The Plan Supplement will include a form of the New Senior Secured Notes in substantially the form to be implemented on the Effective Date.

"New Shareholder Agreement" means the shareholder agreement to be entered into among the recipients of New Ziff Davis Holdings Common Stock, a copy of which will be included in the Plan Supplement. The Shareholder Agreement shall be reasonably acceptable to the Debtors, the Committee and the Ad Hoc Senior Secured Note Holder Group.

"New Ziff Davis Holdings Common Stock" means the authorized common stock of Reorganized Ziff Davis Holdings, to be issued on the Effective Date pursuant to the terms of the Plan.

"Note Purchase Agreement" means that certain Note Purchase Agreement dated as of February 15, 2007 between Ziff Davis Media Inc., as Issuer, certain guarantors party thereto, and MHR Institutional Partners III LP, and any of the permitted assignees, as Purchasers.

"Objection" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to Disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim) or Interest other than a Claim or an Interest that is Allowed.

"Old Ziff Davis Holdings Common Stock and Interests" means all authorized, issued and outstanding shares of common stock of, and Interests in, Ziff Davis Holdings Inc. as of the Petition Date, including, without limitation the Series A Redeemable Preferred Stock, the series B Redeemable Preferred Stock, the Series C Convertible Preferred Stock, the Series D. Redeemable Preferred Stock, and the Series E Redeemable Preferred Stock and all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of Old Ziff Davis Holdings Common Stock or Interests. Old Ziff Davis Holdings Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing.

"Person" means and includes a natural person, individual, partnership, corporation (as defined in section 101(a) of the Bankruptcy Code), or organization including, without limitation, corporations, limited partnerships, limited liability companies, general partnerships, joint ventures, joint stock companies, trusts, land trusts, business trusts, unincorporated organizations or associations, or other organizations, irrespective of whether they are legal entities, governmental bodies (or any agency, instrumentality or political subdivision thereof), or any other form of legal entities; provided, however, "Person" does not include governmental units, except that a governmental unit that (a) acquires an asset from a Person (i) as a result of the operation of a loan guarantee agreement or (ii) as receiver or liquidating agent of a Person; (b) is

a guarantor of a pension benefit payable by or on behalf of a Debtor or an Affiliate of a Debtor of; or (c) is the legal or beneficial owner of an asset of (i) an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code of 1986 or (ii) an eligible deferred compensation plan, as defined in section 457(b) of the Internal Revenue Code of 1986, shall be considered for purposes of section 1102 of the Bankruptcy Code to be a Person with respect to such asset or such benefit.

"Petition Date" means March 5, 2008, the date on which the Debtors Filed their respective petitions for relief commencing the Chapter 11 Cases.

"Plan" means this Second Amended Joint Chapter 11 Plan of Reorganization Dated as of May 6, 2008, including all exhibits, appendices, schedules and annexes, if any, attached hereto, as submitted by the Debtors, including the Plan Supplement, as such Plan may be altered, amended, supplemented or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Confirmation Order and the terms and conditions of Section 13.04 of the Plan.

"Plan Supplement" means the Supplement to this Plan to be Filed with the Bankruptcy Court on or before May 30, 2008. All documents in the Plan Supplement shall be in form, scope, and substance reasonably satisfactory to the Debtors and the Majority Senior Secured Note Holders. The form of the New Debtors Certificates of Incorporation and By-laws, New Management Incentive Plan, New Shareholder Agreement and Warrant Agreement shall be in form, scope and substance reasonably satisfactory to the Debtors, the Majority Senior Secured Note Holders and the Committee.

"Plan Support Agreement" means that certain Restructuring, Settlement and Plan Support Agreement dated as of April 30, 2008, pursuant to which, *inter alia*, each of the members of the Ad Hoc Senior Secured Note Holder Group, the MHR Note Holders, Willis Stein, the Committee and certain Committee Members and the other creditors signatory thereto agreed, subject to the terms and conditions specified therein, to support and to vote in favor of, and the Debtors agreed to seek confirmation of, a plan of reorganization as described therein.

"Post-Petition Collateral" has the meaning ascribed to it in the Cash Collateral Order.

"Priority Tax Claim" means any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

"Professional Fee Claim" means a claim for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code relating to services incurred on and after the Petition Date and prior to and including the Effective Date in connection with an application made to the Bankruptcy Court by Professionals in the Chapter 11 Cases.

"Professionals" means any professional employed in these Chapter 11 Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or any Professional entitled to compensation pursuant to sections 327, 328, 330, 331, 503(b)(2) or (4), or 1103 of the Bankruptcy Code.

CHI:2085596.5

"Property" means all assets or property of the Debtors' respective Estates of any nature whatsoever, real or personal, tangible or intangible, including contract rights, accounts and Causes of Action, previously or now owned by the Debtors, or acquired by the Debtors' respective Estates, as defined in section 541 of the Bankruptcy Code.

"Reinstated or Reinstatement" means: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitled the Holder of such Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence or which prohibit certain transactions or actions contemplated by the Plan, or conditioning such transactions or action on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

"Releasees" means: (a) the directors, officers and employees of the Debtors, in each case as of the Petition Date or that have become directors, officers, or employees thereafter but prior to the Effective Date, and the Debtors' agents and professionals, (b) the Ad Hoc Senior Secured Note Holder Group, (c) the Senior Secured Notes Indenture Trustee and the Collateral Trustee, (d) MHR, (e) the MHR Note Holders, (f) affiliates of the parties identified in subclauses (d) and (e) that have previously held or currently hold MHR Note Claims against the Debtors and the investment managers and general partners of such affiliates, (g) the Committee and the Committee Members, (h) Willis Stein, (i) the respective current and former officers, directors, employees, agents, stockholders, managers, members, affiliates, partners, advisors and professionals of the parties identified in subclauses (a) through (h); provided, however, that the foregoing released parties identified in subclauses (a) through (i) above shall be released only from liabilities arising out of actions taken in such capacity.

"Reorganized Debtors" means Reorganized Ziff Davis Holdings, Reorganized Ziff Davis Media, and the Reorganized Affiliated Debtors on and after the Effective Date.

"Reorganized Ziff Davis Holdings" means Ziff Davis Holdings Inc. on and after the Effective Date.

"Reorganized Ziff Davis Media" means Ziff Davis Media Inc. on and after the Effective Date.

CHI:2085596.5

"Reorganized Affiliated Debtors" means Ziff Davis Intermediate Holdings Inc., Ziff Davis Development Inc., Ziff Davis Publishing Holdings Inc., Ziff Davis Internet Inc. and Ziff Davis Publishing Inc. on and after the Effective Date.

"Schedule of Rejected Contracts" means the schedule listing certain executory contracts and unexpired leases to be rejected by the Debtors as of the Effective Date of this Plan, which schedule shall be included in the Plan Supplement.

"Schedules" means the schedules of assets and liabilities and statements of financial affairs Filed by any of the Debtors in the Chapter 11 Cases, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

"Secured Claim" means any Claim arising before the Petition Date that is: (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law on Property in which the Debtors' respective Estates has an interest and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both case (a) and (b), only to the extent of each such Estate's interest in the value of the assets or Property securing any such Claim or the amount subject to setoff, as the case may be.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Management" means Jason Young, Neil Glass and such other executives and employees designated by the Debtors to receive options to purchase New Ziff Davis Holdings Common Stock under the New Management Incentive Plan. The Reorganized Debtors' senior management shall be substantially the same as the Debtors' senior management on the date immediately prior to the Effective Date.

"Senior Management Contracts" means (i) certain of the existing employment and severance agreements with Senior Management (which with the approval of the Debtors and the consent of the Majority Senior Secured Note Holders may be modified and supplemented) which with the consent of the Majority Senior Secured Note Holders shall be assumed by the Debtors as of the Effective Date, and (ii) any new employment agreements with Senior Management which shall be subject to the approval of the Debtors and the Majority Senior Secured Note Holders, and which shall become effective as of the Effective Date. The form of the Senior Management Contracts for the Debtors' Chief Executive Officer, Mr. Jason Young, and the other members of Senior Management will be Filed under seal with the Bankruptcy Court in connection with the Filing of the Plan Supplement.

"Segregated Account" means account number 725-02095 at Merrill Lynch where certain proceeds from the Enterprise Sale were deposited.

"Senior Secured Note Claims" means the secured claims of the Senior Secured Notes Indenture Trustee and the Senior Secured Note Holders issued under the Senior Secured Notes Indenture (including interest accrued on and after the Petition Date through the Effective Date at the contractual default rate set forth in the Senior Secured Notes Indenture) and any

Adequate Protection Claims granted to the Collateral Trustee and the Senior Secured Note Holders under the Cash Collateral Order and any subsequent order of the Bankruptcy Court.

"Senior Secured Notes Indenture" means that certain Indenture dated as of April 22, 2005 between Ziff Davis Media Inc., and certain guarantors party thereto, and U.S. Bank National Association, as Trustee, regarding certain Senior Secured Floating Rate Notes Due 2012, as it may have been amended or supplemented from time to time.

"Senior Secured Notes Indenture Trustee" means U.S. Bank National Association, as Trustee under the Senior Secured Notes Indenture.

"Senior Secured Note Holders" means the Holders of the Senior Secured Notes issued under the Senior Secured Notes Indenture, together with their successors and assigns.

"Senior Secured Notes" means the Senior Secured Floating Rate Notes Due 2012 originally issued in the aggregate principal amount of $205,000,000 pursuant to the Senior Secured Notes Indenture.

"Stub Notes" means the 12% Senior Subordinated Notes due 2010 issued under the Stub Notes Indenture which Stub Notes, as of the Petition Date, were outstanding in the approximate amount of $12,000,000.

"Stub Note Claims" means all prepetition unsecured Claims of all Holders of Stub Notes issued under the Stub Notes Indenture and includes all Claims of the Stub Notes Indenture Trustee.

"Stub Note Holders" means the Holders of the Stub Notes issued under the Stub Notes Indenture, together with their successors and assigns.

"Stub Notes Indenture" means that certain indenture, dated as of July 21, 2000, among Ziff Davis Media Inc., the guarantors named therein and Bankers Trust Company, as trustee, as it may have been amended or supplemented from time to time.

"Stub Notes Indenture Trustee" means Deutsche Bank Trust Company Americas (formerly known as Bankers Trust Company), as Trustee under the Stub Notes Indenture, or its successors and assigns.

"Subordinated Note Holders" means the Holders of the Subordinated Notes issued under the Subordinated Notes Indenture, together with their successors and assigns.

"Subordinated Notes Indenture" means that certain indenture dated as of August 12, 2002 between Ziff Davis Media Inc., and the guarantors named herein, and Deutsche Bank Trust Company Americas, as Trustee, regarding certain Senior Subordinated Compounding Notes Due 2009, as it may have been amended or supplemented from time to time.

"Subordinated Notes Indenture Trustee" means Deutsche Bank Trust Company Americas, as Trustee under the Subordinated Notes Indenture.

CHI:2085596.5

"Subordinated Note Claims" means all prepetition, unsecured Claims of all Holders of Subordinated Notes issued under the Subordinated Notes Indenture and includes all claims of the Subordinated Notes Indenture Trustee.

"Subordinated Notes" means the Senior Subordinated Compounding Notes Due 2009 in the aggregate principal amount of $152,500,000 issued pursuant to the Subordinated Notes Indenture.

"Subordination Rights" means the subordination provisions contained in Article X of the Subordinated Notes Indenture and Article 10 of the Stub Notes Indenture.

"Subsidiary Debtors" means Ziff Davis Media Inc., Ziff Davis Development Inc., Ziff Davis Intermediate Holdings Inc., Ziff Davis Internet Inc., Ziff Davis Publishing Inc., and Ziff Davis Publishing Holdings Inc.

"Subsidiary Interests" means any and all authorized, issued and outstanding Interests in any of the Subsidiary Debtors as of the Petition Date.

"Tax" means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign governmental authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation and withholding tax, together with any interest, penalties, fines or additions attributable to, imposed on, or collected by any such federal, state, local or foreign governmental authority.

"Term Sheet" means that certain "Exhibit A" attached to the Plan Support Agreement.

"Unclaimed Property" means any distribution of Cash or any other Property made to the Holder of an Allowed Claim pursuant to the Plan that: (a) is returned to the Reorganized Debtors as undeliverable and no appropriate forwarding address is received within the later of (a) one (1) year after the Effective Date and (b) one (1) year after such distribution is made to such Holder, or (b) in the case of a distribution made in the form of a check, is not negotiated and no request for reissuance is made as provided for in Section 5.05 of the Plan.

"Unimpaired" means any Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

"United States Trustee" means the United States Trustee appointed under section 581(a)(3) of title 28 of the United States Code to serve in the Southern District of New York.

"U.S. Trustee's Fee Claims" means any fees or interest assessed against the Debtors' Estates pursuant to section 1930(a)(6) of title 28 or section 3717 of title 31 of the United States Code.

"Voting Agent" means the BMC Group Inc.

CHI:2085596.5

"Warrant" or "Warrants" means warrants exercisable into shares of New Ziff Davis Holdings Common Stock representing five percent (5%) of the shares of New Ziff Davis Holdings Common Stock to be issued on the Effective Date (calculated without regard for the potential dilution, subject to the terms of the Warrant Agreement, of such shares subsequent to the Effective Date, including potential dilution in connection with the New Management Incentive Plan) which Warrants: (i) shall entitle the holder to purchase from Reorganized Ziff Davis Holdings one fully paid and non assessable share of Ziff Davis Holdings Common Stock at the price per share that implies a full recovery for the holders of the Senior Secured Note Claims and the MHR Note Claims (including principal and interest calculated at the contractual default rate through the Effective Date, and (ii) shall expire automatically on the five-year anniversary of the Effective Date.

"Warrant Agreement" means the form of Warrant Agreement pursuant to which the Warrants will be issued on the Effective Date. The Warrant Agreement shall be in form and substance reasonably acceptable to the Debtors, the Majority Senior Secured Note Holders and the Committee and shall include, without limitation, antidilution protections and provisions for cashless exercise. The Plan Supplement will include a form of the Warrant Agreement in substantially the form to be implemented on the Effective Date.

"Willis Stein" means Willis Stein & Partners Management III, L.L.C. and certain of its affiliates that are signatories to the Plan Support Agreement.

"Ziff Davis Holdings" means the Debtor Ziff Davis Holdings Inc.

"Ziff Davis Intermediate Holdings" means the Debtor Ziff Davis Intermediate Holdings Inc.

"Ziff Davis Media" means the Debtor Ziff Davis Media Inc.

Section 1.02. <u>Rules of Interpretation</u>. All references to "the Plan" herein shall be construed, where applicable, to include references to this document and all its exhibits, appendices, schedules and annexes, if any (and any amendments thereto made in accordance with the Bankruptcy Code), including the Plan Supplement. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular paragraph, subparagraph, or clause contained in the Plan. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included. The captions and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any term used in the Plan that is not defined in the Plan, either in Article I hereof or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the case of a conflict or ambiguity). Without limiting the preceding sentence, the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply to the Plan, unless superseded herein. In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) and Section 13.15 hereof shall apply, but Bankruptcy Rule 9006(a) shall govern.

Section 1.03. <u>Exhibits</u>. All Exhibits to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein, regardless of when Filed.

# ARTICLE II
# CLASSIFICATION OF CLAIMS AND INTERESTS

Section 2.01. <u>Generally</u>. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class. A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

Section 2.02. <u>Unclassified Claims</u>. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the Classes designated in this Article II of the Plan. The treatment accorded Administrative Claims and Priority Tax Claims is set forth in Article III of the Plan.

Section 2.03. <u>Unimpaired Classes</u>. The Plan classifies the following Unimpaired Claims and Unimpaired Interests that are not entitled to vote on the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of a Claim or Interest in the following Classes is conclusively presumed to have accepted the Plan in respect of such Claims or Interests and is not entitled to vote to accept or reject the Plan:

(a)     Class 1 shall consist of all Miscellaneous Secured Claims.

(b)     Class 2 shall consist of all Miscellaneous Priority Claims.

(c)     Class 3 shall consist of all Subsidiary Interests.

Section 2.04. <u>Impaired Classes Entitled to Vote</u>. The Plan classifies the following Classes as the only Impaired Classes that may receive a distribution under the Plan and that are entitled to vote to accept or reject the Plan:

(a)     Class 4 shall consist of the Senior Secured Note Claims and the MHR Note Claims.

(b)     Class 5 shall consist of the Subordinated Note Claims and the Stub Note Claims.

16

(c)     Class 6 shall consist of the General Unsecured Claims.

(d)     Class 7 shall consist of the Convenience Class Claims.

Section 2.05.  <u>Impaired Class Deemed to Reject</u>.   The Plan classifies the following Impaired Interests Class as an Impaired Class that is not entitled to vote on the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Interest in this Class is conclusively presumed to have rejected the Plan in respect of such Interest because the Plan does not entitle the Holders of such Interests to receive or retain any property under the Plan on account of such Interests.   Accordingly, Holders of such Interests are not entitled to vote to accept or reject the Plan:

(a)     Class 8 shall consist of all Old Ziff Davis Holdings Common Stock and Interests.

## ARTICLE III
## PROVISIONS FOR TREATMENT OF CLASSES OF
## CLAIMS AND INTERESTS

Section 3.01.  <u>Satisfaction of Claims and Interests</u>.   The treatment of and consideration to be received by Holders of Allowed Claims or Allowed Interests pursuant to this Article III and the Plan shall be in full satisfaction, settlement, release, extinguishment and discharge of their respective Claims against or Interests in the Debtors and the Debtors' respective Estates, except as otherwise provided in the Plan or the Confirmation Order.

Section 3.02.  <u>Unclassified Claims, Classified Unimpaired and Impaired Claims and Classified Interests</u>.   Administrative Claims and Priority Tax Claims are treated in accordance with section 1129(a)(9)(A) and section 1129(a)(9)(C) of the Bankruptcy Code, respectively.     Such Claims are Unimpaired under the Plan and, in accordance with section 1123(a)(1) of the Bankruptcy Code, are not designated as Classes of Claims for purposes of this Plan and for purposes of sections 1123, 1124, 1126 and 1129 of the Bankruptcy Code. In addition, Class 1 Claims, Class 2 Claims, and Class 3 Interests are classified as Classes of Claims and Interests that are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Claims or Interests in such Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  Class 4 Claims, Class 5 Claims, Class 6 Claims, and Class 7 Claims are Impaired and the Holders thereof are entitled to vote to accept or reject the Plan.  Class 8 Interests are Impaired under the Plan and the Holders thereof will receive no distribution on account of their respective Interests and, pursuant to section 1126(g) of the Bankruptcy Code, such Holders are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Section 3.03.  <u>Administrative Claims</u>.  Administrative Claims are Unimpaired. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors (with the consent of the Majority

17

Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (i) liabilities, accounts payable or other Claims, or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date and (ii) contractual liabilities including those arising under loans or advances to the Debtors (including the Senior Secured Notes Indenture, the Note Purchase Agreement, the Subordinated Notes Indenture and the Stub Notes Indenture), whether or not incurred in the ordinary course of business of the Debtors subsequent to the Petition Date, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

Section 3.04.  <u>Priority Tax Claims</u>.  Priority Tax Claims are Unimpaired.  Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Priority Tax Claim is based, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.  The Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

Section 3.05.  <u>Class 1:  Miscellaneous Secured Claims</u>.  Class 1 Miscellaneous Secured Claims are Unimpaired.  Each Holder of an Allowed Class 1 Miscellaneous Secured Claim shall receive, in the sole discretion of the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Miscellaneous Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, and

CHI:2085596.5

the Holder of such Class 1 Miscellaneous Secured Claim; (b) treatment such that such Miscellaneous Secured Claim is Reinstated; (c) the Property securing such Miscellaneous Secured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

Section 3.06. <u>Class 2: Miscellaneous Priority Claims</u>. Class 2 Miscellaneous Priority Claims are Unimpaired. Each Holder of an Allowed Class 2 Miscellaneous Priority Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class 2 Claim becomes Allowed, and (iii) a date agreed to by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, and the Holder of such Class 2 Miscellaneous Priority Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Class 2 Priority Claims representing (i) liabilities, accounts payable or other Claims, or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date and (ii) contractual liabilities including those arising under loans or advances to the Debtors, whether or not incurred in the ordinary course of business of the Debtors subsequent to the Petition Date, shall be paid or performed by the Debtors (with the consent of the Majority Senior Secured Note Holders and the Committee) or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

Section 3.07. <u>Class 3: Subsidiary Interests</u>. Class 3 Interests are Unimpaired and the Holders thereof are deemed to have accepted the Plan. Each Holder of an Allowed Interest in Class 3 shall retain such Interest and its respective share or shares of common stock of the Subsidiary Debtors representing such Interest, but such Holder shall receive no distribution under the Plan on account of such Interest.

Section 3.08. <u>Class 4: Senior Secured Note Claims and MHR Note Claims</u>. Class 4 Senior Secured Note Claims and MHR Note Claims are Impaired. On the Effective Date, the Collateral Trustee will receive, for pro rata distribution (determined by dividing a Holder's Senior Secured or MHR Note Claims, as the case may be, by the sum of all Allowed Senior Secured and MHR Note Claims) to Holders of Allowed Senior Secured Note Claims and MHR Note Claims, the following in full satisfaction, settlement, release, extinguishment and discharge of such Claims: (a) the New Senior Secured Notes; (b) all Cash of the Debtors (except for cash in the Debtors' operating accounts and the Cash Funding at Exit which shall be retained by the Reorganized Debtors to fund operations and working capital needs); (c) ninety percent (90%) of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants); and (d) all proceeds received by the Debtors or the Reorganized Debtors, as the case may be, from the Indemnity Escrow.

19

Section 3.09.  <u>Class 5:  Subordinated Note Claims and Stub Note Claims</u>.  Class 5 Subordinated Note Claims and Stub Note Claims are Impaired.  On the Effective Date, the Holders of Allowed Subordinated Note Claims and Stub Note Claims shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such Claims (subject to the rights of the Subordinated Note Indenture Trustee and the Stub Note Indenture Trustee to first satisfy unpaid fees and expenses therefrom pursuant to Section 7.07 of the Subordinated Notes Indenture and Section 7.07 of the Stub Notes Indenture to the extent of any such fees and expenses that are not paid pursuant to Sections 3.03 and 13.11 of the Plan), their pro-rata share (determined by dividing each such Holder's Allowed Subordinated Note Claim or Stub Note Claims, as the case may be, by the sum of all Allowed Subordinated Note Claims and Stub Note Claims) of (i) ten percent (10%) of the New Ziff Davis Holdings Common Stock (which shares issued on the Effective Date are subject to dilution for the New Ziff Davis Holdings Common Stock allocated to the New Management Incentive Plan and the potential exercise of the Warrants), and (ii) the Warrants exercisable into shares of New Ziff Davis Holdings Common Stock representing 5% of the shares of New Ziff Davis Holdings Common Stock to be issued on the Effective Date, each of which shall entitle the holder thereof to purchase from Reorganized Ziff Davis Holdings one (1) fully paid and non assessable share of New Ziff Davis Holdings Common Stock at the price per share that implies a full recovery for the Holders of Allowed Senior Secured Note Claims and MHR Note Claims (including principal and interest at the contractual default rate through the Effective Date).

Section 3.10.  <u>Class 6:  General Unsecured Claims</u>.  Class 6 General Unsecured Claims are Impaired.  On the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Class 6 General Unsecured Claim shall receive its pro rata share (determined by dividing such Holder's Allowed General Unsecured Claim by the sum of all Allowed General Unsecured Claims) of $1,250,000.  Each Holder of an Allowed Class 6 Claim in an amount in excess of $10,000 but less than $50,000 may, in the alternative, elect to reduce its Class 6 Claim to $10,000 and have its Claim treated as a Class 7 Convenience Class Claim.

Section 3.11.  <u>Class 7:  Convenience Class Claims</u>.  Class 7 Convenience Class Claims are Impaired.  On the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Class 7 Convenience Class Claim shall receive 50% of the Allowed Amount of such Claim in Cash.

Section 3.12.  <u>Class 8:  Old Ziff Davis Holdings Common Stock and Interests</u>.  Class 8 Old Ziff Davis Holdings Common Stock and Interests are Impaired.  Holders of Class 8 Old Ziff Davis Holdings Common Stock and Interests shall not receive or retain any property under the Plan on account of such Old Ziff Davis Holdings Common Stock and Interests.  On the Effective Date, all Old Ziff Davis Holdings Common Stock and Interests shall be cancelled.

# ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN; CRAMDOWN

Section 4.01.  <u>Acceptance by Impaired Classes of Claims and Interests</u>.  Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if: (a) the Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class (other than Claims held by any Holder designated pursuant to

section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan, and (b) more than one-half (1/2) in number of the Holders of such Allowed Claims actually voting in such Class (other than Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan.  No Class of Interests is entitled to vote on the Plan pursuant to section 1126 of the Bankruptcy Code.

Section 4.02.  <u>Voting Classes</u>.  Except as otherwise required by the Bankruptcy Code or the Bankruptcy Rules or as otherwise provided in this Section 4.02, the Holders of Claims in Classes 4, 5, 6, and 7 shall be entitled to vote to accept or reject the Plan in accordance with Section 4.01 of the Plan.  Classes of Claims and Interests Unimpaired under the Plan (Miscellaneous Secured Claims (Class 1), Miscellaneous Priority Claims (Class 2), and Subsidiary Interests (Class 3)) shall not be entitled to vote to accept or reject the Plan, and shall be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  The Class of Interests that are Impaired that are receiving no distribution under the Plan, Old Ziff Davis Holdings Common Stock and Interests (Class 8), shall not be entitled to vote to accept or reject the Plan and shall be conclusively presumed to have rejected the Plan.  Administrative Claims and Priority Tax Claims are Unimpaired and not classified under the Plan and hence are not entitled to vote to accept or reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Section 4.03.  <u>Ballot Instructions</u>.  Each Holder of a Claim entitled to vote on the Plan will be asked to complete and return a Ballot to the Voting Agent, which will compile the votes so received.  Any questions as to the validity, form, and eligibility (including time of receipt) of Ballots will be resolved by the Bankruptcy Court upon application or at the Confirmation Hearing.

Section 4.04.  <u>Cramdown</u>.  If all applicable requirements for Confirmation of the Plan are met as set forth in section 1129(a)(1) through (13) of the Bankruptcy Code except subsection (8) thereof, the Debtors intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the requirements of section 1129(a)(8) thereof, on the bases that the Plan is fair and equitable, and does not discriminate unfairly, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.

## ARTICLE V
## PROVISIONS GOVERNING DISTRIBUTIONS
## UNDER THE PLAN

Section 5.01.  <u>Timing of Distributions</u>.  Except as set forth in Section 5.03 below, distributions of Property will be made to Holders of Allowed Claims and Allowed Interests in accordance with Article III of the Plan.  If a Claim or Interest is not an Allowed Claim or an Allowed Interest as of the applicable distribution date, distributions will be made only if and when the Claim or Interest is Allowed, and then in accordance with Article III of the Plan and, with respect to the cure of defaults for assumed executory contracts and unexpired leases, Section 6.02 of the Plan, and in each case, subject to Article VIII of the Plan.

21

Section 5.02. <u>Distributions to Holders of Allowed Claims</u>.    Except for distributions to Holders of Allowed Claims in Classes 4, 5, 6, and 7, which will be made in accordance with Sections 3.08 through 3.11 of the Plan, on the Effective Date, the Reorganized Debtors shall deliver to the Disbursing Agent sufficient Cash to make the distributions to be made on the Effective Date to the Holders of Allowed Claims entitled to receive Cash in accordance with Article III of the Plan.  Payments and other distributions to be made pursuant to the Plan will be available from the funds held by the Reorganized Debtors as of the Effective Date as well as from the Cash Funding at Exit or the Exit Facility, as applicable.  Further, in the event that the Debtors (or the Reorganized Debtors determine in the exercise of their reasonable business judgment that an Exit Facility is necessary or appropriate, an Exit Facility may be entered into (with the consent of the Majority Senior Secured Note Holders) with the proceeds thereof used to fund operations and/or make payments required under the Plan.  If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution, the Reorganized Debtors shall, in lieu of making such distribution to such Holder, delay such distribution until the disposition thereof shall be determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

Section 5.03. <u>Delivery of Distributions</u>.  Except for distributions to Holders of Allowed Senior Secured Note Claims and MHR Note Claims, which shall be made to the Collateral Trustee for the benefit of such Holders, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent: (a) at the last known addresses of such Holders or (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent.  If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest.  All distributions pursuant to the Plan shall be at the Reorganized Debtors' expense.

Section 5.04. <u>Application of Distribution Record Date</u>.  At the close of business on the Distribution Record Date, the transfer ledgers for the Subordinated Notes and the Stub Notes shall be closed, and there shall be no further changes in the record holders of such notes.  Except as provided herein, the Debtors, the Reorganized Debtors, the Disbursing Agent, the Subordinated Notes Indenture Trustee, the Stub Notes Indenture Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of the Subordinated Notes or the Stub Notes occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

Section 5.05. <u>Method of Cash Distributions</u>.  Any Cash payment to be made pursuant to the Plan may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Reorganized Debtors.

Section 5.06. <u>Failure to Negotiate Checks</u>.    Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance.  Any amounts returned to the Reorganized Debtors in respect of such non-

negotiated checks shall be held by the Reorganized Debtors, as appropriate. Requests for reissuance for any such check shall be made directly to the Reorganized Debtors by the Holder of the Allowed Claim with respect to which such check originally was issued. All amounts represented by any voided check will be held until the later of one (1) year after (a) the Effective Date or (b) the date that a particular Claim is Allowed, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made prior to such date. Thereafter, all such amounts shall be deemed to be Unclaimed Property, in accordance with Section 5.06 of the Plan, and all Holders of Claims in respect of void checks shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtors or their respective assets or the Reorganized Debtors or their respective assets.

Section 5.07. <u>Unclaimed Distributions</u>. All Property distributed on account of Claims must be claimed within the later of (a) one (1) year after the Effective Date or (b) one (1) year after such distribution is made to such Holder or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.05 of the Plan. All Unclaimed Property will be retained by and will revest in the Reorganized Debtors and will no longer be subject to distribution. All full or partial payments made by the Disbursing Agent and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of Debtors pursuant to the Plan. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Reorganized Debtors and any Claims filed in these cases. Pursuant to section 1143 of the Bankruptcy Code, all claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with this Section 5.06 will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or their respective assets or the Reorganized Debtors or their respective assets.

Section 5.08. <u>Limitation on Distribution Rights</u>. If a claimant holds more than one Claim in any one Class, all Claims of the claimant in that Class will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

Section 5.09. <u>Fractional Dollars</u>. Notwithstanding any other provision of the Plan, Cash distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Property pursuant to Section 5.06 of this Plan.

Section 5.10. <u>Compliance With Tax Requirements</u>. In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Reorganized Debtors shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law. With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Reorganized

Debtors within thirty (30) days from the date of such request, the Reorganized Debtors may, at their option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

Section 5.11. <u>De Minimis Distributions</u>. No Cash payment of less than five ($5.00) dollars shall be made to any Holder of an Allowed Claim on account of such Allowed Claim.

Section 5.12. <u>Documentation Necessary to Release Liens</u>. Each Creditor which is to receive a Cash distribution under the Plan in full satisfaction of a Secured Claim shall not receive such distribution until such Creditor executes and delivers any documents necessary to release all Liens arising under any applicable security agreement or non-bankruptcy law (in recordable form if appropriate) in connection with such Secured Claim and such other documents as the Debtors or the Reorganized Debtors, as applicable, may reasonably request or otherwise turns over and releases any and all Property of the Debtors that secures or purportedly secures such Claim. Any such holder that fails to execute and deliver such release of liens within 120 days of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors or their assets or Property in respect of such Claim and shall not participate in any distribution hereunder on account of such Claim. Notwithstanding the immediately preceding sentence, any such Holder of a Disputed Claim shall not be required to execute and deliver such release until at least the date that is 30 days after the date on which such Claim is Allowed or Disallowed.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION OBLIGATIONS; BENEFIT PROGRAMS

Section 6.01. <u>Treatment of Executory Contracts and Unexpired Leases</u>. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or Entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (a) has expired or terminated pursuant to its own terms, (b) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (c) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (d) is listed on the Schedule of Rejected Contracts which shall be included with the Plan Supplement; provided, however, that the Debtors shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Rejected Contracts upon notice to the counterparty to such contract or lease (a) to delete any executory contract or unexpired lease listed therein, thus providing for its assumption pursuant to this Section 6.01 or (b) to add any executory contract or unexpired lease thereto, thus providing for its rejection pursuant to this Section 6.01. The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, approving the assumptions and rejections hereunder. Each contract and lease assumed pursuant to this Section 6.01 shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. Assumption of a contract or lease pursuant to this Section 6.01 shall not constitute an admission by the Debtors or the Reorganized Debtors that such contract or lease is an executory contract or

unexpired lease or that the Debtors or the Reorganized Debtors have any liability thereunder. All executory contracts and unexpired leases that are assumed will be assumed under their present terms or upon such terms as are agreed to in writing between the applicable Debtor (with the consent of the Majority Senior Secured Note Holders) and the counterparty to the executory contract or unexpired lease. Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include: (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

Section 6.02. <u>Cure of Defaults for Assumed Contracts and Leases</u>. Except to the extent that (a) a different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 6.01 of this Plan, or (b) any executory contract or unexpired lease shall have been assumed pursuant to an order of the Bankruptcy Court which order shall have approved the cure amounts with respect thereto, the Reorganized Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, no later than May 30, 2008, serve on the counterparties to all executory contracts or unexpired leases a notice of intent to assume together with a proposed cure schedule, listing the cure amounts of all executory contracts and unexpired leases to be assumed. The nondebtor parties to such executory contracts and unexpired leases being assumed shall have thirty (30) days from service of such notice and cure schedule to object to the cure amounts specified therein. Service of such notice and cure schedule shall be sufficient if served on the other party to the executory contract or unexpired lease at the address indicated on (a) the contract or lease, (b) any proof of claim filed by such other party in respect of such contract or lease, or (c) the Reorganized Debtors' books and records; provided, however, that if a notice and cure schedule served by the Reorganized Debtors to one of the foregoing addresses is promptly returned as undeliverable, the Reorganized Debtors shall attempt reservice of the notice and cure schedule on an alternative address, if any, from the above listed sources. If any objections are filed, and cannot be resolved by agreement, the Bankruptcy Court shall hold a hearing to determine the cure amount with respect to the executory contract or unexpired lease subject to the objection. Any party failing to object to a proposed cure amount within thirty (30) days after service of the proposed cure amount by the Reorganized Debtors shall be forever barred from asserting, collecting, or seeking to collect from the Reorganized Debtors any amounts in excess of the proposed cure amount. Notwithstanding the foregoing, or anything else in this Article VI, with respect to any executory contract or unexpired lease which is subject to a cure amount objection, the Reorganized Debtors shall retain the right, until five (5) Business Days after any order fixing the cure amount becomes a Final Order, to reject such executory contract or unexpired lease.

Section 6.03. <u>Resolution of Objections to Assumption of Executory Contracts and Unexpired Leases</u>. Any party objecting to the Debtors' proposed assumption of an executory contract or unexpired lease on any grounds other than the proposed cure amount,

including, without limitation, the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed shall File and serve on counsel for the Debtors a written Objection to the assumption of such contract or lease not later than thirty (30) days from service of notice of the Debtors' intent to assume such executory contract or unexpired lease. Service of such notice shall be sufficient if served on the other party to the executory contract or unexpired lease at the address indicated on (a) the contract or lease, (b) any proof of claim filed by such other party in respect of such contract or lease, or (c) the Reorganized Debtors' books and records; provided, however, that if such a notice is served by the Reorganized Debtors to one of the foregoing addresses and is promptly returned as undeliverable, the Reorganized Debtors shall attempt reservice of the notice on an alternative address, if any, from the above listed sources. Failure to File an Objection within the time period set forth above shall constitute an acknowledgement of the assumption and revestment of such contract or lease, subject to payment of the cure amount, if any, including an acknowledgment that the proposed assumption provided adequate assurance of future performance. To the extent that any Objections to the assumption of a contract or lease are timely Filed and served and such Objections are not resolved between the Debtors and the objecting parties, the Bankruptcy Court shall resolve such disputes at the hearing on confirmation of this Plan or as soon as reasonable practicable thereafter. Notwithstanding the foregoing, or anything else in this Article VI, with respect to any executory contract or unexpired lease which is subject to a cure amount objection, the Reorganized Debtors shall retain the right, until five (5) Business Days after any order fixing the cure amount becomes a Final Order, to reject such executory contract or unexpired lease.

Section 6.04. <u>Bar Date for Claims for Rejection Damages</u>. Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Section 6.01 hereof must be filed with the Bankruptcy Court no later than the later of (a) twenty (20) days after the Effective Date, or (b) thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period shall be forever barred. The Reorganized Debtors shall have the exclusive right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.05 of this Plan.

Section 6.05. <u>Treatment of Rejection Damages Claims</u>. The Bankruptcy Court shall determine any objections Filed in accordance with Section 8.05 hereof at a hearing to be held on a date to be determined by the Bankruptcy Court. Subject to any statutory limitation, including, but not limited to the limitations contained in sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code, any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be Impaired and treated as Class 6 General Unsecured Claims in accordance with Section 3.10 of the Plan.

Section 6.06. <u>Executory Contracts and Unexpired Leases Entered Into and Other Obligations Incurred After the Petition Date</u>. On the Effective Date, all contracts, leases, and other agreements entered into by any or all of the Debtors on or after the Petition Date, which agreements have not been terminated in accordance with their terms on or before the Effective Date, shall revest in and remain in full force and effect as against the Reorganized Debtors and the other parties to such contracts, leases and other agreements.

CHI:2085596.5

Section 6.07. <u>Reorganized Debtors' Indemnification Obligations</u>. To the extent not inconsistent with the Plan, any obligations of the Debtors, pursuant to their respective articles of incorporation or by-laws, applicable state law or their specific agreement, to indemnify a Person with respect to all present and future actions, suits and proceedings against the Debtors, the Reorganized Debtors or such indemnified Person, based upon any act or omission related to service with, or for or on behalf of, the Debtors or the Reorganized Debtors, shall survive Confirmation of the Plan and shall not be impaired by Confirmation of the Plan, but shall be deemed and treated as executory contracts that are assumed and, as applicable, amended by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code, except to the extent any such obligation has been released, discharged or modified pursuant to the Plan. Such indemnification obligations shall survive unaffected by the Plan and shall be performed and honored by the Reorganized Debtors.

Section 6.08. <u>Benefit Programs</u>. Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) any officer, director or employee compensation and benefit program that entitled such Persons to receive or to acquire any Old Ziff Davis Holdings Common Stock or Interests, (b) executory contracts or plans specifically rejected pursuant to the Plan, and (c) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts. Notwithstanding any other provision of the Plan, any entitlement to receive or to acquire Old Ziff Davis Holdings Common Stock or Interests held as of the Effective Date by any officer, director or employee of any of the Debtors, or any other Person, whether automatic or contained in a compensation and benefit program, shall be terminated and any resulting Claims shall be Disallowed.

**ARTICLE VII**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

Section 7.01. <u>Corporate Action</u>. The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or to cause to be taken all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, (a) the cancellation of the Old Ziff Davis Holdings Common Stock and Interests, (b) the issuance of the New Ziff Davis Holdings Common Stock and Warrants, (c) the election of directors and officers in accordance with Section 10.02 of the Plan, (d) the adoption of the New Debtors Certificates of Incorporation and By-laws, (e) the issuance of the New Senior Secured Notes, (f) the execution and delivery of the New Senior Secured Documents, (g) the execution and delivery of the new Senior Management Contracts, (h) the adoption of New Management Incentive Plan, and (i) the entry into an Exit Facility if the Debtors, with the approval of the Majority Senior Secured Note Holders, determine that such an Exit Facility is

necessary and appropriate. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate officers and directors of the Debtors and the Reorganized Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan and the Plan Supplement in the name and on behalf of the Debtors and the Reorganized Debtors.

Section 7.02. <u>Articles of Organization</u>. The New Debtors' Certificates of Incorporation shall contain such provisions as are required to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, (a) authorization to issue 1,000,000 shares of New Ziff Davis Holdings Common Stock and the Warrants, (b) a prohibition on the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code, (c) a prohibition on the repurchase, by the Debtors, of New Ziff Davis Holdings Common Stock or the issuance of dividends or other Cash distributions on New Ziff Davis Holdings Common Stock until such time as the New Senior Secured Notes are repaid in full, (d) provisions for a seven (7) member Board of Directors of Reorganized Ziff Davis Holdings consisting of five (5) members appointed by the Ad Hoc Senior Secured Note Holder Group, one (1) member appointed by MHR and the other member being the acting Chief Executive Officer, (e) such other provisions as required by the New Shareholder Agreement, and (f) other provisions ordinary and customary in such situations so long as they are not inconsistent with any of the provisions to contained in the foregoing (a) through (e).

Section 7.03. <u>Issuance of New Ziff Davis Holdings Common Stock</u>. On the Effective Date, all of the issued and outstanding Old Ziff Davis Holdings Common Stock and Interests shall be canceled, and the New Ziff Davis Holdings Common Stock shall be issued to the Holders of Allowed Class 4 and 5 Claims, in accordance with Sections 3.08 and 3.09 of the Plan.

Section 7.04. <u>Issuance of Warrants</u>. On the Effective Date, the Warrants shall be issued in accordance with Section 3.09 of the Plan.

Section 7.05. <u>New Senior Secured Notes</u>. On the Effective Date, the Debtors shall issue the New Senior Secured Notes (which shall mature three years after the Effective Date). At the Reorganized Debtors' option, interest on the New Senior Secured Notes shall be payable as follows: (a) for the first eighteen (18) months, either (i) payment-in-kind ("<u>PIK</u>") at a per annum rate equal to the greater of LIBOR plus 1,000 basis points or 13.5%, or (ii) in cash at a per annum rate equal to the greater of LIBOR plus 800 basis points or 11.5%; and, (b) thereafter, in cash at a per annum rate equal to the greater of LIBOR plus 800 basis points or 11.5%. The principal amount of each of the New Senior Secured Notes will be due and payable on the maturity date of the New Senior Secured Notes. All other terms and conditions of the New Senior Secured Notes shall be acceptable to the Debtors and the Majority Senior Secured Note Holders. The $50 million principal amount of the New Senior Secured Notes will increase by an amount equal to the Cash Funding at Exit that remains with the Reorganized Debtors and that is not distributed to the Holders of Allowed Class 4 Claims on the Effective Date.

Section 7.06.   Operations Between the Confirmation Date and the Effective Date. The Debtors shall continue to operate as debtors-in-possession, subject to the supervision of the Bankruptcy Court, during the period from the Confirmation Date through and until the Effective Date.

Section 7.07.   Revesting of Assets.   Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of each Debtor, including, but not limited to, all Avoidance Actions and all Causes of Action shall automatically be retained and revest in the relevant Reorganized Debtor or its respective successor, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished except as otherwise provided in the Plan or in connection with the New Senior Secured Notes and the New Senior Secured Documents. As of the Effective Date, each Reorganized Debtor may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses, or related support services incurred after the Effective Date without any application to the Bankruptcy Court.

Section 7.08.   Approval of Agreements.   The solicitation of votes on the Plan shall be deemed a solicitation of the Holders of Claims for the approval of all other agreements and transactions contemplated by the Plan and the Plan Supplement, including, without limitation, the Exit Facility, if applicable, the New Senior Secured Notes, the other New Senior Secured Note Documents, the New Shareholder Agreement, the New Management Incentive Plan and the Senior Management Contracts.  Entry of the Confirmation Order shall constitute approval of such agreements and transactions and the Confirmation Order shall so provide.

Section 7.09.   Adoption or Assumption of Senior Management Contracts.  On the Effective Date, the Reorganized Debtors shall (i) assume existing Senior Management Contracts with members of Senior Management, or (ii) enter into new Senior Management Contracts and all previous employment contracts with members of Senior Management shall be deemed cancelled, extinguished and superseded in all respects by the new Senior Management Contracts and the members of Senior Management party to such previous contracts shall have no rights thereunder.

Section 7.10.   Adoption of New Management Incentive Plan.  On the Effective Date, Reorganized Ziff Davis Holdings (with the consent of the Majority Senior Secured Note Holders and the Committee) will adopt the New Management Incentive Plan.  Members of Senior Management that are to be covered by the New Management Incentive Plan shall receive, in the aggregate, 4% of the New Ziff Davis Holdings Common Stock and (i) 10-year options to purchase an additional 2% of the Ziff Davis Holdings New Common Stock at an exercise price per share that implies an enterprise value for Reorganized Ziff Davis Holdings of $100 million, (ii) 10-year options to purchase an additional 2% of the New Ziff Davis Holdings Common Stock at an exercise price per share that implies an enterprise value for Reorganized Ziff Davis

29

Holdings of $130 million, (iii) 10-year options to purchase an additional 2% New Ziff Davis Holdings Common Stock at an exercise price per share that implies an enterprise value for Reorganized Ziff Davis Holdings of $175 million, and (iv) 10-year options to purchase an additional 3% of New Ziff Davis Holdings Common Stock at an exercise price per share that implies an enterprise value for Reorganized Ziff Davis Holdings in excess of $200 million. The options will vest annually at the rate of 20% over a 5-year period, with immediate 100% vesting in the event Reorganized Ziff Davis Holdings undergoes a change of control. In addition, any amount(s) not paid under the Debtors' 2008 management bonus plan as of the Effective Date shall be paid as and when it becomes due in accordance with the terms of such management bonus plan.

Section 7.11. <u>Exit Funding</u>. The Reorganized Debtors shall use reasonable best efforts to obtain exit financing to fund working capital and other needs post-emergence from chapter 11. In the event the Reorganized Debtors are unable to obtain such financing on terms acceptable to them and the Majority Senior Secured Note Holders, then the Reorganized Debtors with the consent of the Majority Senior Secured Note Holders shall have available to them up to $7.5 million of remaining proceeds from the Enterprise Sale to fund their working capital and other needs post-emergence from chapter 11. If the Reorganized Debtors and the Majority Senior Secured Note Holders, determine that all or any portion of the Cash Funding at Exit is not needed to fund the Reorganized Debtors' working capital and other needs post-emergence from chapter 11, then the portion that is not so needed will be paid to the Holders of Allowed Senior Secured Note Claims and MHR Note Claims on the Effective Date.

Section 7.12. <u>Deregistration</u>. Reorganized Ziff Davis Holdings shall take all necessary steps to deregister as of the Effective Date; provided that Reorganized Ziff Davis Holdings shall provide to each holder of New Ziff Davis Holdings Common Stock (i) its financial results through Intralinks (or a similar agreed upon information sharing site) on a monthly basis no more than 30 days after the last day of each month; (ii) a written discussion and analysis of the previous quarter's financial results no later than 45 days after the last day of each quarter; and (iii) a written discussion and analysis of the previous fiscal year's financial results no later than 45 days after the end of each fiscal year; and (iv) audited financial results as soon as available, but in any event no later than 90 days after the end of the fiscal year

Section 7.13. <u>Cancellation of Subordinated Notes and Stub Notes</u>. On the Effective Date, except as otherwise provided for herein, (a) the Subordinated Notes and the Stub Notes shall be deemed extinguished, cancelled and of no further force or effect, and (b) the obligations of the Debtors and the Reorganized Debtors under any agreements or indentures governing the Subordinated Notes or the Stub Notes (including the Subordinated Notes Indenture and the Stub Notes Indenture) shall be discharged without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the party of the Bankruptcy Court or any Person; provided, however, that the Subordinated Notes, the Stub Notes, the Subordinated Notes Indenture and the Stub Notes Indenture shall continue in effect solely for the purposes of (i) allowing the holders of the Subordinated Notes and the Stub Notes to receive the distributions provided for in Section 3.09 of the Plan, (ii) allowing the Disbursing Agent or the Subordinated Notes Indenture Trustee or the Stub Notes Indenture, as the case may be, to make distributions on account of the Subordinated Note Claims and the Stub Note Claims, and (iii) preserving the rights of the Subordinated Notes Indenture Trustee and the Stub Notes

Indenture Trustee with respect to their respective fees and expenses (including legal fees) to the extent not paid pursuant to Section 13.11 of the Plan, including, without limitation, the liens identified in Section 13.12 of the Plan and any indemnification rights provided by the Subordinated Notes Indenture and/or the Stub Notes Indenture.

Section 7.14. <u>Release and Discharge of Subordinated Notes Indenture Trustee and Stub Notes Indenture Trustee</u>. Subsequent to the performance by the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee or its agents of any duties that are required under the Plan or the Confirmation Order or under the terms of the Subordinated Notes Indenture and the Stub Notes Indenture, the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee and its agents and their successors and assigns shall be relieved of, and released from, all obligations arising under the Subordinated Notes Indenture, the Stub Notes Indenture, or other applicable agreements or law and the Subordinated Notes Indenture and the Stub Notes Indenture shall be deemed to be discharged..

## ARTICLE VIII
## PRESERVATION OF CAUSES OF ACTION AND
## RIGHT TO DEFEND AND CONTEST

Section 8.01. <u>Preservation of Rights</u>. Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by this Plan, nothing, including, but not limited to, the failure of the Debtors or the Reorganized Debtors to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors or the Reorganized Debtors with respect to any Claim or Interest, including, but not limited to, all rights of the Debtors or Reorganized Debtors to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the Holder thereof.

Section 8.02. <u>Rights of Action</u>. Except as otherwise provided in the Plan, all Causes of Action, including Avoidance Actions, shall automatically be retained and preserved and will revest in the Reorganized Debtors. Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors (as representatives of the Debtors' Estates) will retain and have the exclusive right to enforce and prosecute such Causes of Action against any Entity, that arose before the Effective Date, other than those expressly released or compromised as part of or pursuant to the Plan.

Section 8.03. <u>Setoffs</u>. Except to the extent that any Claim is Allowed, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action and claims of every type and nature whatsoever which the Estates, the Debtors or the Reorganized Debtors may have against their Creditors, but neither the failure to do so nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Debtors of any such claims or Causes of Action the Debtors may have against such Creditors, and all such claims and Causes of Action which are not expressly released pursuant to the Plan shall be reserved to and retained by the Reorganized Debtors.

31

Section 8.04. <u>No Payment or Distribution Pending Allowance</u>. All references to Claims and amounts of Claims refer to the amount of the Claim Allowed by agreement of the Debtors or Reorganized Debtors and the Holder of such Claim, by operation of law, by Final Order, or by this Plan. Notwithstanding any other provision in the Plan, no payment or distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.

Section 8.05. <u>Resolution of Disputed Claims</u>. Unless otherwise ordered by the Court after notice and a hearing, the Reorganized Debtors shall have the exclusive right, on and after the Effective Date, to File objections to Claims (except those specifically Allowed by this Plan) and shall serve a copy of each such objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than Claims Objection Deadline. The foregoing deadlines may be extended by order of the Court. An objection to any Claim shall be deemed properly served on the Holder thereof if the Reorganized Debtors effect service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

# ARTICLE IX
# CONDITIONS TO CONSUMMATION OF THE PLAN

Section 9.01. <u>Confirmation Order</u>. The Confirmation Order shall not be entered unless and until the form and substance thereof have been approved by the Debtors, the Majority Senior Secured Note Holders and the Committee in their reasonable discretion. The Plan Support Agreement shall not be terminated and shall be in full force and effect. The Confirmation Order shall, among other things, (a) authorize the issuance of the New Ziff Davis Holdings Common Stock and the other transactions contemplated by the Plan, and (b) provide that the provisions of the Confirmation Order are non-severable and mutually dependent.

Section 9.02. <u>Conditions to Effective Date</u>. The Plan shall not be consummated, and the Effective Date shall not occur, unless and until the following conditions have occurred or have been duly waived (if waivable) pursuant to Section 9.03 below:

(a) the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate;

(b) the Confirmation Order shall have been entered and shall not be stayed by order of a court of competent jurisdiction;

(c) all documents and agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered by the parties thereto;

(d) the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors and the Reorganized

Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents created, amended, supplemented, modified or adopted in connection with the Plan;

(e)     the New Debtors Certificates of Incorporation and By-laws shall be in form, scope and substance reasonably satisfactory to the Debtors, the Majority Senior Secured Note Holders and the Committee and shall have been filed with the applicable authority of each such Debtors' jurisdiction of incorporation or organization in accordance with such jurisdiction's applicable law;

(f)     all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained;

(g)     the New Senior Secured Notes shall have been issued;

(h)     the New Senior Secured Note Documents shall have been entered into;

(i)     the Exit Facility, if applicable, shall have been entered into;

(j)     the Senior Management Contracts shall have been (i) assumed by the Debtors pursuant to the Plan, or (ii) entered into by the parties thereto (as applicable);

(k)     the New Management Incentive Plan shall have been adopted;

(l)     the New Shareholder Agreement shall have been entered into and shall be in form and substance reasonably acceptable to the Debtors, the Ad Hoc Senior Secured Note Holder Group and the Committee;

(m)     the New Management Incentive Plan shall be in form and substance reasonably acceptable to the Debtors, the Majority Senior Secured Note Holders and the Committee;

(n)     the New Senior Secured Notes, the New Senior Secured Note Documents and the Exit Facility shall be in form and substance reasonably acceptable to the Debtors and the Majority Senior Secured Note Holders;

(o)     the Warrant Agreement shall be in form and substance reasonably acceptable to the Debtors, the Majority Senior Secured Note Holders and the Committee; and

(p)     no order of a court shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan.

Section 9.03.  <u>Waiver of Conditions to Consummation</u>.  The conditions to consummation in Section 9.02 (other than 9.02(a) and (b)) may be waived at any time by a writing signed by an authorized representative of each of the Debtors, the Majority Senior Secured Note Holders and the Committee, without notice or order of the Bankruptcy Court or any further action other than proceeding to consummation of the Plan.

CHI:2085596.5

Section 9.04. Effect of Failure or Absence of Waiver of Conditions Precedent to the Effective Date of the Plan. In the event that one or more of the conditions specified in Section 9.02 of the Plan have not occurred (or been waived), upon notification submitted by the Debtors to the Bankruptcy Court, (a) the Confirmation Order, automatically and without further order of the Bankruptcy Court, shall be, and shall be deemed, vacated, null and void, with no force or legal effect whatsoever, (b) no distributions under the Plan shall be made, (c) all Property of the Estates shall revest in the Debtors' Estates, (d) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (e) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

## ARTICLE X
## OPERATION AND MANAGEMENT OF THE REORGANIZED DEBTORS

Section 10.01. Post-Effective Date Operation of Business. From and after the Effective Date, the Reorganized Debtors will continue to exist and engage in business as separate corporate entities, in accordance with the applicable law in the respective jurisdictions in which they are incorporated and pursuant to the New Debtors Certificates of Incorporation and By-laws.

Section 10.02. Post Effective Date Officers and Directors. On the Effective Date, the officers of the Reorganized Debtors (a) shall be those Persons serving in those positions prior to the Effective Date and (b) will be reimbursed for all reasonable costs and expenses, and will receive compensation, as set forth in the Senior Management Contracts, with all such payments to be made by the respective Reorganized Debtors. The identities of the members of the Boards of Directors of Reorganized Ziff Davis Holdings and the Reorganized Debtors, which shall serve on the Effective Date, will be identified in the Plan Supplement.

## ARTICLE XI
## EFFECTS OF CONFIRMATION

Section 11.01. Discharge. To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), and except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties, regardless of whether any Property shall have been distributed or retained pursuant to the Plan on account of such Claims. Upon the Effective Date, and except as expressly contemplated in this Plan, the Debtors, and each of them, shall (a) be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, debts (as such term is defined in section 101(12) of the Bankruptcy Code), Liens, security interests, and encumbrances of and against all Property of the respective Estates, the Debtors, or the Reorganized Debtors that arose prior to the Effective Date, including without limitation, all debts of the kind specified in

sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) such Claim has been Allowed pursuant to section 502 of the Bankruptcy Code, or (ii) the Holder of such Claim has voted to accept the Plan and (b) terminate all Interests of the Holders of Old Ziff Davis Holdings Common Stock and Interests. Further, as of the Effective Date, all entities, including, without limitation, all Holders of Claims or Interests, shall be barred and enjoined from asserting against the Debtors or the Reorganized Debtors, their successors or their Property any other or further Claims, debts, rights, Causes of Action, liabilities or Interests relating to the Debtors based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date, except for those obligations expressly created by, or reserved in, this Plan. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests of the Holders of Old Ziff Davis Holdings Common Stock and Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge and termination shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

Section 11.02. <u>Injunction</u>.

(a)     <u>Discharged Claims and Terminated Interests</u>. Except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following actions against the Debtors, the Reorganized Debtors or their Property on account of any such discharged Claims, debts or liabilities or such terminated Interests or rights: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (e) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

(b)     <u>Released Claims</u>. As of the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person that has held, currently holds or may hold a Claim, demand, debt, right, Cause of Action or liability that is released pursuant to Section 11.04 of the Plan from enforcing or attempting to enforce any such Claim, demand, debt, right, Cause of Action or liability against any (i) Debtor, (ii) Reorganized Debtor, (iii) Releasee, or (iv) Exculpated Person, or any of their respective Property, based on, arising from or relating to, in whole or in part, any act, omission, or other occurrence including actions in connection with indebtedness for money borrowed by the Debtors taking place on or prior to the Effective Date with respect to or in any way relating to the Chapter 11 Cases, all of which claims, demands, debts, rights, Causes of Action or liabilities shall be deemed released on and as

35

of the Effective Date; provided, however, that with respect to the former directors, officers and employees of the Debtors, this injunction shall apply only to the enforcement of Claims, demands, debts, rights, Causes of Action or liabilities with respect to which such former directors, officers and employees would be entitled to indemnification from the Debtors or the Reorganized Debtors under contract or law; and, provided further, however, that this injunction shall not apply to (a) any claims Creditors may assert under the Plan to enforce their rights thereunder to the extent permitted by the Bankruptcy Code or (b) any claims Creditors or other third parties may have against each other, which claims are not related to the Debtors and the Reorganized Debtors, it being understood, however, that any defenses, offsets or counterclaims of any kind or nature whatsoever which the Debtors may have or assert in respect of any of the claims of the type described in (a) or (b) of this proviso are fully preserved.

Section 11.03. <u>Exculpation</u>. None of the Debtors, Reorganized Debtors or Exculpated Persons shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating this Plan, or the Property to be distributed under this Plan, including all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases, provided, however, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.

Section 11.04. <u>Releases</u>.

(a) <u>Releases by Debtors</u>. Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan; provided, however, that no Releasee shall be released or discharged from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors.

(b) <u>Releases by Holders of Claims and Interests</u>. Effective as of the

36

Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of the Persons set forth below under the Plan and, if applicable, the Cash, securities, contracts, releases and other agreements or documents to be delivered in connection with the Plan, each Holder of a Claim or Interest who votes in favor of the Plan, and any Affiliate of any such Holder (as well as any trustee or agent on behalf of each such Holder shall be deemed to have forever waived, released and discharged (i) the Debtors, (ii) the Reorganized Debtors, and (iii) the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder)), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan.

Section 11.05. <u>Indemnification</u>.  To the extent not inconsistent with the Plan or the Confirmation Order and to the fullest extent permitted by applicable law, including, but not limited to the extent provided in their constituent documents, contracts (including, but not limited to, employment agreement or indemnification agreement), statutory law or common law, the Reorganized Debtors will indemnify, hold harmless and reimburse the Exculpated Persons from and against any and all losses, claims, Causes of Action, damages, fees, expenses, liabilities and actions (a) for any act taken or omission made in good faith in connection with or in any way related to negotiating, formulating, implementing, confirming or consummating the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created in connection with the Plan or the administration of the Chapter 11 Cases or (b) for any act or omission in connection with or arising out of the administration of the Plan or the Property to be distributed under the Plan or the operations or activities of the Reorganized Debtors, and any Claims of any such Exculpated Person against the Debtors or the Reorganized Debtors on account of such indemnification obligations shall be unaltered and Unimpaired within the meaning of section 1124(1) of the Bankruptcy Code, except that none of the Debtors or the Reorganized Debtors shall have any obligation to indemnify any Exculpated Person for any acts or omissions that constitute gross negligence or willful misconduct as such is finally determined by a court of competent jurisdiction.  Such indemnification obligations shall survive unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

Section 11.06. <u>Other Documents and Actions</u>.  The Debtors and the Reorganized Debtors are authorized to execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

Section 11.07. <u>Term of Injunctions or Stays</u>.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105(a) or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

CHI:2085596.5

Section 11.08. Preservation of Insurance. Except as necessary to be consistent with the Plan, the Plan and the discharge provided herein shall not diminish or impair (a) the enforceability of insurance policies that may cover Claims against the Debtors or any other Person or Entity or (b) the continuation of workers' compensation programs in effect, including self-insurance programs.

Section 11.09. Guaranties. Notwithstanding the existence of guaranties by the Debtors of obligations of any Entity or Entities, and the Debtors' joint obligations with another Entity or Entities with respect to the same obligations, all Claims against the Debtors based upon any such guaranties shall be satisfied, discharged and released in the manner provided in this Plan and the Holders of Claims shall be entitled to only one distribution with respect to any given obligation of the Debtors.

Section 11.10. Subordination Rights. Any distributions under the Plan shall be received and retained free of and from any obligations to hold or transfer the same to any other Creditor, and shall not be subject to levy, garnishment, attachment or other legal process by any Holder by reason of claimed contractual subordination rights, the Subordination Rights shall be waived and the Confirmation Order shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any contractual, legal or equitable subordination rights to Property distributed under the Plan, in each case other than as provided in the Plan.

Section 11.11. No Successor Liability. Except as otherwise expressly provided in the Plan, the Debtors and the Reorganized Debtors do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Effective Date. The Reorganized Debtors are not, and shall not be, successors to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors shall assume the obligations specified in the Plan and the Confirmation Order.

## ARTICLE XII
## RETENTION OF JURISDICTION

Section 12.01. Exclusive Jurisdiction of Bankruptcy Court. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a)     classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim pursuant to the Plan;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or

otherwise provided for in the Plan, for periods ending on or before the Effective Date;

(c)     determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(d)     ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(e)     construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtors in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

(f)     determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan and the Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

(g)     hear any application of the Debtors or Reorganized Debtors to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 13.04 hereof or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(h)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(i)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(j)     determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the

Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

      (k)     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

      (l)     hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

      (m)     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

      (n)     enter a final decree closing the Chapter 11 Cases;

      (o)     determine and resolve any and all controversies relating to the rights and obligations of the Disbursing Agent in connection with the Chapter 11 Cases;

      (p)     allow, disallow, determine, liquidate or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to such Claim (to the extent permitted under applicable law);

      (q)     permit the Debtors to recover all assets of the Debtors and Property of their respective Estates, wherever located;

      (r)     hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

      (s)     hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Debtors thereafter, including Avoidance Actions, proceedings with respect to the rights of the Debtors to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Debtors may have; and

      (t)     hear any other matter not inconsistent with the Bankruptcy Code.

      Section 12.02. <u>Failure of Bankruptcy Court to Exercise Jurisdiction</u>. If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above in Section 12.01 hereof, this Article XII shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

# ARTICLE XIII
## MISCELLANEOUS PROVISIONS

Section 13.01. <u>Binding Effect of Plan</u>.  The provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, the Reorganized Debtors, any Holder of any Claim or Interest treated herein or any Person named or referred to in the Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

Section 13.02. <u>Withdrawal of the Plan</u>.  The Debtors reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan.  If the Plan is withdrawn, the Plan shall be null and void and have no force and effect.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

Section 13.03. <u>Final Order</u>.  Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtors (with the consent of the Majority Senior Secured Note Holders) or, after the Effective Date, the Reorganized Debtors upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

Section 13.04. <u>Modification of the Plan</u>.  The Debtors (with the consent of the Majority Senior Secured Note Holders, MHR, the Committee and Willis Stein, which consent shall not be unreasonably withheld) may alter, amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date.  The consent of the parties described in the foregoing sentence shall be presumed to have been received if any such party does not inform the Debtors that it objects to a proposed alteration, modification or amendment to the Plan within two Business Days after request for such consent by the Debtors, with such request to be made in accordance with the notice provisions in paragraph 19 of the Plan Support Agreement.  After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may (with the consent of the Majority Senior Secured Note Holders and the Committee), so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

Section 13.05. <u>Business Days</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

CHI:2085596.5

Section 13.06. <u>Severability</u>.  Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which such provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.  The Debtors reserve the right not to proceed with Confirmation or consummation of the Plan if any such ruling occurs.

Section 13.07. <u>Governing Law</u>.  EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Section 13.08. <u>Dissolution of Committee and Ad Hoc Senior Secured Note Holder Group</u>.  On the Effective Date, the Committee and the Ad Hoc Senior Secured Note Holder Group shall be automatically dissolved and all of their respective members, Professionals and agents shall be deemed released of their duties, responsibilities and obligations, and shall be without further duties, responsibilities and authority in connection with the Debtors, the Chapter 11 Cases, the Plan or its implementation.

Section 13.09. <u>Payment of Fees and Expenses of the Senior Secured Notes Indenture Trustee and the Collateral Trustee</u>.  The Debtors or the Reorganized Debtors (as applicable) shall pay the Senior Secured Notes Indenture Trustee's and the Collateral Trustee's (i) Allowed Administrative Claims (including Allowed Claims for fees and expenses within the meaning of Section 7.07(e) of the Senior Secured Notes Indenture) in accordance with Section 3.03 of the Plan; and (ii) reasonable fees and expenses incurred in connection with the performance of their duties pursuant to the Plan (as long as such duties are performed prior to the Effective Date) which invoices may be submitted directly to the Debtors or Reorganized Debtors (as applicable) and shall not be subject to approval by the Bankruptcy Court.

Section 13.10. <u>Retention of Lien</u>.  The Senior Secured Notes Indenture Trustee shall retain its lien and security interest as set forth in and in accordance with Section 7.07(d) of the Senior Secured Notes Indenture.

Section 13.11. <u>Payment of Fees and Expenses of the Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee</u>.  The Debtors or the Reorganized Debtors (as applicable) shall pay the Subordinated Notes Indenture Trustee's and the Stub Notes Indenture Trustee's (i) Allowed Administrative Claims (including Allowed Claims for fees and expenses within the meaning of Section 7.07 of the Subordinated Notes Indenture and Section

7.07 of the Stub Notes Indenture) in accordance with Section 3.03 of the Plan; and (ii) reasonable fees and expenses incurred in connection with the performance of their duties pursuant to the Plan (as long as such duties are performed prior to the Effective Date) which invoices may be submitted directly to the Debtors or Reorganized Debtors (as applicable) and shall not be subject to approval by the Bankruptcy Court.

Section 13.12. <u>Retention of Lien</u>.  The Subordinated Notes Indenture Trustee and the Stub Notes Indenture Trustee shall retain their respective liens and security interests as set forth in and in accordance with Section 7.07 of the Subordinated Notes Indenture and Section 7.07 of the Stub Notes Indenture.

Section 13.13. <u>Payment of Statutory Fees</u>.  All U.S. Trustee's Fee Claims, as determined, if necessary, by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date.

Section 13.14. <u>Post-Confirmation Operating Reports</u>.  The Debtors shall continue to file quarterly operating reports as required by the United States Trustee until such time as an order is entered under section 350(a) of the Bankruptcy Code closing the Bankruptcy Cases.

Section 13.15. <u>Notices</u>.  Any notice required or permitted to be provided under this Plan to the Debtors or the Reorganized Debtors, or any request for information with respect to the Plan, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

Ziff Davis Media Inc.
28 East 28th Street
New York, NY 10016
Attn:   Shirin Malkani
          General Counsel
Facsimile: (212) 503-3560
Email:  Shirin_Malkani@ziffdavis.com

With a copy to:

Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601
Attn.:  Mark K. Thomas
Facsimile:  (312) 558-5700
Email:  mkthomas@winston.com

Section 13.16. <u>Filing of Additional Documents</u>.  On or before substantial consummation of the Plan, the Debtor shall issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

CHI:2085596.5

**Section 13.17. <u>Section 1125 of the Bankruptcy Code</u>.**

(a)     The Debtors have, and upon Confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and (b) the Debtors (and each of their respective Affiliates, officers, directors, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and Professionals), have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan, and are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

**Section 13.18. <u>Section 1146 Exemption</u>.**  To the fullest extent permitted under section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, if any, or the execution, delivery or recording of an instrument of transfer under the Plan, or the revesting, transfer or sale of any real or other Property of or to the Debtors or the Reorganized Debtors, shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax or similar tax.

**Section 13.19. <u>Section 1145 Exemption</u>.**  To the fullest extent permitted under section 1145 of the Bankruptcy Code, the issuance of the New Ziff Davis Holdings Common Stock, New Notes and Warrants on the Effective Date shall be exempt from the registration requirements of Section 5 of the Securities Act and any and all federal, state and local laws requiring the registration or licensing of an issuer, underwriter, broker or dealer in such securities.

**Section 13.20. <u>Time</u>.**  Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of next succeeding day that is a Business Day.  Otherwise, the provisions of Bankruptcy Rule 9006 shall apply.

**Section 13.21. <u>No Attorneys' Fees</u>.**  No attorneys' fees will be paid by the Debtors with respect to any Claim or Interest except as expressly specified herein or by order of the Bankruptcy Court (including the Cash Collateral Order).

**Section 13.22. <u>No Injunctive Relief</u>.**  No Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

CHI:2085596.5

Section 13.23. <u>Non-Voting Equity Securities</u>.  The Debtors shall comply with the provisions of section 1123(a)(6) of the Bankruptcy Code.

Section 13.24. <u>Continued Confidentiality Obligations</u>.  Pursuant to the terms thereof, members of and advisors to the Creditors' Committee, any other Holder of a Claim or Interest and their respective predecessors, successors and assigns shall continue to be obligated and bound by the terms of any confidentiality agreement executed by them in connection with these Chapter 11 Cases or the Debtors, to the extent that such agreement, by its terms, may continue in effect after the Confirmation Date.

Section 13.25. <u>No Admissions or Waivers</u>.  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

Section 13.26. <u>Entire Agreement</u>.  The Plan (and all Exhibits to the Plan and the Plan Supplement) sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents.  The Debtors shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

Section 13.27. <u>Waiver</u>.  The Debtors (with the consent of the Majority Senior Secured Note Holders, MHR and the Committee, which consent shall not be unreasonably withheld) or the Reorganized Debtors, as applicable, reserve the right to waive any provision of this Plan to the extent such provision is for the sole benefit of the Debtors and/or their officers or directors.  The consent of the parties described in the foregoing sentence shall be presumed to have been received if any such party does not inform the Debtors or the Reorganized Debtors that it objects to a proposed waiver within two Business Days after request for such consent by the Debtors or the Reorganized Debtors, with such request to be made in accordance with the notice provisions in paragraph 19 of the Plan Support Agreement.

Section 13.28. <u>Bar Date for Professionals</u>.  Applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (a) from the Petition Date through the Effective Date or (b) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(3) through (b)(5) of the Bankruptcy Code, shall be Filed no later than forty-five (45) days after the Effective Date or such later date as the Bankruptcy Court approves.  Such applications shall be served on (a) the Reorganized Debtors at the address set forth in Section 13.11 of the Plan, (b) counsel to the Debtors at the address set forth in Section 13.11 of the Plan, (c) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004, Attn: Brian Masumoto, (d) counsel for the Ad Hoc Senior Secured Note Holder Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Attn: Alan Kornberg, and (e) counsel for the Committee, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: Michael J. Sage.  Applications that are not timely Filed will not be considered by the Court.  The Reorganized Debtors may pay any Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

CHI:2085596.5

# CONFIRMATION REQUEST

The Debtors hereby request confirmation of the Plan pursuant to section 1129(a) or section 1129(b) of the Bankruptcy Code.

Dated: May 6, 2008

ZIFF DAVIS MEDIA INC., ZIFF DAVIS DEVELOPMENT INC., ZIFF DAVIS HOLDINGS INC., ZIFF DAVIS INTERMEDIATE HOLDINGS INC., ZIFF DAVIS INTERNET INC., ZIFF DAVIS PUBLISHING INC. AND ZIFF DAVIS PUBLISHING HOLDINGS INC.

By: /s/ Jason Young

Name: Jason Young

Title: Chief Executive Officer

CHI:2085596.5

**<u>Appendix B</u>**

Financial Projections

# Appendix B

## Financial Projections (Unaudited)

As a condition to confirmation of a chapter 11 plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business and prepared financial projections ("Projections") contained in this Appendix B.

The Projections should be read in conjunction with Article X of the Disclosure Statement, entitled "FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS" and with the assumptions, qualifications and footnotes to the tables containing the Projections (which include projected statements of operations, a projected balance sheet as of the projected Effective Date (defined below), and projected statements of cash flows), and the historical consolidated financial information (including the notes and schedules thereto) set forth in Appendix E to the Disclosure Statement.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY INDEPENDENT ACCOUNTANTS.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE CONSUMMATION DATE OR TO HOLDERS OF NEW SECURITIES OR ANY OTHER PARTY AFTER THE CONSUMMATION DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISION ("SEC"), OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS'. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME AND TO THE BEST OF THEIR KNOWLEDGE, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE REORGANIZED DEBTORS' ABILITY

TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

The Projections reflect numerous assumptions, including the confirmation and consummation of the Plan for the Debtors substantially in the form filed with the Bankruptcy Court. The Projections should be viewed in conjunction with a review of these assumptions, including the qualifications and footnotes as set forth herein. The Projections were prepared in good faith based upon assumptions believed to be reasonable at the time of preparation. While presented with numerical specificity, the Projections are based upon a variety of estimates and assumptions subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. Actual results may vary materially from those presented. The Projections have not been prepared to comply with the guidelines established with respect to Projections by the SEC or the American Institute of Certified Public Accountants ("AICPA"), have not been audited, and are not presented in accordance with Generally Accepted Accounting Principles ("GAAP").

The Projections are based on the assumption that the Debtors will emerge from chapter 11 on or about June 30, 2008 ("Effective Date"). If the Effective Date of the Plan is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. In addition, the Debtors believe that their business will continue to be adversely impacted as a result of being in a chapter 11 process.

The Debtors will be required to estimate the Debtors' reorganization value, the fair value of their assets, and their actual liabilities as of the Effective Date. Such determination will be based upon the fair values as of that date, which could be materially greater or less than the value assumed in the Projections. Any fresh-start reporting adjustments that may be required in accordance with Statement of Position 90-7 – Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Debtors' reorganization value to the Debtors' assets in accordance with the procedures specified in Financial Accounting Standards Board Statement 141 – Business Combinations will be made when the Debtors emerge from bankruptcy. The Projections do not reflect any fresh-start reporting adjustments that may be required to be made on the Effective Date.

The Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, Reorganized Debtors' ability to operate the Debtors' business consistent with their projections, comply with the covenants of their financing agreements, attract and retain key executives and customers, not suffer the loss or material downtime of a major supplier, respond to adverse actions taken by the federal and state governments, as well as the accuracy of the Debtors' estimates with regards to the timing and realization of the recoveries

of assets and the payments of Claims, the amount of expenses projected to recognize such recoveries and reconcile such Claims, or the realization of the proceeds from the collections of various amounts outstanding. See also Article VI of the Disclosure Statement "CERTAIN RISK FACTORS TO BE CONSIDERED".

**Projection Assumptions**

**General**

The Projections are aggregated from operating forecasts for the Reorganized Debtors along with assets, expenses and liabilities that are projected to exist as a result of the Plan.

The Projections assume the Company's continued transition into a predominantly digital media focused enterprise. The Company continually reviews its operations, the economic environment and the markets in which it competes to evaluate the potential future profitability of each of its product lines. The actual operations of the Company, as well as the financial results from operations, could vary significantly from the assumptions used to generate the Projections as a result of, among other things, changes to the future operations of the Company based on ongoing assessment of operations and future economic conditions differing from the assumptions regarding such conditions underlying the current Projections. The near-term projections assume a negative impact on the Company's profitability due to both the current recessionary economic environment and the impact of progressing through the chapter 11 process. Projections for 2009 and 2010 do not include print revenue or costs. The Company and its advisors are currently exploring all options and alternatives regarding the print operations.

The Projections assume the benefit of the holdback of an additional $5.0 million of cash collateral with the balance distributed to the holders of Senior Secured Note Claims and the MHR Note Claims upon emergence and the conversion of $428.9 million of cash pay debt into $55.0 million of a combination non-cash pay PIK and cash pay debt as described in the Plan. A material change in any of these assumptions would have a material impact on the Projections.

As with any financial projections there are certain risks and opportunities to achieving forecast results, including:

    a. the Plan assumes 1Up Network advertising for gaming software titles will be sustained past the initial software launch period, which would constitute a change in advertising practice on the part of game publishers;

    b. the Company has started to use, and throughout the year will increase its ability to use, behavioral targeting of advertisements for certain online products; the Company assumes this enhanced capability will increase revenues and margins during the forecast period;

    c. the Plan assumes the Company's online revenue growth will accelerate, commencing with the third quarter of 2008, as a result of (1) the organizational transition from personnel resources in certain functions serving both print and online product lines to separate dedicated online and print teams, and (2) the emergence from the chapter 11 process;

    d. the Company will be able to retain and attract the employees required to execute its business plan; and

    e. the Company will be successful in achieving its projected reduction in indirect expense, including rent and systems costs.

**Projected Consolidated Income Statement**

<u>Advertising Revenue</u>:  Advertising rates and rate structures vary among publications and Internet properties and are based on, among other things, the circulation or audience of the particular property, the readership demographics, the scheduled frequency and the size and placement of the advertisement in the publication or website.  Advertising revenue is influenced by a number of external factors, including the volume of new technology product introductions, the amount and allocation of marketing expenditures by advertising clients and the extent to which customers elect to advertise using print and online media.

<u>Subscriptions</u>:  Generally, the Company sells subscriptions to its publications either directly through its circulation management teams or by independent subscription direct marketing companies or agents.  The Company receives a percentage of the total price of subscriptions sold through agents based on specific agreement with each agent.  In addition to agents, the Company has historically sold subscriptions using a variety of techniques including direct reply subscription cards, direct mail and the Internet.

<u>Newsstand</u>:  The Company is expected to sell more than 1.0 million single copies of magazines for the year ending December 31, 2008.  Generally, the Company receives a percentage of the cover price of an individual magazine sold through the newsstand with the balance of the cover price retained by the magazine's distributors, wholesalers and retailers.

<u>Other Revenue Sources</u>:  The Company also derives revenue from a variety of ancillary activities, including mailing list rentals, events, royalty and license agreements and eNewsletters.

<u>Operating Expenses</u>:  The principal components of production costs are raw materials, printing and distribution as well as internet hosting services. The Company's principal raw material is paper, the supply and prices of which are subject to volatility and may be significantly affected by many factors, including market and economic conditions.

<u>DigitalLife</u>:  Approximately 3.7% of the Company's production costs related to the execution costs for the DigitalLife convention.

<u>Selling, General and Administrative Expenses</u>:  The Company's principal operating costs are selling, general and administrative expenses.  Included in these costs are compensation expenses (salaries, commissions and incentives), benefits, editorial costs and circulation, marketing and promotion expenses.

<u>Debt</u>:  During the initial 18 months, the Debtors have assumed PIK interest on the New Senior Secured Notes at a rate of 10.5% per annum and cash pay at a rate of 3% per annum.  Following the initial 18-month period, the Plan assumes cash pay interest at the higher of three month LIBOR plus 800 basis points or 11.5%.  The interest rate on the New Senior Secured Notes is assumed to be 11.5% after the initial 18-month period.

**Ziff Davis Media**
**Income Statement**

(US $000's)

| | 1/1-6/30/08 | Post-Emerg. 7/1-12/31/08 | Projected FY 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Total Revenue** | $ 25,672 | $ 37,955 | $ 63,627 | $ 47,500 | $ 56,000 |
| **Total Cost of Sales** | 23,250 | 24,220 | 47,470 | 29,600 | 34,200 |
| Total Circ/Prod/DB Mktg | 111 | 108 | 219 | - | - |
| **Income Before Corporate Expense** | 2,312 | 13,626 | 15,939 | 17,900 | 21,800 |
| Corporate | 5,930 | 5,985 | 11,915 | 7,504 | 8,001 |
| **EBITDAR** | (3,618) | 7,641 | 4,023 | 10,396 | 13,799 |
| Gain/Loss on Sale | (2,127) | - | (2,127) | - | - |
| Employee Stock Option Expense | - | (18) | (18) | (18) | (18) |
| Restructuring Expense | 8,952 | 8,008 | 16,960 | - | - |
| **EBITDA** | $ (10,442) | $ (348) | $ (10,791) | $ 10,415 | $ 13,817 |

# Ziff Davis Media

**Pro Forma Balance Sheet as of 6/30/08**

(US $000's)

|  |  | 6/30/08 |
|---|---|---:|
| Cash and Cash Equivalents | $ | 31,316 |
| Restricted Cash |  | - |
| AR - net |  | 16,465 |
| Inventory |  | - |
| Prepaid Expenses |  | 4,081 |
| **Total Current Assets** |  | 51,862 |
|  |  |  |
| Property, Plant & Equipment - Net |  | 7,276 |
| Other Non Current Assets |  | 16,418 |
| Goodwill & Intangible Assets - Net | (1) | 136,407 |
| **Total Assets** | $ | 211,963 |
|  |  |  |
| LIABILITIES NOT SUBJECT TO COMPROMISE |  |  |
| Accounts Payable | $ | 2,269 |
| Interest & Dividend Payable |  | 8,697 |
| Accrued Other Expenses |  | 4,557 |
| *Accrued Other Expenses - operating* |  | - |
| *Accrued Other Expenses - non-operating* |  | - |
| Unexpired Subscriptions |  | 12,236 |
| Short Term Liabilities |  | - |
| **Total Current Liabilities** |  | 27,759 |
|  |  |  |
| Pre-Petition Long Term Debt |  | - |
| Post-Petition Debt |  | - |
| Troubled Debt |  | - |
| Other Non Current Liabilities |  | - |
| Preferred Stock - Mandatory Redeemable |  | - |
| **Total Liabilities Not Subject to Compromise** |  | 27,759 |
| LIABILITIES SUBJECT TO COMPROMISE |  |  |
| Accounts Payable |  | 11,764 |
| Interest & Dividend Payable |  | 36,941 |
| Accrued Other Expenses |  | 7,512 |
| Unexpired Subscriptions |  | - |
| Short Term Liabilities |  | 4,256 |
| **Total Current Liabilities** |  | 60,472 |
|  |  |  |
| Long Term Debt |  | 310,471 |
| Troubled Debt |  | 23,935 |
| Other Non Current Liabilities |  | 16,467 |
| Preferred Stock - Mandatorily Redeemable |  | 1,128,087 |
| **Total Liabilities Subject to Compromise** |  | 1,539,433 |
| **Total Liabilities** |  | 1,567,192 |
| **Stockholders' Equity/Deficit** | (1) | (1,355,228) |
| **Total Liabilities and Equity/Deficit** | $ | 211,963 |

(1) Reflects balance as of March 5, 2008, prior to fresh start accounting.

## **Appendix C**

Corporate Structure as of the Petition Date

# Ziff Davis Media Inc. and Affiliates
## Corporate Structure



**Ziff Davis Holdings Inc.**
(Delaware)
36-4335050

100%

**Ziff Davis Intermediate Holdings Inc.**
(Delaware)
36-3455051

100%

**Ziff Davis Media Inc.**
(Delaware)
36-4336460

100%

**Ziff Davis Internet Inc.**
(Delaware)
13-4105758

50%

**SEEC/Ziff Davis Group (China) Ltd.**
(British Virgin Islands)

100%

**Wealth and Wisdom Media Consulting Company**
(China)

100%

**Ziff Davis Publishing Holdings Inc.**
(Delaware)
13-4105765

100%

**Ziff Davis Europe Ltd.**
(United Kingdom)

100%

**Ziff Davis Publishing (UK) Ltd.**
(United Kingdom)

100%

**Ziff Davis France S.A.**
(France)

100%

**Ziff Davis Publishing Inc.**
(Delaware)
13-4105763

100%

**Ziff Davis Development Inc.**
(Delaware)
13-4105761

Debtor

Non-Debtor

**<u>Appendix D</u>**

Liquidation Analysis

# Appendix D

# Liquidation Analysis

This liquidation analysis (the "Liquidation Analysis") was prepared by Alvarez & Marsal for the Debtors and represents their best estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the United States Bankruptcy Code. This Liquidation Analysis assumes that the Debtors' chapter 11 cases are converted into liquidations under chapter 7 as of June 30, 2008.

The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic and competitive uncertainties beyond the control of the Debtors, and upon assumptions which could be subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation. In addition, any liquidation ultimately undertaken would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the analysis that follows is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual liquidation proceeds could vary significantly from the amounts set forth in the Liquidation Analysis. Such actual liquidation proceeds could be materially higher or lower than the amounts set forth above, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated in the liquidation of the Debtors under chapter 7 of the United States Bankruptcy Code. The liquidation valuations have been prepared solely for purposes of estimating the proceeds available in chapter 7 and do not represent values that may be appropriate for any other purpose, including the values applicable in the context of the Plan. Nothing contained in these valuations is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis.

## General Assumptions

In chapter 7, a trustee (the "Chapter 7 Trustee") is appointed to manage the Debtors' affairs and conduct a liquidation. This Liquidation Analysis assumes that the Debtors would be forced to liquidate. The Debtors would be forced to cease substantially all operations almost immediately and use their cash position to liquidate their assets and pay priority claims. The likely consequences of the conversion to Chapter 7 include the following:

- The Company's workforce consists of highly trained, specialized employees, who are highly coveted by competitors. With the Company facing certain liquidation, those employees would quickly leave the Company and find employment elsewhere. The loss of these employees would make an orderly wind down significantly more difficult and would render the possibility of continuing operations in an effort to complete a going concern sale highly remote, if not impossible. The inability to retain employees for a transitional period would be exacerbated by concerns over the Company's ability to fund ongoing payroll.

- The bulk of the Company's revenues are derived from advertising revenues. Those customers have the ability to very quickly shift their purchases from the Company's

publications and websites to the competition and/or other advertising mediums. It is highly unlikely that any large advertising customers could be maintained by a Chapter 7 Trustee for any period of time.

- Outstanding receivables would be difficult to collect in full. Advertising agencies would hold/slow trade payments on a concern that ads would not be served, though after some period of time some partial payments would likely be received. Circulation receivables would be very difficult to collect as distribution agents would hold back payments based upon estimated costs related to the removal of the Company's publications from the distribution system, holdbacks for returns and allowances, and/or to provide a cushion until the final audit of their books and records had been completed. Existing subscribers would likely demand refunds for remaining magazines and new subscriptions would cease entirely.

- Prepaid expenses are primarily composed of deferred expenses and various deposits. Deferred expenses would be offset against past due balances and, therefore, uncollectible. The benefit plan and insurance deposits would be held by carriers to cover any tail coverage issues. Postal deposits and cash deposits would likely be used to offset final bills/obligations.

- The majority of the Company's property, plant and equipment ("PP&E") are substantially depreciated hardware and/or software assets that have been specifically tailored to the PC Mag Network and/or 1Up Network brand names. These assets are of very limited value on the secondary market and it is unlikely that any meaningful value would be realized upon liquidation.

- The bulk of the Company's assets is intangible and is in the form of brand names, patents, trademarks and goodwill. The value of these assets would be severely compromised under a liquidation scenario. Some value would be realized from the sale of the PC Magazine and Electronic Gaming Monthly subscriber lists and from the Company's trademarks and URLs.

- The Company's only joint venture is its 50% interest in SEEC/Ziff Davis Group (China) Ltd. Typical joint venture and limited liability company agreements require ongoing capital to be contributed by the Company to fund the projects, and contain restrictions on dividends to partners, particularly when the partner is unable to meet ongoing funding requirements. Moreover, most joint venture agreements prohibit the sale by a partner or its interest without the other partner's consent, which provisions are likely enforceable under applicable law. Foreign laws and local foreign creditor rights, among other things, would make obtaining recoveries on assets in foreign locations practically impossible. Joint ventures have third party partners with contractual rights that would severely restrict access by the Company to assets in joint ventures in a liquidation of the Company. As a result of these and other factors, in chapter 7, the ability of the Company to continue in managing the joint ventures or to successfully sell its joint venture interests for value would be negligible. Accordingly, it is assumed that the only potential recovery on assets would be from assets located in domestic, non-joint venture entities.

- The income related to the licensing of the Company's print publications to foreign publishers, the sale of rights and permissions for the wholesale reprint of articles, and/or licensing of permissions to use the Company's copyrighted content and trademarked awards (, e.g. Editors or Readers Choice Awards) is linked to the ongoing production of the Company's publications and websites. Earnings from Licensing and Rights & Permissions would have no value on a stand-alone basis and would either be bundled and sold along with the Company's assets or would cease entirely.

The bulk of the information concerning the Company's assets for this analysis was taken from Exhibit B ("The Consolidated Financial Statements and Financial Projections of Reorganized Debtors") of the Debtors' Disclosure Statement dated March 27, 2008 (the "Debtors' Disclosure Statement").

**Specific Assumptions**

*Note 1*
The Company projects a consolidated cash balance of $37.6 million at June 30, 2008, of which approximately $20.5 million is held in the segregated account. Under a liquidation scenario, it is assumed that all funds in the segregated account would be paid to the secured debt holders, which would result in a cash balance of $17.1 million.

*Note 2:*
Accounts receivable: The table below shows the composition of A/R as of the Petition Date:

| (US$ in millions) | 3/5/2008 |
|---|---|
| A/R – Trade | $7.6 |
| A/R – Circulation | 4.2 |
| A/R – Other | 2.0 |
| Total | $13.9 |

A/R is projected to approximate $16.5 million, in the aggregate, as of June 30, 2008. Because of the points mentioned in the above discussion, the Debtors may optimistically recover some final payments, though the vast majority of receivables would be uncollectable in chapter 7 liquidation. This analysis optimistically assumes that 30% to 60% of receivables would be able to be collected by the Trustee.

*Note 3:*
Prepaid Expenses: The table below shows the composition of prepaid assets as of the Petition Date:

| (US$ in millions) | 3/5/2008 |
|---|---|
| Deferred Expenses | $3.9 |
| Benefit Plan/Insur. Deposits | 0.3 |

| | |
|---|---|
| Postal Deposits | 0.4 |
| Cash Deposits | 0.0 |
| Total | $4.6 |

Prepaid expenses are estimated to approximate $4.1 million at June 30, 2008. As of the Petition Date, deferred expenses were primarily comprised of advances to the Company's printer RR Donnelly (~$1.5 million), prepaid real estate taxes on the NY office space ($0.6 million), retainers for professionals ($0.5 million) and insurance ($150k). The advance balance to the printer would be used to fund payment of the final issues and any remaining credit balance would be offset against a $3.8 million past due balance. The balance of the real estate taxes would be exhausted by the time the liquidation occurred and the professional fee retainers would be absorbed by the professional service firms.

Given the factors mentioned in the above discussion, the Debtors may recover some of the smaller deposits, though the vast majority of prepaid assets would be uncollectable. This analysis assumes that 0% to 5% of prepaid expenses would be collected by the Chapter 7 Trustee.

**Note 4:**
Property Plant &Equipment: The following table shows the composition of the Company's PP&E account as of the Petition Date:

| (US$ in millions) | 3/5/2008 |
|---|---|
| Computer Hardware | $1.6 |
| Capitalized Software | 3.7 |
| Leasehold Improvements | 3.2 |
| Other | 0.2 |
| Total | $8.7 |

The net book value of property, plant and equipment ('PP&E') was shown as $8.7 million as of the Petition Date and is estimated to approximate $7.3 million at June 30, 2008. Given the factors mentioned in the above discussion, and the use specific nature and age of the Company's PP&E, recovery in liquidation is estimated at a range of 0% to 5% of projected net PP&E.

**Note 5:**
The following table shows the composition of goodwill and intangible assets as of the Petition Date:

| (US$ in millions) | 3/5/2008 |
|---|---|
| Goodwill | $23.2 |
| Trademarks & Names | 86.2 |
| Intangibles | 31.3 |
| Total | $140.8 |

Goodwill and intangibles are estimated to approximate $136.4 million at June 30, 2008. In the event of liquidation, goodwill would be assumed to have no inherent economic value and would

be written down to zero.  There would be some value to the PC Magazine, Electronic Gaming Monthly, and Games for Windows mailing lists and the Company's trademarks and URLs.  While the market for such information is limited, management has estimated a value of approximately 0% to 5% of the Petition Date value.

*Note 6:*
The following table shows the composition of other long-term assets as of the Petition Date:

| (US $ in millions) | 3/5/2008 |
|---|---|
| Debt Issuance Costs | $9.9 |
| Deferred Rent | 6.7 |
| Equity Investment in Chinese JV | 0.1 |
| Other | 0.7 |
| Total | $17.3 |

Long-term assets are estimated to approximate $16.4 million at June 30, 2008.  In the event of liquidation, debt issuance costs and deferred rent would be assumed to have no inherent economic value and would be written down to zero.  Equity investments and other long-term assets would be assumed to have an estimated value of approximately 0% to 5%.

*Note 7:*
At December 31, 2007, the Company had a net operating loss ("NOL") carry forward balance of approximately $142 million.  The value of the NOL would not be realized in liquidation and therefore no recovery is assumed.

*Note 8:*
The costs of liquidation include the following:
- Chapter 7 trustee fees - estimated at 3.0% of the net proceeds from the sale/wind down of assets/business units, net of cash on hand.
- Professional fees - estimated at $1.0 million per month for one month in a best case scenario and three months in a worst case scenario.
- Payroll – estimated to approximate 30 days of payroll expense at $2.3 million per month.  The Worker Adjustment and Retraining Notification Act (29 U.S.C. section 2101) may require 60 days notice for all full-time employees.  The actual payroll expense could be lower to the extent the liquidation is completed more quickly, but could increase to pay necessary stay bonuses or WARN Act liabilities, if applicable.
- General and administrative expenses - estimated to approximate $12.4 million during 2008, adjusted downward by 80% and assumed at one month in a best case scenario and three months in a worst case scenario.

*Note 9:*
Administrative and professional fees claims are paid monthly.  The Debtors are assuming that, at conversion, the remaining fees would approximate $1.0 million in a best case scenario and $2.0 million in a worse case scenario.  Pursuant to the cash collateral orders entered in the cases, certain of these fees would be paid ahead of the claims of the holders of the Floating Rate Notes and the New Notes (described below).

***Note 10:***

As of the Petition Date, the Company had two outstanding secured debt obligations: (1) approximately $205.0 million of Floating Rate Notes issued in 2005 and (2) approximately $21.8 million (principal and PIK interest) of new notes issued in February 2007 ("New Notes"). The Company paid interest on both issues through August 2007. Accrued interest was calculated for the period from August 1, 2007 through the Petition Date. The secured note holders received a distribution of $81.0 million from the Enterprise Sale proceeds in April 2008 and it is assumed that they would receive an additional $15.5 million in reserved funds at liquidation.

| ($ in millions) | Floating Rate Notes | New Notes | Total |
|---|---|---|---|
| Principal | $205.0 | $21.8 | $226.8 |
| Accrued Interest | 14.2 | 1.6 | 15.8 |
| Balance as of Petition Date | 219.2 | 23.4 | 242.6 |
| ZDE Proceeds - April 2008 | (73.2) | (7.8) | (81.0) |
| Subtotal | 146.0 | 15.6 | 161.6 |
| ZDE Proceeds - remaining | (14.0) | (1.5) | (15.5) |
| Total | $132.0 | $14.1 | $146.1 |

***Note 11:***

This category includes all post-petition liabilities identified by the Debtors as not being subject to compromise. The Company estimates the following amount to be owing as of June 30, 2008 (U.S. $ in millions):

| | |
|---|---|
| Accounts payable | $ 2,269 |
| Accrued expenses | 4,557 |
| Accrued executory contract liabilities | 1,233 |
| Total postpetition liabilities | $ 8,059 |

The Debtors have included the full amount of all post-petition liabilities. This analysis assumes that the case would convert to a chapter 7 on or about June 30, 2008.

***Note 12:***

Pre-petition unsecured trade claims as of June 30, 2008 are estimated to approximate $15.6 million, including estimated lease rejection damage claims equal to one year of rent expense.

***Note 13:***

As of the Petition Date, the Company had the following outstanding unsecured funded note obligations: (1) approximately $12.0 million of stub notes remaining from the 2002 financial restructuring and (2) approximately $152.5 million of compounding notes issued in August 2002. The Company paid interest on the stub notes through June 1, 2007 but did not pay interest due on the compounding notes due August 15, 2007. Accrued interest through the petition date for the period from July 1, 2007 for the stub notes and August 15, 2007 for the compounding notes is shown below.

| ($ in millions) | Stub Notes | Compounding Notes | Total |
|---|---|---|---|
| Principal | $12.0 | $152.5 | $164.5 |
| Accrued Interest | 1.0 | 20.8 | 21.9 |
| Balance as of Petition Date | $13.1 | $173.3 | $186.4 |

**Ziff Davis Media**
**Chapter 7 Liquidation Analysis**
(US$000's)
Estimated as of 6/30/2008

| | Notes | Projected Net Book Value as of 3/5/2008 (Unaudited) | Additions and/or (Eliminations) | Remaining Book Value as of as 6/30/2008 Low | High | Estimated Recovery Percentage Low | High | Estimated Liquidation Low | High |
|---|---|---|---|---|---|---|---|---|---|
| Cash | 1 | $ 120,870 | (103,785) | $ 17,085 | $ 17,085 | 100% | 100% | $ 17,085 | $ 17,085 |
| Accounts receivable | 2 | 13,895 | 2,570 | 16,465 | 16,465 | 30% | 60% | 4,940 | 9,879 |
| Prepaid Expenses | 3 | 4,562 | (481) | 4,081 | 4,081 | 0% | 5% | - | 204 |
| Property & equipment, net | 4 | 8,709 | (1,433) | 7,276 | 7,276 | 0% | 5% | - | 364 |
| Goodwill & Intangible assets, net | 5 | 140,765 | (4,358) | 136,407 | 136,407 | 0% | 5% | - | 6,820 |
| Other long-term assets | 6 | 17,337 | (919) | 16,418 | 16,418 | 0% | 5% | - | 821 |
| Tax benefits | 7 | - | - | - | - | 0% | 5% | - | - |
| Total | | $ 306,137 | $ (108,405) | $ 197,732 | $ 197,732 | | | $ 22,025 | $ 35,173 |
| Less: | | | | | | | | | |
| Estimated cost of liquidation | 8 | | | | | 100% | 100% | $ (8,773) | $ (4,508) |
| Admin/professional claims | 9 | | | $ (2,000) | $ (1,000) | 100% | 100% | $ (2,000) | $ (1,000) |
| Secured lender claims | 10 | | | $ (141,068) | $ (141,068) | 8% | 21% | $ (11,252) | $ (29,665) |
| Amount available for (shortfall to) post-petition trade and unsecured | | | | | | | | $ - | $ - |
| Post-petition liabilities | 11 | | | $ (8,059) | $ (8,059) | 0% | 0% | $ - | $ - |
| Unsecured trade claims | 12 | | | $ (15,600) | $ (15,600) | 0.0% | 0.0% | $ - | $ - |
| Unsecured note claims | 13 | | | $ (186,389) | $ (186,389) | 0.0% | 0.0% | $ - | $ - |

*This analysis should be read only in conjunction with the assumptions, qualifications and explanations set forth in the attached assumptions and those in the Disclosure Statement, including, without limitation, those set forth in Section X.C "Best Interests Test", Section X.D "Liquidation Analysis", Section X.E "Application of the 'Best Interests' of Creditors Test to the Liquidation Analysis" and Article XI "Alternatives to Confirmation and Consummation of the Plan."*

## **Appendix E**

Historical Financial Data

### ZIFF DAVIS HOLDINGS INC.
### CONSOLIDATED BALANCE SHEETS
(dollars in thousands)

| | | As of March 5, 2008 (unaudited) | | As of December 31, 2007 (unaudited) | | As of December 31, 2006 (audited) [1] |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | | $ 120,870 | | $ 122,454 | | $ 15,369 |
| Accounts receivable, net | | 13,895 | | 16,320 | | 17,096 |
| Prepaid expenses and other current assets | | 4,562 | | 3,806 | | 2,876 |
| Assets of business held for sale | | - | | - | | 15,761 |
| Total current assets | | 139,327 | | 142,580 | | 51,102 |
| Property and equipment, net | | 8,709 | | 9,705 | | 14,212 |
| Intangible assets, net | | 120,018 | | 122,198 | | 135,294 |
| Goodwill, net | | 20,746 | | 20,746 | | 20,746 |
| Other assets, net | | 17,337 | | 17,874 | | 18,760 |
| Assets of business held for sale | | - | | - | | 59,664 |
| Total assets | | $ 306,137 | | $ 313,103 | | $ 299,778 |
| **LIABILITIES** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | | $ 11,764 | | $ 9,298 | | $ 12,855 |
| Accrued expenses and other current liabilities | (2) | 53,265 | | 46,888 | | 32,058 |
| Unexpired subscriptions and deferred revenue, net | | 12,100 | | 11,599 | | 15,592 |
| Liabilities of business held for sale | | - | | - | | 11,555 |
| Debt expected to be currently due | (3) | 391,471 | | 391,195 | | - |
| Total current liabilities | | 468,600 | | 458,980 | | 72,060 |
| Long-term debt | | - | | - | | 369,764 |
| Accrued interest - troubled debt restructuring | | 23,935 | | 26,671 | | 43,084 |
| Accrued expenses - long term | | 5,405 | | 5,405 | | 6,058 |
| Mandatorily redeemable preferred stock | | 1,128,087 | | 1,107,900 | | 996,578 |
| Other non-current liabilities | | 11,062 | | 10,963 | | 10,612 |
| Liabilities of business held for sale | | - | | - | | 1,984 |
| Total liabilities | | 1,637,089 | | 1,609,919 | | 1,500,140 |
| Stockholders' deficit | | | | | | |
| Common stock | | 17,329 | | 17,329 | | 17,329 |
| Additional paid-in capital | | 8,468 | | 8,468 | | 8,468 |
| Accumulated deficit | | (1,356,749) | | (1,322,613) | | (1,226,159) |
| Total stockholders' deficit | | (1,330,952) | | (1,296,816) | | (1,200,362) |
| Total liabilities and stockholders' deficit | | $ 306,137 | | $ 313,103 | | $ 299,778 |

Notes:

(1) As restated to report assets and liabilities of business held for sale, see latest publicly filed report (June 30, 2007 10-Q/A)

(2) Includes accrued interest payable

(3) Reported as current liabilities as required by US GAAP due to default under the applicable indentures (failure to pay interest)

# Ziff Davis Holdings Inc.
## Consolidated Statement of Operations
### (dollars in thousands)

| | For the 2008 period ended March 5, 2008 (unaudited) | for the years ended December 31, 2007 (unaudited) | 2006 (audited) |
|---|---|---|---|
| Revenue, net | $ 9,053 | $ 114,755 | $ 181,017 |
| Operating expenses: | | | |
| Cost of production | 2,674 | 28,846 | 48,991 |
| Selling, general and administrative expenses | 7,239 | 73,701 | 104,890 |
| Non-cash employee stock compensation expense, (income) | - | (612) | 3 |
| Depreciation and amortization of property and equipment | 1,266 | 8,086 | 7,628 |
| Amortization of intangible assets | 2,179 | 15,597 | 17,908 |
| Restructuring charges, net | - | 2,974 | 510 |
| Impairment charge | - | - | 4,064 |
| Acquisition related compensation | - | - | 3,107 |
| Transaction related expenses | - | 3,050 | 409 |
| Financial restructuring expenses | 2,795 | 2,274 | - |
| (Gain)/Loss on sale of Enterprise Group assets, net | (2,127) | (66,186) | - |
| Loss in equity investment | - | 325 | 322 |
| Total operating expenses | 14,026 | 68,055 | 187,832 |
| Income (loss) from operations | (4,973) | 46,700 | (6,815) |
| Interest expense, net | (28,303) | (143,013) | (126,823) |
| Loss before income taxes | (33,276) | (96,313) | (133,638) |
| Income tax provision | - | 141 | 112 |
| Net loss | $ (33,276) | $ (96,454) | $ (133,750) |

Note:

The consolidated statements of operations for the years ended December 31, 2006 and 2007 as presented above include the revenue and expenses of Ziff Davis Enterprise Group through the sale of that business on July 31, 2007. Preparation of audited financial statements for those periods (2006 to be restated) will require the revenues and expenses of operations for Ziff Davis Enterprise Group to be extracted and presented as a separate line on the consolidated statement of operations entitled 'income from discontinued operations'.

## **Appendix F**

Causes of Action Against the Debtors
Pending on the Petition Date

- *Libecom Publications Printing v. Ziff Davis Media Inc.* In May 2004, Ziff Davis Media Inc. (the "Company") gave notice of its election not to renew the existing license agreement pursuant to which the licensee (the "Former Licensee") was licensed to publish the Greek edition of *PC Magazine*. In July 2004, the Company was informed that the Former Licensee had commenced litigation in Greece against the Company. In December 2004, a Greek court denied plaintiff's request for an injunction against the Company, and granted the Company's request for an injunction against plaintiff. In December 2004, the Company was informed that the Former Licensee sued the Company in Greece for damages. In April 2005, the Company was informed that the Former Licensee sued the Company's current licensee and one of its employees. In January 2007, a hearing was held concerning the Company's counterclaims against the Former Licensee. In August 2007, the Company was informed that the court will not issue a ruling on the Company's counterclaims as heard in such January 2007 hearing because the Former Licensee did not take the procedural steps necessary to have its claims against the Company heard at such time. A hearing concerning the Company's counterclaims against the Former Licensee and the Former Licensee's claims is now scheduled for May 14, 2008.

- *800 Jorie Blvd., L.L.C. v. Ziff Davis Publishing Inc.*, *Ziff Davis Media Inc. and CNET Networks, Inc.* In May 2007, 800 Jorie Blvd. L.L.C. (the "Landlord") commenced an action against Ziff Davis Publishing Inc. and Ziff Davis Media Inc. (together, the "Company") seeking payment of amounts allegedly owed pursuant to the Company's lease of certain real property in Oak Brook, Illinois ("Lease") that the Company formerly had occupied in connection with its Game Group but which the Company had not occupied for more than a year. The Company has filed an answer and affirmative defenses to the Landlord's complaint. CNET Networks, Inc., as successor to ZD, Inc., a party to the Lease ("CNET"), has filed a cross-claim against the Company alleging that the Company's predecessor counsel at Kirkland & Ellis agreed in open court that the Company would assume defense of CNET in the lawsuit; the Company answered CNET's cross-claim in October 2007. The parties are in the process of discovery.

- *Ziff Davis Publishing Inc. v. Sandor Marketing Group, Inc.*, No. 02-020118, Supreme Court of New York State, County of Nassau. In December 2002, Ziff Davis Publishing Inc. ("Ziff Davis Publishing") sued Sandor Marketing Group, Inc. ("Sandor") for breach of contract to recover $25,259.85. On February 25, 2003, Sandor filed a counterclaim against Ziff Davis Publishing, alleging fraudulent marketing practices. Ziff Davis Publishing served discovery requests on Sandor, and Sandor responded. Sandor has taken no actions against Ziff Davis Publishing to prosecute its counterclaim. Sandor has not served any discovery requests on Ziff Davis Publishing and has failed to respond in a timely manner to discovery requests and correspondence. On January 12, 2004, Ziff Davis Publishing served requests for admission on Sandor. Sandor responded to these requests on February 27, 2004. No judge currently is assigned to this case, and no discovery deadline is in place at this time.